# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES

YDD CORPORATION LLP AND
TNC KAZCHROME JSC,

               Consolidated Plaintiffs,

v.

UNITED STATES,

                   Defendant,

and

CC METALS AND ALLOYS, LLC
AND FERROGLOBE USA, INC.,

           Defendant-Intervenors.

**Consol. Ct. No. 25-00100**


**NON-CONFIDENTIAL
VERSION**

**Business Proprietary
Information Contained in
Brackets ("[]") and
Removed From Pages 8-10,
13, 19, and 21**

## CONSOLIDATED PLAINTIFF'S RULE 56.2 MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD

Christine M. Streatfeild
Justin R. Becker
Lauren Shapiro

**Baker & McKenzie LLP**
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

*Counsel to Consolidated Plaintiff TNC
Kazchrome JSC*

November 7, 2025

# **TABLE OF CONTENTS**

I.    RULE 56.2 STATEMENT ....................................................................1

   A.  Administrative Determination to Be Reviewed ...............................1

   B.  Issues Presented and Summary of Argument.................................2

II.   STATEMENT OF FACTS ..................................................................4

III.  STANDARD OF REVIEW ...............................................................15

IV.   ARGUMENT......................................................................................17

   A.  Commerce's Selection of Date of Sale is Unsupported by Substantial
   Evidence and Not in Accordance with Law .......................................17

   1.  Commerce's Decision Not to Use the Final Invoice Date as the Date of Sale
   Is Unsupported by Substantial Evidence and Not in Accordance with Law .......17

   2.  Commerce's Use of the Shipment Date as the Date of Sale Is Unsupported
   by Substantial Evidence and Not in Accordance with Law ................................19

V.    CONCLUSION.................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altx, Inc. v. United States*,
    167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) .......................................16

*ArcelorMittal USA LLC v. United States*,
    302 F.Supp.3d 1366 .......................................16

*Atlantic Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) .......................................15

*Chemours Company FC, LLC v. United States*,
    443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) .......................................16

*Hitachi Energy USA Inc. v. United States*,
    34 F.4th 1375 (Fed. Cir. 2022) .......................................22

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) .......................................15

*Nucor Corp. v. United States*,
    612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) .......................................18

*Saha Thai Steel Pipe Pub. Co., LTD v. United States*,
    605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) .......................................22

*Sahaviriya Steel Industries Public Co. Ltd. v. United States*,
    714 F. Supp. 2d 1263 (Ct. Int'l Trade 2010), *aff'd*, 649 F.3d 1371
    (Fed. Cir. 2011) .......................................18

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) .......................................15

*USEC Inc. v. United States*,
    498 F. Supp. 2d 1337 (Ct. Int'l Trade 2007) .......................................17

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................15

19 U.S.C. § 1677b(a)(1)(A)....................................................................16

**Regulations**

19 C.F.R. § 351.401(i)...............................................................2, 17, 18, 19

**Administrative Determinations**

*Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian
Federation: Initiation of Less-Than-Fair-Value Investigations*, 89
Fed. Reg. 31,137 (Dep't of Commerce, Apr. 24, 2024) .......................5

*Ferrosilicon From Kazakhstan: Preliminary Affirmative
Determination of Sales at Less Than Fair Value, Preliminary
Negative Determination of Critical Circumstances, Postponement
of Final Determination, and Extension of Provisional Measures*,
89 Fed. Reg. 88,007 (Dep't of Commerce, Nov. 6, 2024) ..................11

*Ferrosilicon From Malaysia: Amended Final Determination of Sales
at Less Than Fair Value; Ferrosilicon From Brazil, Kazakhstan,
and Malaysia: Antidumping Duty Orders*, 90 Fed. Reg. 21,456
(Dep't of Commerce, May 20, 2025)......................................................1

*Ferrosilicon from the Republic of Kazakhstan: Final Affirmative
Determination of Sales at Less-Than-Fair-Value and Final
Negative Determination of Critical Circumstances*, 90 Fed. Reg.
14,077 (Dep't of Commerce, Mar. 28, 2025) .........................................1

**Other Authorities**

*Antidumping Duties; Countervailing Duties: Final Rule*, 62 Fed. Reg.
27,296, 27,349 (May 19, 1997).............................................................18

## I.    RULE 56.2 STATEMENT[1]

### A.  Administrative Determination to Be Reviewed

Consolidated Plaintiff seeks judicial review of the Final Determination issued by the U.S. Department of Commerce ("Commerce") in the antidumping duty ("AD") investigation of ferrosilicon from the Republic of Kazakhstan (Case No. A-834- 812).  The period of investigation ("POI") was January 1, 2023, through December 31, 2023.  Notice of the final determination was published in the *Federal Register* on March 28, 2025.  *See Ferrosilicon from the Republic of Kazakhstan: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 14,077 (Dep't of Commerce, Mar. 28, 2025) ("Final Determination"), P.R. 280; *see also* accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of the Less-Than-Fair-Value Investigation of Ferrosilicon from Kazakhstan*, Case No. A-834-812 (Mar. 21, 2025) ("Final IDM"), P.R. 272. Commerce published the Order, based on the Final Determination, in the *Federal Register* on May 20, 2025.  *See Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less Than Fair Value; Ferrosilicon From Brazil,*

---

[1]    In this memorandum of law, where there are citations to the same document in both the confidential record and the public record, the Court should rely on the public record version to confirm the bracketing of confidential information.

1

*Kazakhstan, and Malaysia: Antidumping Duty Orders*, 90 Fed. Reg. 21,456 (Dep't

of Commerce, May 20, 2025) ("Order"), P.R. 288.

**B.  Issues Presented and Summary of Argument**

**1.  Did Commerce lawfully use the shipment date as the date of sale for Kazchrome's U.S. sales even though Commerce itself identified a later date that controlled all material terms between the foreign producer and the sole U.S. customer and then Commerce validated those precise dates?**

No.  Commerce erroneously used the shipment date as the date of sale for

Kazchrome's U.S. sales, even though the record demonstrated that the final invoice

date was the date upon which the material terms of sale were finalized. The U.S.

sales record in this investigation is remarkable straightforward as all sales were

made to one U.S. customer based on a single contract that set out the terms and

document flow.  The record therefore established that the material terms of sale

were set on the final invoice date – which is the final date and amount that

triggered payment – and as such, the regulations at 19 C.F.R. § 351.401(i)

obligated Commerce to use that date as the date of sale.  The use of the shipment

date as the date of sale instead of the final invoice date caused Commerce to

calculate Kazchrome's dumping margin based on an incorrect universe of sales –

and unlawfully resulted in a margin being created where there was none.  The final

dumping margin therefore was legally and factually flawed.

Case 1:25-cv-00100-JCG    Document 31-1    Filed 11/07/25    Page 7 of 29

Consol. Ct. No. 25-00100                           NON-CONFIDENTIAL VERSION

> **2. Alternatively, where Commerce preliminarily determined that the date of "title transfer" (as defined in the parties' contract) was the date on which material terms were final and all such dates and verifying records were submitted and fully validated, is Commerce's decision to then ignore that date supported by substantial evidence and in accordance with law?**

No.  Commerce incorrectly dismissed the dates of title transfer as the date of sale for Kazchrome's U.S. sales when, at a minimum, it should have used these dates through which terms of sale changed *after* the preceding shipment dates. Commerce requested detailed narratives and supporting documentation to allow it to conduct a fulsome review of the producer's sales to the sole U.S. customer, and then upon obtaining the detailed trace, Commerce ignored it.  Commerce's ultimate decision to reject the reported dates of title transfer as the date of sale relied on unsupported findings that: (1) the record lacked sufficient documentation to support the dates of title transfer; (2) Kazchrome did not argue in its sales case brief for the use of the title transfer date as the date of sale; and (3) the lack of inclusion in the U.S. sales database is sufficient to reject substantial evidence on the record.  To the contrary, all title transfer dates were reported and tied to each specific sale on the record; Kazchrome did argue for the use of the title transfer dates as an alternative to the final invoice date in its sales case brief; and the fact that the date was not an express field in  the U.S. sales database is of no legal consequence at all. The key issue is that Commerce's selection of the shipment date

as the date of sale was not supported by substantial evidence and was otherwise not in accordance with law because the record establishes that the material terms of sale were not final upon shipment.

## II.    STATEMENT OF FACTS

On March 28, 2024, CC Metals and Alloys, LLC and Ferroglobe USA, Inc. (collectively "Petitioners") filed a petition for AD and countervailing duty ("CVD") measures on imports of ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia. *See Ferrosilicon from Brazil, Malaysia, the Republic of Kazakhstan, and the Russian Federation: Petitions for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended, on Behalf of CC Metals and Alloys LLC and Ferroglobe USA, Inc.*, Case Nos. A-351-860, A-834-812, A-557-828, A-821-838, C-351-861, C-834-813, C-557-829, and C-821-839 (Mar. 28, 2024) ("Petition"), P.R. 1.  Ferrosilicon is a silver-colored "ferroalloy of iron and silicon" that may also contain "very small proportions of minor elements, including aluminum, calcium, carbon, manganese, phosphorus, and sulfur."  Petition, at 3-4, P.R. 1.  As explained in the Petition, Ferrosilicon is "used primarily in steel and cast-iron production."  Petition, at 8, P.R. 1.  Specifically, ferrosilicon can be used to deoxidize molten steel (which "is necessary to permit casting of the steel without undesirable bubbles in the solidified steel"); as an agent to enhance the chromium content in stainless steel;

and as an input in the production of "certain steel alloys, including electrical steel."
Petition, at 8, P.R. 1.  Atomized ferrosilicon can also be combined with water and
used to separate mineral ore in mining operations, or used as a coating for welded
rod to enhance deoxidization.  Petition, at 8, P.R. 1.

After receiving the Petition, Commerce initiated AD investigations with
respect to ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia on April 17,
2025.  *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian
Federation: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg.
31,137 (Dep't of Commerce, Apr. 24, 2024), P.R. 24.

On May 8, 2024, Commerce initially selected TELF and YDD Corporation
as the mandatory respondents in its AD investigation.  *See Memorandum to The
File from Mira Warrier, International Trade Compliance Analyst, Office II,
Antidumping and Countervailing Duty Operations, Less-Than-Fair Value
Investigation of Ferrosilicon from Kazakhstan: Respondent Identification*, Case
No. A-834-812 (May 8, 2024), P.R. 32.  However, upon receipt of information
submitted by TELF and Kazchrome which demonstrated Kazchrome to be the first
party with knowledge of the U.S. destination of TELF's exports of subject
merchandise, Commerce revised its respondent selection, replacing TELF with
Kazchrome.  *See Memorandum to James Maeder, Deputy Assistant Secretary for
Antidumping and Countervailing Duty Operations, from Minoo Hatten, Director,*

*Office II, Antidumping and Countervailing Duty Operations, Ferrosilicon from*

*Kazakhstan: Respondent Identification Memorandum – Clarification*, Case No. A-

834-812 (Jun. 10, 2024), P.R. 55.

Commerce then conducted an individual investigation of Kazchrome, during

which Kazchrome submitted responses to all questionnaires issued and other

relevant information required by Commerce. *See Letter from Baker McKenzie*

*LLP to the Hon. Gina Raimondo, Kazchrome's Section A Questionnaire Response*,

Case No. A-834-812 (Jul. 8, 2024) ("Kazchrome's AQR"), P.R. 70-76/C.R. 40-51;

*Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, Kazchrome's*

*Sections B-C Questionnaire Response*, Case No. A-834-812 (Aug. 5, 2024)

("Kazchrome's BCQR"), P.R. 89-90/C.R. 103-111; *Letter from Baker McKenzie*

*LLP to the Hon. Gina Raimondo, Kazchrome's Section D Questionnaire Response*,

Case No. A-834-812 (Aug. 14, 2024) ("Kazchrome's DQR"), P.R. 103/C.R. 166-

174; *Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, Kazchrome's*

*Section A-C Supplemental Questionnaire Response*, Case No. A-834-812 (Sept. 16,

2024) ("Kazchrome's A-C SQR1"), P. R. 122/C.R. 179-188; *Letter from Baker*

*McKenzie LLP to the Hon. Gina Raimondo, Kazchrome's Section D Supplemental*

*Questionnaire Response*, Case No. A-834-812 (Oct. 4, 2024) ("Kazchrome's

DSQR1"), P.R. 148/C.R. 237-248; *Letter from Baker McKenzie LLP to the Hon.*

*Gina Raimondo, Kazchrome's Second Sections A-C Supplemental Questionnaire*

Case 1:25-cv-00100-JCG    Document 31-1    Filed 11/07/25    Page 11 of 29

Consol. Ct. No. 25-00100                                    NON-CONFIDENTIAL VERSION

*Response*, Case No. A-834-812 (Oct. 9, 2024) ("Kazchrome's A-C SQR2"), P.R. 150/C.R. 250-253; *Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, Kazchrome's Response to the Department's October 16, 2024 Memorandum*, Case No. A-834-812 (Oct. 16, 2024) ("Kazchrome's October 16 Submission"), P.R. 158/C.R. 259; *Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, Kazchrome's Second Section D Supplemental Questionnaire Response*, Case No. A-834-812 (Oct. 22, 2024) ("Kazchrome's DSQR2"), P.R. 169-170/C.R. 312-318; *Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, Kazchrome's Third Sections A-C Supplemental Questionnaire Response,* Case No. A-834-812 (Oct. 24, 2024) ("Kazchrome's A-C SQR3"), P.R. 175/C.R. 319-324.

In its submissions to Commerce, Kazchrome explained its U.S. sales process in detail and disclosed that 100 percent of its sales during the POI were to TELF, meaning that the document trail to the U.S. customer was largely consistent for all U.S. sales. Kazchrome also explained that as part of this U.S. sales process— which was governed by a detailed, long-term contract between Kazchrome and TELF—Kazchrome issued provisional and final invoices to TELF. *See* Kazchrome's AQR, at 19, 22, P.R. 70-76/C.R. 40-51; Kazchrome's BCQR, at C-16, C-18 – C-19, P.R. 89-90/C.R. 103-111. The provisional invoice included an estimated sales price that was used to calculate an initial payment for purposes of shipment. *See* Kazchrome's BCQR, at C-18, P.R. 89-90/C.R. 103-111. This initial

BUSINESS PROPRIETARY
INFORMATION      NON-CONFIDENTIAL VERSION
HAS BEEN DELETED

payment effectively served as a deposit for the sale. The provisional invoice price

was based in part on **[                                    ]**. *See* Kazchrome's

October 16 Submission, at Attachment I, P.R. 158/C.R. 259. More specifically,

the provisional price would typically be calculated with reference to a **[**


**]**.

After Kazchrome shipped the merchandise and issued the provisional

invoice to TELF, TELF would pay **[    ]** percent of the provisional invoice price.

*See* Kazchrome's BCQR, at C-18, P.R. 89-90/C.R. 103-111. TELF would then

generate a notice of title transfer, and at that time title to the merchandise would

transfer to TELF. The transfer of title would trigger TELF to send a separate

pricing schedule to Kazchrome. *See* Kazchrome's October 16 Submission, at

Attachment I, P.R. 158/C.R. 259. The final price for the merchandise would be

based on this pricing schedule if Kazchrome accepts the price. If Kazchrome

accepted the price, it would acknowledge acceptance by issuing a final invoice

with that price to TELF. In this way, the final invoice price triggers the actual final

payment and is the point in the transaction when price is formally established. The

date of title transfer (which triggers TELF's issuance of the pricing schedule) is

significant in that it establishes the final price if Kazchrome accepted TELF's

pricing schedule. At which point, the acceptance is memorialized in the final invoice.

The prices reflected in Kazchrome's final invoices differed from the prices reflected in its provisional invoices. *See* Kazchrome's BCQR, at Exhibit B-4, P.R. 89-90/C.R. 103-111; Kazchrome's A-C SQR1, at Exhibit B-4 (Revised), P. R. 122/C.R. 179-188; Kazchrome's A-C SQR3, at Exhibit B-4 (Revised 2), P.R. 175/C.R. 319-324. While provisional and final prices were calculated with reference to one another, adjustments could be (and were) made that resulted in differences between these prices. As noted above, the provisional price would generally be calculated with reference to a [

]. The subsequent final price, however, may then differ from its related provisional price as a result of adjustments made for certain items, such as [

]. *See* Kazchrome's October 16 Submission, at Attachment I, P.R. 158/C.R. 259.

9

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

As explained above, TELF paid **[      ]** percent of the provisional invoice price before it issued the pricing schedule to Kazchrome. Upon Kazchrome's acceptance of the pricing schedule and issuance of the final invoice, the difference between the provisional invoice payment and the final invoice price would be paid by or reimbursed to TELF, if the provisional invoice payment was lower or higher, respectively, than the final price. In any event, the ultimate price paid by TELF for the quantity shipped was not established until Kazchrome accepted TELF's pricing schedule and issued the final invoice.

 Kazchrome thoroughly explained and provided documentation to corroborate the sequence of events in its U.S. sales process, including the changes in price. In particular, Kazchrome highlighted the key provisions of the governing contract between itself and TELF, as well as the dates of the provisional invoices, the notices of title transfer, and the final invoices. *See* Kazchrome's BCQR, at Exhibit B-4, Exhibit C-1, P.R. 89-90/C.R. 103-111; Kazchrome's A-C SQR1, at Exhibit B-4 (Revised), Exhibit C-1 (Revised), P. R. 122/C.R. 179-188; Kazchrome's A-C SQR2, at Exhibit C-1 (Revised 2), P.R. 150/C.R. 250-253; Kazchrome's A-C SQR3, at Exhibit B-4 (Revised 2), P.R. 175/C.R. 319-324; Kazchrome's October 16 Submission, Attachment I, P.R. 158/C.R. 259. Crucially, Kazchrome provided the dates of title transfer in the **[                      ]** Report included in Kazchrome's original and revised sales reconciliations. *See*

Kazchrome's BCQR at Exhibit B-4, P.R. 89-90/C.R. 103-111; Kazchrome's A-C

SQR1 at Exhibit B-4 (Revised), P. R. 122/C.R. 179-188; Kazchrome's A-C SQR3

at Exhibit B-4 (Revised 2), P.R. 175/C.R. 319-324.

On November 6, 2024, Commerce published its Preliminary Determination.

*See Ferrosilicon From Kazakhstan: Preliminary Affirmative Determination of*

*Sales at Less Than Fair Value, Preliminary Negative Determination of Critical*

*Circumstances, Postponement of Final Determination, and Extension of*

*Provisional Measures*, 89 Fed. Reg. 88,007 (Dep't of Commerce, Nov. 6, 2024)

("Preliminary Determination"), P.R. 199; *see also accompanying Decision*

*Memorandum for the Preliminary Affirmative Determination in the Less-Than-*

*Fair-Value Investigation of Ferrosilicon from Kazakhstan*, Case No. A-834-812

(Oct. 31, 2024) ("Preliminary IDM"), P.R. 184.  In its Preliminary Determination,

Commerce decided that the material terms of sale for Kazchrome's U.S. sales were

set upon the date of title transfer, but then went on to incorrectly state that the dates

of title transfer for the reported U.S. sales were not on the record.  *See* Preliminary

IDM, at 15, P.R. 184; *see also Memorandum to The File from Samantha Kinney,*

*Senior International Trade Compliance Analyst, AD/CVD Operations, Office II,*

*Preliminary Determination Margin Calculation for TNC Kazchrome JSC*, Case

No. A-834-812 (Oct. 31, 2024), at 3 ("Preliminary Margin Calculation Memo"),

P.R. 188/C.R. 331.  This was demonstrably untrue; yet, Commerce relied on this

erroneous gap to apply its default practice of using the earlier of invoice date or shipment date as the date of sale.  *See* Preliminary IDM, at 15, P.R. 184.  Using the shipment date, Commerce captured U.S. sales that should not have been included as part of Kazchrome's dumping margin because they predated the POI and therefore fell out of the scope of the investigation.  When these sales were incorrectly captured, Kazchrome's margin went from *de minimis* to more than 6 percent.

After Commerce issued its Preliminary Determination, it conducted an on-site sales verification for Kazchrome.  *See Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, Kazchrome's Sales Verification Exhibits*, Case No. A-834-812 (Dec. 2, 2024) ("Kazchrome's Sales Verification Exhibits"), P.R. 213/C.R. 443-456.  During the verification, Kazchrome fully supported its previous reporting to Commerce that the date on which the material terms were set (namely, the ultimate price paid by TELF) was the final invoice date.  *See* Kazchrome's Sales Verification Exhibits, at Exhibits SVE-3 & SVE-4, P.R. 213/C.R. 443-456.  Kazchrome also demonstrated to Commerce that the dates of title transfer were previously on the record and demonstrated that the title transfer dates tied fully through to its original books and records for all U.S. sales.  *See* Kazchrome's Sales Verification Exhibits, at Exhibit SVE-4 (citing to Exhibit B-4 (Revised 2) of Kazchrome's A-C SQR3), P.R. 213/C.R. 443-456.

12

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

On December 23, 2024, after completion of the verification process, Commerce issued its sales verification report. *See Verification of the Sales Response of TNC Kazchrome JSC in the Less-Than-Fair-Value Investigation of Ferrosilicon from Kazakhstan*, Case No. A-834-812 (Dec. 23, 2024) ("Sales Verification Report"), P.R. 227/C.R. 482. In the verification report, Commerce acknowledged that Kazchrome representatives further explained the company's U.S. sales process, confirming the accuracy of Kazchrome's submissions. Specifically, Commerce acknowledged company officials' explanations that: (1) Kazchrome's U.S. sales are governed by a contract with TELF; (2) pursuant to this contract, Kazchrome first issues a provisional invoice to TELF and "TELF prepays [                    ] of the price" on that invoice; (3) "it is not until the final invoice that the final price and quantity are set"; and (4) based on the price in the final invoice, TELF will either owe Kazchrome an additional payment or will be reimbursed for the amount by which its provisional payment exceeded the final invoice price. *See* Sales Verification Report, at 5-6, P.R. 227/C.R. 482. In addition, Commerce acknowledged company officials' explanation that the date of notice of title transfer is used to calculate the final price—which is then reflected in TELF's pricing schedule issued to Kazchrome—but that the final price is established once Kazchrome accepts this price by issuing a final invoice. *See* Sales Verification Report, at 6-7, P.R. 227/C.R. 482. Commerce noted that these

Case 1:25-cv-00100-JCG    Document 31-1    Filed 11/07/25    Page 18 of 29

Consol. Ct. No. 25-00100                                    NON-CONFIDENTIAL VERSION

explanations from company officials aligned with sales process documentation provided by Kazchrome. *See* Sales Verification Report, at 6, P.R. 227/C.R. 482.

After the issuance of the sales verification report, Kazchrome timely submitted case and rebuttal briefs focused on sales-related information based on Commerce's instructions. *See Kazchrome Sales Case Brief*, Case No. A-834-812 (Jan. 14, 2025) ("Kazchrome's Sales Case Brief"), P.R. 237/C.R. 488; *Kazchrome Sales Rebuttal Brief*, Case No. A-834-812 (Jan. 21, 2025), P.R. 241/C.R. 492. Kazchrome addressed Commerce's date of sale selection in its sales case brief and described in detail the factual information on the record that proved that the final invoice date was the date upon which the material terms of sale were finalized – in particular, price. Kazchrome also reiterated that the dates of title transfer were on the record for Commerce to use should it continue to find the key triggering date was the title transfer date (per its Preliminary Determination analysis and conclusion) and therefore the appropriate date of sale. *See Kazchrome's Sales Case Brief*, at 6 (citing to Kazchrome's BCQR, at Exhibit B-4; Kazchrome's A-C SQR1, at Exhibit B-4 (Revised); Kazchrome's A-C SQR3, at Exhibit B-4 (Revised 2)), P.R. 237/C.R. 488; *Kazchrome's Sales Verification Exhibits*, at Exhibits SVE-4 & SVE-6, P.R. 213/C.R. 443-456.

On March 28, 2025, Commerce published its Final Determination in the Federal Register. *See* Final Determination, P.R. 280; *see also* Final IDM, P.R.

14

272.  In its Final Determination, Commerce continued to use the shipment date as

the date of sale for Kazchrome's U.S. sales.  *See* Final IDM, at 7, P.R. 272.  It did

so on the unsupported bases that record information did not support or was

insufficient to support the use of the final invoice date or title transfer date as the

date of sale.

## III.    STANDARD OF REVIEW

This Court must "hold unlawful any determination, finding, or conclusion

found . . . to be unsupported by substantial evidence on the record, or otherwise not

in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

To satisfy the "substantial evidence" standard, Commerce must take into

account "the entire record, including whatever fairly detracts from the

substantiality of the evidence."  *Atlantic Sugar, Ltd. v. United States*, 744 F.2d

1556, 1562 (Fed. Cir. 1984); *see also Nippon Steel Corp. v. United States*, 337

F.3d 1373, 1379 (Fed. Cir. 2003).  And the Court may not sustain Commerce's

determination "without taking into account contradictory evidence or evidence

from which conflicting inferences could be drawn."  *Universal Camera Corp. v.

NLRB*, 340 U.S. 474, 487 (1951).

In order to satisfy the "substantial evidence" standard, Commerce must also

provide a reasoned explanation for its determination.  To do so, it must "make the

necessary findings and have an adequate evidentiary basis for its findings," which

requires "examin{ing} the relevant data and articulat{ing} a satisfactory

explanation for its action including a rational connection between the facts found

and the choice made." *Chemours Company FC, LLC v. United States*, 443 F.

Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) (citing *In re NuVasive, Inc.*, 842 F.3d

1376, 1382 (Fed. Cir. 2016)). Commerce "must address significant arguments and

evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v.

United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001).

To be "in accordance with law," Commerce's determination must comply

with the antidumping duty statute and its implementing regulations. In

antidumping duty investigations, the accuracy of Commerce's dumping margin

calculations depends on its proper identification of the date of sale for a

respondent's U.S. sales and home market (or third-country export market) sales.

Proper identification of the date of sale allows Commerce to accurately determine

the universe of U.S. sales that occurred during the POI; to perform accurate foreign

currency conversions where necessary; and to ensure appropriate comparisons

between the U.S. export price (or constructed export price) and the normal value.

*See, e.g.*, 19 U.S.C. § 1677b(a)(1)(A) (defining the "normal value" as "the price {of

the foreign like product} at a time reasonably corresponding to the time of the sale

used to determine the export price or constructed export price."); *see also*

*ArcelorMittal USA LLC v. United States*, 302 F.Supp.3d 1366, 1370 ("The date of

Case 1:25-cv-00100-JCG    Document 31-1    Filed 11/07/25    Page 21 of 29

Consol. Ct. No. 25-00100                                   NON-CONFIDENTIAL VERSION

sale therefore defines the universe of sales that fall within Commerce's {POI}, and

that are subject to Commerce's less than fair value determination.").  Under 19

C.F.R. § 351.401(i), Commerce must use "the date on which the exporter or

producer establishes the material terms of sale" as the date of sale.

## IV.    ARGUMENT

### A.    Commerce's Selection of Date of Sale is Unsupported by Substantial Evidence and Not in Accordance with Law

Commerce's date of sale determination is unsupported by substantial

evidence on the record and otherwise not in accordance with the law.  Specifically,

Commerce's decision to identify the date of sale for Kazchrome's U.S. sales as the

date on which the product was shipped, rather than when the final terms of sale

were established, ignores and contradicts substantial record evidence

demonstrating that the appropriate date of sale for Kazchrome's U.S. sales was the

final invoice date.

#### 1.    Commerce's Decision Not to Use the Final Invoice Date as the Date of Sale Is Unsupported by Substantial Evidence and Not in Accordance with Law

As noted above, under 19 C.F.R. § 351.401(i), Commerce must use "the date

on which the exporter or producer establishes the material terms of sale" as the

date of sale.  The material terms of sale normally include the price, quantity,

delivery terms, and payment terms. *See USEC Inc. v. United States*, 498 F. Supp.

2d 1337, 1343 (Ct. Int'l Trade 2007); *see also Sahaviriya Steel Industries Public*

*Co. Ltd. v. United States*, 714 F. Supp. 2d 1263, 1280 (Ct. Int'l Trade 2010), *aff'd*,

649 F.3d 1371 (Fed. Cir. 2011) ("In its interpretation of material terms of sale, the

Department's practice has evolved to include price, quantity, delivery terms and

payment terms") (citations omitted).  This Court has emphasized that the "date of

sale" analysis must be "a reasoned, case-specific, fact-intensive analysis as to when

the parties had a ***meeting of the minds*** on the material terms of sale." *Nucor Corp.*

*v. United States*, 612 F. Supp. 2d 1264, 1303 (Ct. Int'l Trade 2009) (emphasis

added).  Indeed, in its explanatory notes accompanying the promulgation of 19

C.F.R. § 351.401(i), Commerce stressed that "{a} preliminary agreement on terms,

even if reduced to writing, in an industry where renegotiation is common does not

provide any reliable indication that the terms are truly "established" in the minds of

the buyer and seller." *Antidumping Duties; Countervailing Duties: Final Rule*, 62

Fed. Reg. 27,296, 27,349 (May 19, 1997).

 The record shows that the final price of Kazchrome's U.S. sales to TELF

was not established until Kazchrome accepted TELF's pricing schedule and issued

the final invoice.  Before Kazchrome accepted TELF's pricing schedule and issued

the final invoice, there was no "meeting of the minds" between the parties as to a

material term of sale—*i.e.*, the final price.  The notice of title transfer is important

too in that it triggered TELF to issue the pricing schedule, but the price in that

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

schedule was not set until Kazchrome subsequently accepted it.   Under the

contract, Kazchrome [

].  Kazchrome's October 16

Submission, Attachment I, P.R. 158/C.R. 259 ([

]) (emphasis

added).  The price of the merchandise therefore remained subject to renegotiation,

and thus was not established, until Kazchrome's formal acceptance of TELF's

schedule.  As noted above, Kazchrome communicated its acceptance through

issuance of the final invoice, which memorialized the final terms and triggered the

remaining payments (or credits).  Therefore, Commerce was obligated under 19

C.F.R. § 351.401(i) to use the final invoice date as the date of sale.  Commerce's

determination that the material terms of sale were established before the final

invoice date, and its consequent decision not to use the final invoice date as the

date of sale, were therefore unlawful and cannot be squared with the record

evidence.

>    2.   **Commerce's Use of the Shipment Date as the Date of Sale**
>         **Is Unsupported by Substantial Evidence and Not in**
>         **Accordance with Law**

Case 1:25-cv-00100-JCG    Document 31-1    Filed 11/07/25    Page 24 of 29

Consol. Ct. No. 25-00100                                          NON-CONFIDENTIAL VERSION

Despite information on the record proving that the material terms of

Kazchrome's U.S. sales were only finalized upon issuance of the final invoice,

Commerce used the shipment date as the date of sale in the Final Determination.

*See* Final IDM, at 7, P.R. 272.  Commerce rejected Kazchrome's reported (and

supported) final invoice dates and opted to use the shipment dates as the dates of

sale for four main reasons.  First, as explained in Section IV.A.1 above, Commerce

(incorrectly) found that the material terms of sale were established prior to the final

invoice date.  *See* Final IDM, at 7, P.R. 272.  Second, Commerce inexplicably

claimed (again) that the record does not contain documentation to support the title

transfer dates.  *See* Final IDM, at 7, P.R. 272.  Third, Commerce found that the

date of title transfer was not reported in the U.S. sales database submitted by

Kazchrome, and inexplicably claimed that this justified its dismissal of the title

transfer dates.  *See* Final IDM, at 7, P.R. 272.  And fourth, Commerce claimed that

Kazchrome did not argue for the use of the title transfer date as an alternative date

of sale should Commerce decide not to use the final invoice date.  *See* Final IDM,

at 7, P.R. 272.  Below, Kazchrome addresses each of these additional reasons.  As

Kazchrome explains below, each of these findings by Commerce is not supported

by substantial evidence on the record and is otherwise contrary to law.

Commerce's claim that the record does not contain documentation to support

the title transfer dates is plainly wrong.  Kazchrome reported all of the dates of title

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

transfer for its U.S. sales in the [                              ] Report included in its

original and revised sales reconciliations.  *See* Kazchrome's BCQR at Exhibit B-4,

P.R. 89-90/C.R. 103-111; Kazchrome's A-C SQR1 at Exhibit B-4 (Revised), P. R.

122/C.R. 179-188; Kazchrome's A-C SQR3 at Exhibit B-4 (Revised 2), P.R.

175/C.R. 319-324.  Moreover, Kazchrome provided primary documentation of title

transfer dates (*i.e.*, [                                                                ])

in its sales trace documentation and Sales Verification Exhibits.  *See* Kazchrome's

A-C SQR3, at Exhibit A-14 (Revised), P.R. 175/C.R. 319-324; *see also*

Kazchrome's Sales Verification Exhibits, at Exhibit SVE-4, P.R. 213/C.R. 443-

456.  In short, Kazchrome submitted, and the record maintains, necessary

information and primary documentation to corroborate the reported title transfer

dates for its U.S. sales.

Commerce's reliance on the fact that the title transfer dates were not

included in Kazchrome's U.S. sales database does not justify its rejection of

evidence of all relevant title transfer dates and supporting documentation for each

reported date.  Commerce never instructed nor requested Kazchrome to include the

title transfer date in its U.S. sales database after Commerce first stated its

understanding that the material terms of sale were finalized on the title transfer

date.  If Commerce wished to conclude that Kazchrome's title transfer date

reporting was somehow insufficient because these dates were not included in the

U.S. sales database, Commerce had to notify Kazchrome of deficiencies in its U.S.

sales database and give Kazchrome the opportunity to remedy those deficiencies.

*See Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir.

2022) (quoting *SKF USA Inc. v. United States*, 391 F. Supp. 2d 1327, 1336-1337

(Ct. Int'l Trade 2005)) ("'{i}f the Department wished to place the burden of error

on {the respondent}, it had to make clear and give {the respondent} a chance to

correct the error prior to the issuance of a final decision.'"); *see also Saha Thai*

*Steel Pipe Pub. Co., LTD v. United States*, 605 F. Supp. 3d 1348, 1365 (Ct. Int'l

Trade 2022) ("Under § 1677m(d), Commerce had an obligation to notify Saha Thai

of the alleged deficiencies in its U.S. sales database and provide an opportunity to

remedy.").  In other words, if Commerce wished to justify its use of the shipment

date as the date of sale with the absence of the title transfer dates from

Kazchrome's U.S. sales database, Commerce had to first give Kazchrome an

opportunity to amend its U.S. sales database to include the title transfer dates.

However, Commerce did not provide Kazchrome with any such opportunity.

Therefore, the absence of the title transfer dates from Kazchrome's U.S. sales

database does not support Commerce's date of sale determination.

  Finally, Commerce's statement that Kazchrome did not argue for the use of

the title transfer date as an alternative date of sale in its sales case brief is incorrect.

In its sales case brief, Kazchrome explicitly requested that Commerce use the title

Case 1:25-cv-00100-JCG     Document 31-1     Filed 11/07/25     Page 27 of 29

Consol. Ct. No. 25-00100                                    NON-CONFIDENTIAL VERSION

transfer date in the event that it continued to (incorrectly) find that the material terms of sale were finalized on the title transfer date and not on the final invoice date. *See Kazchrome's Sales Case Brief*, at 4, 6, P.R. 237/C.R. 488.

In sum, all of Commerce's reasons for disregarding Kazchrome's reported (and documented) title transfer dates and selecting the shipment date as the date of sale instead are faulty. Commerce's stated reasons for this decision ignore verified information submitted by Kazchrome, assign invalid importance to the absence of certain information from the U.S. sales database, and completely ignore explicit arguments in Kazchrome's sales case brief. Through these actions, Commerce acted unlawfully with the result of inflating a zero percent dumping margin to more than 6 percent.

## V.    CONCLUSION

Kazchrome fully cooperated and participated in the underlying investigation for more than one year, including through two separate on-site verifications in Kazakhstan. Throughout this process, Kazchrome demonstrated with substantial documentation its sales process with its sole U.S. customer through which a clear document trail existed. The record as a whole confirmed that Kazchrome and its sole U.S. customer established the final quantity and price for its shipments through separate (and documented) steps, including shipment confirmation, a provisional invoice that triggered an initial portion of payment, confirmation of

title transfer, and an exchange on final price that resulted in a final invoice confirming acceptance of that price. Final price was set through the final invoice, and on this basis, the regulations require Commerce to rely on that final invoice date as the date of sale. Commerce's decision to use a significantly earlier and unsupported date had a meaningful and adverse impact on Kazchrome in this case – namely to generate a dumping margin where there was none. The Court should vacate this determination and instruct Commerce to reconsider the date of sale in this investigation.

Dated: November 7, 2025                     Respectfully submitted,

Christine M. Streatfeild
Justin R. Becker
Lauren Shapiro
Baker & McKenzie LLP
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

*Counsel to Consolidated Plaintiff TNC Kazchrome JSC*

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the attached Memorandum of Law in Support of Consolidated Plaintiff TNC Kazchrome JSC's Rule 56.2 Motion for Judgment on the Agency Record, filed November 7, 2025, contains 5,405 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 14,000 word count limitation set forth in the Scheduling Order issued by the Court on September 3, 2025 (ECF No. 29)

Dated: November 7, 2025                    Respectfully submitted,

                                           */s/ Christine M. Streatfeild*
                                           Christine M. Streatfeild
                                           Justin R. Becker
                                           Lauren Shapiro
                                           Baker & McKenzie LLP
                                           815 Connecticut Avenue, N.W.
                                           Washington, DC 20006-4078
                                           Tel.: (202) 835-6111
                                           christine.streatfeild@bakermckenzie.com

                                           *Counsel to Consolidated Plaintiff TNC
                                           Kazchrome JSC*