**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES**

---

YDD CORPORATION LLP, *et al.,*

       Plaintiffs,

       v.

UNITED STATES OF AMERICA,

       Defendant,

       and

CC METALS AND ALLOYS, LLC AND
FERROGLOBE USA, INC.,

       Defendant-Intervenors.

**PUBLIC VERSION**

Consol. Court No. 25-00100

Business Proprietary Information
Removed Between Single Brackets [ ]

---

**PLAINTIFF YDD CORPORATION LLP'S RULE 56.2
MOTION FOR JUDGMENT ON THE AGENCY RECORD
AND MEMORANDUM IN SUPPORT THEREOF**

Matthew J. McConkey
Ryan R. Migeed
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3235
*Counsel to YDD Corporation LLP*

Dated: November 7, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES**

YDD CORPORATION LLP, *et al.,*

        Plaintiffs,

        v.

UNITED STATES OF AMERICA,

        Defendant,

        and

CC METALS AND ALLOYS, LLC AND
FERROGLOBE USA, INC.,

        Defendant-Intervenors.

Consol. Court No. 25-00100

**PLAINTIFF YDD CORPORATION LLP'S RULE 56.2
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the Court of International Trade, YDD Corporation

LLP ("Plaintiff" or "YDD"), hereby moves for judgment on the agency record with respect to the

issues raised in YDD's Complaint filed with the Court on July 7, 2025. *YDD Corp. v. United

States et al.*, No. 25-00100, ECF No. 7 (July 7, 2025) ("Compl.").

Plaintiff YDD challenges the U.S. Department of Commerce's ("Commerce") final

determination in the antidumping investigation covering Ferrosilicon from Kazakhstan,

published in the *Federal Register* on March 28, 2025. *Final Affirmative Determination of Sales

at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 90 Fed.

Reg. 14077 (Dep't Commerce Mar. 28, 2025) ("*Final Determination*"). As demonstrated in

Plaintiff's brief in support of this motion, Commerce's *Final Determination* is not supported by

substantial evidence and is otherwise not in accordance with law. Plaintiff, therefore,

respectfully requests that this Court grant judgment in its favor and remand the *Final

Determination* to Commerce for reconsideration consistent with the opinion of this Court.

Respectfully submitted,

Matthew J. McConkey
Ryan R. Migeed
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3235
*Counsel to YDD Corporation LLP*

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES

YDD CORPORATION LLP, *et al.,*

        Plaintiffs,

        v.

UNITED STATES OF AMERICA,

        Defendant,

        and

CC METALS AND ALLOYS, LLC AND
FERROGLOBE USA, INC.,

        Defendant-Intervenors.

Consol. Court No. 25-00100

## ORDER

Upon consideration of Plaintiff YDD's Rule 56.2 Motion for Judgment on the Agency Record, the Court having reviewed the responses thereto, and all other pertinent pleadings and papers, it is hereby:

**ORDERED** that Plaintiff's Rule 56.2 Motion is hereby granted; and it is further

**ORDERED** that the *Final Determination* issued by the U.S. Department of Commerce ("Commerce") in the antidumping investigation covering *Ferrosilicon from Kazakhstan* in *Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 14077 (Dep't Commerce Mar. 28, 2025) ("*Final*

*Determination*") is not supported by substantial evidence and is otherwise not in accordance with law; and it is further

**ORDERED** that the *Final Determination* is remanded to Commerce for further consideration consistent with this opinion.

**SO ORDERED**.


Dated:_____, 2025            _____
        New York, New York                                    Jennifer Choe-Groves, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES**

YDD CORPORATION LLP, *et al.,*

        Plaintiffs,

        v.

UNITED STATES OF AMERICA,

        Defendant,

        and

CC METALS AND ALLOYS, LLC AND
FERROGLOBE USA, INC.,

        Defendant-Intervenors.

<u>**PUBLIC VERSION**</u>

Consol. Court No. 25-00100

Business Proprietary Information
Removed Between Single Brackets [ ]

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF YDD'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Matthew J. McConkey
Ryan R. Migeed
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3235
*Counsel to YDD Corporation LLP*

Dated: November 7, 2025

# TABLE OF CONTENTS

**Contents**

I.     STATEMENT PURSUANT TO RULE 56.2 ....................................................................... 2

    A.    Administrative Determination Under Review ......................................................... 2

    B.    Issues of Law Presented and Reasons for Contesting the Determination ............... 2

II.    SUMMARY OF ARGUMENT ........................................................................................ 3

III.    STATEMENT OF FACTS ............................................................................................. 5

IV.    STANDARD OF REVIEW ........................................................................................... 12

V.    ARGUMENT ................................................................................................................. 13

    A.    Commerce Improperly Included Sales Destined for Canada in Its Calculation of YDD's Dumping Margin ....................................................................................... 13

    B.    YDD's Reporting Complied with Commerce's Requests for Information and Provided All Necessary Information on the Record ............................................. 21

    C.    Commerce's Application of Zeroing Is Contrary to Law ..................................... 33

    D.    Commerce's Calculation of the Partial AFA Portion of YDD's Final Antidumping Duty Margin Was Incorrect and Therefore Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law ........................................................ 38

VI.    CONCLUSION ............................................................................................................. 43

**Cases**

*Albemarle Corp. v. United States*, 821 F.3d 1345, 1358-59 (Fed. Cir. 2016) ........................ 31, 34

*Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003)................. 13, 19, 38

*Grobest & I–Mei Industrial (Vietnam) Co., Ltd. v. United States*, 815 F.Supp.2d 1342, 1365-67 (Ct. Int'l Trade 2012) ................................................................................................................. 20

*Husteel Co. v. United States*, 98 F.Supp.3d 1315 (Ct. Int'l Trade 2015) ............................... 27, 29

*Hyundai Steel Co. v. United States*, 415 F. Supp. 3d 1293, 1301-03 (Ct. Int'l Trade 2019)........ 38

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46 (1983) ................................................................................................................................................... 28, 38

*Mukand, Ltd. v. United States*, 767 F.3d 1300, 1304 (Fed. Cir. 2014) ......................................... 30

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003)......................... 27, 30

*NSK Ltd. v. United States*, 798 F. Supp. 721, 725 (Ct. Int'l Trade 1992)............................... 13, 33

*NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).......................... 13, 39

*TIJID, Inc. v. United States*, 366 F.Supp.2d 1286, 1296-97 (Ct. Int'l Trade 2005) .............. passim

*Torrington Co. v. United States*, 818 F. Supp. 1563, 1574 (Ct. Int'l Trade 1993)................. 14, 20

*Torrington Co. v. United States*, 82 F.3d 1039, 1044-47 (Fed. Cir. 1996)................................... 14

*Union Steel v. United States*, 713 F.3d 1101, 1104 (Fed. Cir. 2013)......................... 34, 35, 36, 37

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) ...................................... 12, 26, 28

*U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1362 (Fed. Cir. 2010) ........................ 33, 34, 35

**Statutes**

19 C.F.R. § 351.102(b)(3)............................................................................................................. 22
19 C.F.R. § 351.301(c)(1)(v) ....................................................................................................... 32
19 C.F.R. § 351.414(c)(1).............................................................................................................. 34
19 U.S.C. § 1677(33)............................................................................................................... 22, 30
19 U.S.C. § 1677(33)(B)................................................................................................................ 23
19 U.S.C. § 1677e(b) ............................................................................................................... 27, 29

19 U.S.C. § 1677e(b)(1)(A) ...................................................................................................... 27

19 U.S.C. § 1677(33)(B) .......................................................................................................... 21

19 U.S.C. § 1677b(a) ............................................................................................................... 13

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................................................. 12

19 U.S.C. § 1673 ...................................................................................................................... 14

19 U.S.C. § 1673d(e) ........................................................................................................ 38, 42

19 U.S.C. § 1677(33)(F) .................................................................................................... 21, 23

19 U.S.C. § 1677(35) ............................................................................................................... 33

19 U.S.C. § 1677e(a) ............................................................................................................... 26

19 U.S.C. § 1677e(a)(2)(A) ..................................................................................................... 29

19 U.S.C. § 1677e(a)(2)(D) ..................................................................................................... 29

19 U.S.C. § 1677f–1(d)(1)(A) ........................................................................................... 33, 34

19 U.S.C. § 1677m(d) .............................................................................................................. 27

19 U.S.C. § 1677m(e) ........................................................................................................ 27, 30

19 U.S.C. § 1677a(a) ..................................................................................................... 13, 14, 17

**Adminstrative Decisions**

*Antidumping Proceedings: Calculation of the Weighted–Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77722 (Dep't Commerce Dec. 27, 2006)............................................................................................................................... 33

*Carbon and Alloy Steel Wire Rod from the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, and Preliminary Negative Determination of Critical Circumstances*, 82 Fed. Reg. 50386 (Dep't Commerce Oct. 31, 2017) ..................... 15

*Certain Large Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Over 4 1/2 Inches) From Japan: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 41366 (Dep't Commerce July 10, 2013) ......................................... 14

*Extruded Rubber Thread From Malaysia, Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 33588, 33599 (Dep't Commerce June 20, 1997) ....................... 14, 19, 20

*Ferrosilicon From Kazakhstan: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 88007 (Dep't Commerce Nov. 6, 2024)........................................................................................................................ passim

*Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less Than Fair Value; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Antidumping Duty Orders,* 90 Fed. Reg. 21456 (Dep't Commerce May 20, 2025) ................................................................................. 12

*Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 14077 (Dep't Commerce Mar. 28, 2025) ......................................................................................................................................... passim

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of 1998–1999 Administrative Review, Partial Rescission of Review, and Determination Not To Revoke Order in Part*, 66 Fed. Reg. 1953 (Dep't Commerce Jan. 10, 2001)................................................................................................................................................. 16

*Tin Mill Products from the Netherlands: Final Negative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 1524 (Dep't Commerce Jan. 10, 2024) .................................................... 15

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES

YDD CORPORATION LLP, *et. al.,*

        Plaintiffs,

        v.

UNITED STATES OF AMERICA,

        Defendant,

        and

CC METALS AND ALLOYS, LLC AND
FERROGLOBE USA, INC.,

        Defendant-Intervenors.

**PUBLIC VERSION**

Consol. Court No. 25-00100

Business Proprietary Information
Removed Between Single Brackets [ ]

## PLAINTIFF YDD'S BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Plaintiff YDD Corporation LLP ("Plaintiff" or "YDD"), a foreign producer and exporter of the subject merchandise individually examined in the underlying antidumping duty ("AD") investigation conducted by the U.S. Department of Commerce ("Commerce") in *Ferrosilicon from Kazakhstan*, hereby submits this Brief in Support of its Motion for Judgment on the Agency Record in accordance with Rule 56.2 of the Rules of the United States Court of International Trade ("CIT") and the Court's September 3, 2025 Scheduling Order. Scheduling Order, ECF No. 29. For the reasons set forth below, Plaintiff respectfully requests that the Court grant its Motion for Judgment on the Agency Record and remand Commerce's *Final Determination* in the below-referenced investigation to the agency for action consistent with brief.

1

## I.     STATEMENT PURSUANT TO RULE 56.2

### A.     Administrative Determination Under Review

The administrative determination under review in this action is the *Final Determination*

in the AD investigation of Ferrosilicon from Kazakhstan. *Final Affirmative Determination of*

*Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 90

Fed. Reg. 14077 (Dep't Commerce Mar. 28, 2025), P.R. 280 ("*Final Determination*") and

accompanying Issues and Decision Memorandum, P.R. 272 ("IDM").

### B.     Issues of Law Presented and Reasons for Contesting the Determination

*1.     Whether Commerce's inclusion of sales that were destined for Canada in its calculation of YDD's dumping margin is supported by substantial evidence and is otherwise in accordance with law.*

No. YDD demonstrated throughout the course of the investigation that these sales were

contractually intended as sales to Canada. YDD knew that the product was destined for Canada

before it was exported to the United States. Thus, under Commerce's knowledge test and normal

practice, these sales should not have been considered sales to the United States.

*2.     Whether Commerce's application of partial adverse facts available ("AFA") in calculating YDD's dumping margin is supported by substantial evidence and is otherwise in accordance with law.*

No. YDD cooperated to the best of its ability with Commerce throughout the

investigation, and Commerce may not apply AFA to a cooperating party. Moreover,

Commerce's conclusion that the CEO and executive director of one of YDD's customers also

had a "controlling position" at the parent company of YDD's affiliates, ASIA and KazSilicon,

which allowed him to exercise control over YDD, is not supported by substantial evidence and is

otherwise not in accordance with law because that individual did not have actual capacity or

ability to exercise control.

> 3. Whether Commerce's decision to apply "zeroing" in the calculation of YDD's weighted-average dumping margin is supported by substantial evidence and is otherwise in accordance with law.

No. Commerce has a long-established practice of not using zeroing in antidumping investigations in which it applies its sales comparison methodology known as the "average-to-average" method. In this case, Commerce applied the average-to-average method but still applied zeroing without offering any reasoned explanation for using zeroing. Even if Commerce provided an explanation for using zeroing in this case, Commerce's use of zeroing is unreasonable and unjustifiable under a proper interpretation of the Tariff Act of 1930.

> 4. Whether Commerce's calculation of the portion of YDD's dumping margin based on partial AFA is supported by substantial evidence and is otherwise in accordance with law.

No. Commerce has a statutory obligation to correct ministerial errors, *e.g.,* errors in addition or subtraction, clerical errors resulting from inaccurate copying, duplication, etc., and any other type of unintentional error. In the *Final Determination*, Commerce used a cash deposit rate that does not appear in the data to calculate the partial AFA portion of YDD's final weighted-average dumping margin. The rate differs from the one used in the *Preliminary Determination* even though YDD's highest transaction-specific margin used for the partial AFA portion of YDD's final dumping margin was unchanged in the *Final Determination*. Clearly, Commerce copied the mystery rate from another source and should correct the error.

## II.    SUMMARY OF ARGUMENT

1. Commerce's long-standing practice has been to exclude from the universe of sales used to calculate export price ("EP") any sales of subject merchandise that enter the United States for consumption but are not sold in the United States, including sales destined for other markets. Commerce's determination turns on the exporter's knowledge that certain merchandise was, in fact, destined for another market. Commerce failed to recognize the impact of sales

terms that obligated the reexport of certain sales to Canada, and YDD's knowledge of these sales' ultimate destination, and included these sales in the calculation of EP. Commerce's conclusion is inconsistent with its practice and unsupported by substantial evidence.

2. Commerce unjustifiably relied on Petitioners' late-filed allegation, and wholly ignored YDD's rebuttal factual information, to find that YDD was affiliated with one of its customers through common controlling ownership. YDD substantively demonstrated, based on the relevant shareholding percentages and the contractual relationship with the identified individual, that Petitioners' allegation was false and did not meet the test for finding an affiliation in which one party had the ability to exercise control over the other. Moreover, Commerce was able to resolve outstanding questions relevant to the affiliation finding with regard to the 2022 and 2023 financial statements at verification, which demonstrates that the record was not missing necessary information and YDD had not failed to cooperate. Commerce's determination to apply adverse facts available to YDD in the *Final Determination* was thus unsupported by substantial evidence and otherwise not in accordance with law.

3. Commerce has a long-established practice of not using zeroing in antidumping investigations in which it applies its sales comparison methodology known as the average-to-average method. Commerce departed from this practice in using zeroing when calculating YDD's dumping margin despite applying the average-to-average method for YDD's sales, and without providing any explanation for this change in practice. Commerce's use of zeroing in this case is unsupported by substantial evidence and otherwise not in accordance with law. Moreover, Commerce's interpretation of the statutory text by which it continues to use zeroing is unlawful and must be revisited in the wake of Supreme Court precedent that urges this Court to interpret the statute itself rather than defer to the agency's interpretation. Commerce's continued

4

use of zeroing is unreasonable and unjustifiable under a proper interpretation of the Tariff Act of 1930, *as amended* and should be held unlawful.

4. Commerce has a statutory obligation to correct ministerial errors. The highest transaction-specific margin Commerce used to calculate the partial AFA portion of YDD's dumping margin is a mystery rate that does not otherwise appear in Commerce's underlying SAS program language, and differs from the highest transaction-specific margin in the *Preliminary Determination* despite no methodological change. This ministerial error should be remanded to Commerce for further explanation and, if necessary, correction.

## III.   STATEMENT OF FACTS

On March 27, 2024, CC Metals and Alloys, LLC ("CCMA") and Ferroglobe USA, Inc. ("Ferroglobe") (collectively, "Petitioners") filed an AD petition with Commerce alleging that imports of Ferrosilicon from Brazil, Malaysia, the Republic of Kazakhstan, and the Russian Federation were being, or were likely to be, sold in the United States at less than fair value. Commerce initiated its AD investigation on April 17, 2024. *See Initiation of Less-Than-Fair-Value Investigations,* 89 Fed. Reg. 31137 (Dep't Commerce Apr. 24, 2024).[1]

Commerce selected YDD and TNC Kazchrome JSC ("Kazchrome") as mandatory respondents in the AD investigation. *See* Memorandum from Mira Warrier, International Trade Compliance Analyst, Office II, AD/CVD Operations, to The File, re: *Respondent Identification* (May 8, 2024), P.R. 32, C.R. 16[2]; *see also* Memorandum from Minoo Hatten, Director, Office II, AD/CVD Operations, to James Maeder, Deputy Assistant Secretary, AD/CVD Operations, re: *Respondent Identification Memorandum – Clarification* (June 10, 2024), P.R. 55, C.R. 37. In

---

[1]      Commerce also initiated a countervailing duty investigation which is not at issue in this appeal. *See Initiation of Countervailing Duty Investigations,* 89 Fed. Reg. 31133 (Dep't Commerce Apr. 24, 2024).

[2]      References to the administrative record are identified by their Public Record ("P.R.") and corresponding Confidential Record ("C.R.") numbers.

the *Preliminary Determination*, Commerce found that YDD, Asia FerroAlloys LLP ("ASIA"),

and KazSilicon Metallurgical Combine LLP ("KazSilicon") were affiliated through common

ownership and collapsed them into a single entity, the "YDD Single Entity." *See* P.R. 184 at 5.

For ease of reference, the single entity is referred to herein as YDD.

On June 10, 2024, Commerce issued an initial questionnaire to YDD. *See* Letter from

Genevieve Coen, Program Manager, Office II, AD/CVD Operations, to YDD Corporation LLP,

c/o Matthew McConkey, Mayer Brown LLP, re: *Less-Than-Fair-Value-Investigation of*

*Ferrosilicon from Kazakhstan Request for Information* (June 10, 2024), P.R. 56.

In its response to Section A of Commerce's antidumping questionnaire, YDD clarified

that one of its two channels of distribution for sales of subject merchandise to the United States

consisted of sales to a particular U.S. customer, [                                                    ], that

"were intended to be transshipped to the Canadian market" and were in fact destined for the

Canadian market pursuant to the purchase terms with the customer. *See* Letter from Sydney

Mintzer, Mayer Brown LLP, to U.S. Dep't Commerce, re: *YDD Corporation LLP—Section A*

*Questionnaire Response* at 15-16 (July 10, 2024), P.R. 78, C.R. 52-77. In its Section C

response, YDD noted that it included these sales in its U.S. sales database but reiterated that

these sales should not be included in Commerce's dumping margin calculation because they

were destined for the Canadian market. *See* Letter from Sydney Mintzer, Mayer Brown LLP, to

U.S. Dep't Commerce, re: *YDD Corporation LLP—Section C Questionnaire Response* at C-16

to C-17 (July 31, 2024), P.R. 87, C.R. 78-102. Commerce requested in a supplemental

questionnaire that YDD provide the total quantity and value of merchandise stored by [        ]

at its U.S. warehouse before being shipped to Canada. YDD provided a letter signed by the

customer which explained that the "full quantity" stored in warehouse would be shipped to the

particular Canadian customer pursuant to [                    ] with that Canadian customer. *See* C.R. 192 at Ex. S1-6.1. YDD also provided a movement schedule showing the quantity of YDD sales that had entered the customer's warehouse, the quantity that had been shipped to Canada per the customer's letter, and the quantity that remained in warehouse as of the date of the letter. *See id.* at Ex. S1-6.2.

In comments filed one week before Commerce's *Preliminary Determination* ("Pre-Prelim Comments"), Petitioners alleged that YDD was affiliated with its customer, [        ], through the CEO's nominal board position with a third company, and that YDD failed to report this. *See* Letter from Adam H. Gordon, The Bristol Group PLLC, to U.S. Dep't Commerce, re: *Antidumping Duty Investigation of Ferrosilicon from Kazakhstan: Pre-Preliminary Comments on YDD's 3rd Supplemental Questionnaire Response* (Oct. 24, 2024), P.R. 176, C.R. 325.

YDD filed a response to Petitioners' Pre-Prelim. Comments in which it argued that Petitioners' allegation included untimely filed factual information and that, if Commerce were to accept Petitioners' allegation it should also accept rebuttal factual information from YDD which included company registration documents and the relevant contract with the [        ] CEO. *See* Letter from Nikolay Mizulin, Mayer Brown LLP, to U.S. Dep't Commerce, re: *Ferrosilicon from Kazakhstan: YDD Corporation LLP –Response to Petitioners' October 24, 2024 Pre-Preliminary Comments* (Oct. 30, 2024) P.R. 181, C.R. 328-329. YDD further argued that its previously submitted questionnaire responses explained YDD's shareholding structure and demonstrated that YDD was not affiliated with its customer through common, controlling ownership. *Id.* On October 31, 2024, YDD submitted additional rebuttal factual information that was an excerpt from YDD's responses to Commerce's questionnaire in the companion CVD investigation, which provided a further narrative explanation of YDD's historical shareholder

structure.  *See* Letter from Nikolay Mizulin, Mayer Brown LLP, to U.S. Dep't Commerce, re: *Ferrosilicon from Kazakhstan: YDD Corporation LLP – Additional RFI in Response to Petitioners' Pre-Preliminary Comments* (Oct. 31, 2024), P.R. 182, C.R. 330.

On November 6, 2024, Commerce published the preliminary determination of its AD investigation in the *Federal Register.  See Ferrosilicon From Kazakhstan: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 88007 (Dep't Commerce Nov. 6, 2024), P.R. 199 ("*Preliminary Determination*"), and accompanying Preliminary Decision Memorandum (Dep't Commerce Oct. 31, 2024) P.R. 184, ("Prelim. Decision Memo").  Commerce determined that YDD's weighted-average dumping margin for the period of investigation ("POI") was 4.67 percent, while Kazchrome's margin was 6.20 percent.  *Id.*

In the *Preliminary Determination*, Commerce relied on partial facts available with adverse inferences in calculating YDD's margin because, according to Commerce, YDD failed to notify Commerce of an affiliation with one of its U.S. customers through the corporate positions of an individual who held positions in YDD and its affiliates as well as in the corporate structure of a U.S. customer during the POI.  *See* P.R. 184 at 6-10.  Commerce found YDD failed to cooperate by not providing the 2023 consolidated financial statements of ASIA's and KazSilicon's parent company, [                                                    ].  *Id.*

In the *Preliminary Determination*, in calculating YDD's dumping margin, Commerce also used a method known as "zeroing" in which it set negative dumping margins (*i.e.*, those individual sales in which the margins are above normal value and are therefore not dumped) to zero rather than aggregating these negative margins with positive margins, thereby "offsetting"

positive margins with negative margins. *See* Memorandum from Mira Warrier, Int'l Trade Compliance Analyst, to The File, re: *Antidumping Duty Investigation of Ferrosilicon from Kazakhstan: Preliminary Determination Margin Calculation for YDD Corporation LLP; Asia FerroAlloys LLP; and KazSilicon Metallurgical Combine LLP* (Oct. 31, 2024) ("Prelim. Calc. Memo"), P.R. 190, C.R. 338, at Att. III, C.R. 350.

On November 8, 2024, YDD filed a timely allegation of ministerial error in response to the *Preliminary Determination*. *See* Letter from Nikolay Mizulin, Mayer Brown LLP, to U.S. Dep't Commerce, re: *YDD Corporation LLP—Ministerial Allegation* (Nov. 8, 2024), P.R. 200, C.R. 358. YDD alleged that Commerce should not have used zeroing because Commerce had applied its "average-to-average" sales comparison methodology whereby it calculated YDD's weighted-average dumping margin by comparing home market and U.S. market average prices. Commerce has a long-standing policy of not using zeroing in investigations in which it is applying the average-to-average comparison method. *See Antidumping Proceedings: Calculation of the Weighted–Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77722 (Dep't Commerce Dec. 27, 2006).

Commerce conducted a verification of YDD's reported sales in Kazakhstan from November 11, 2024, through November 15, 2024, and a verification of YDD's reported costs in Kazakhstan from November 25, 2024, through November 29, 2024. Memorandum from Mira Warrier, Int'l Trade Compliance Analyst, and Brittany Bauer, Sr. Int'l Trade Compliance Analyst, to The File, re: *Verification of the Sales Responses of YDD Corporation LLP; Asia FerroAlloys LLP; and KazSilicon Metallurgical Combine LLP (collectively, the YDD Single Entity) in the Less-Than-Fair-Value Investigation of Ferrosilicon from Kazakhstan* (Dec. 23, 2024), P.R. 226, C.R. 481; Memorandum from Heidi Schriefer, Supervisory Accountant, and

Delwyn Mandapathilm, Senior Accountant, to The File, re: *Verification of the Cost Response of YDD Corporation LLP in the Less-Than-Fair-Investigation of Ferrosilicon from Kazakhstan* (Feb. 6, 2025), P.R. 251, C.R. 494.

At verification, YDD attempted to provide Commerce with updated shipment information showing that additional quantities in [          ]'s warehouse had been shipped to Canada, but Commerce declined to accept this information as a "minor correction" to YDD's previously reported totals.  C.R. 368 at Minor Corrections.  However, Commerce was able to verify that the 2023 consolidated financial statements of [          ] were not ready as of the date of the *Preliminary Determination*.  C.R. 368 at Ex. SVE-2.

On December 9, 2024, Commerce rejected YDD's ministerial error allegation, finding that it constituted a "methodological" difference rather than a ministerial error within Commerce's regulations.  *See* Memorandum from Samantha Kinney, Senior International Trade Compliance Analyst, Office II, AD/CVD Operations, to Minoo Hatten, Director, Office II, AD/CVD Operations, re: *Analysis of Ministerial Error Allegation in the Preliminary Determination* (Dec. 9, 2024), P.R. 220 (citing 19 C.F.R. § 351.224(f)).

On January 14, 2025, YDD submitted a case brief discussing sales issues raised in the *Preliminary Determination. See* Letter from Nikolay Mizulin, Mayer Brown LLP, to U.S. Dep't Commerce, re: *Sales and General Issues Case Brief* (Jan. 14, 2025), P.R. 238, C.R. 490 ("Case Brief").  In its Case Brief, YDD raised three affirmative arguments with respect to these sales issues in the *Preliminary Determination*.  First, YDD argued that Commerce's inclusion of sales that were destined to Canada as U.S. sales in YDD's dumping margin calculation was contrary to Commerce's normal practice and was therefore unlawful.  *Id.* at 1-6.  Second, YDD argued that Commerce's application of adverse facts available ("AFA") on those sales to Canada

because YDD did not disclose a relationship between the executive director of the customer to which the sales to Canada had been made and YDD's affiliates ASIA and KazSilicon was improper because YDD fully cooperated with Commerce's investigation. *Id.* at 6-8. Third, YDD argued that Commerce incorrectly set negative margins calculated under the average-to-average methodology to zero in the calculation of the overall weighted-average margin calculation. *Id.* at 8-10.

On January 14, 2025, Petitioners submitted a case brief before Commerce addressing these same issues in which they argued that Commerce should continue to apply adverse facts available to calculate YDD's dumping margin. Letter from Adam H. Gordon, The Bristol Group PLLC, to U.S. Dep't Commerce, re: *Ferrosilicon from Kazakhstan: Case Brief* (Jan. 14, 2025), P.R. 239, C.R. 489. In addition, Petitioners argued, if Commerce continues to apply partial adverse facts available to YDD, it should continue to set negative margins to zero.

YDD submitted a rebuttal brief on sales issues on January 21, 2025 and a rebuttal brief on cost issues on February 26, 2025, but the issues raised in those briefs are not the subject of this appeal. *See* IDM, P.R. 272 at 3.

On March 28, 2025, Commerce published its *Final Determination* in the AD investigation in the *Federal Register.* Commerce calculated an AD margin of 6.01 percent for YDD. *See* P.R. 280. In the *Final Determination*, Commerce continued to treat YDD's sales intended for the Canadian market as U.S. sales and continued to apply partial AFA to these sales. *See* IDM, P.R. 272 at 28-32. Commerce also declined to amend the *Preliminary Determination* with respect to sales with negative dumping margins, referring to its explanation in the Prelim. Calc. Memo and stating that its decision was a methodological choice rather than a calculation error. *See* IDM, P.R. 272 at 32-33.

YDD filed a timely allegation of ministerial error in response to the *Final Determination.*
*See* Letter from Nikolay Mizulin, Mayer Brown LLP, to U.S. Dep't Commerce, re: *YDD Corporation LLP – Ministerial Error Allegation* (March 31, 2025), P.R. 281, C.R. 521.  YDD alleged that Commerce made an error in calculating the highest individual transaction-specific margin to use as the AFA margin for the sales subject to partial AFA.

Commerce determined that the issue raised in YDD's ministerial error allegation was methodological in nature and maintained the result in the *Final Determination*.  *See* Memorandum from Mira Warrier, International Trade Compliance Analyst, Office II, AD/CVD Operations, to Minoo Hatten, Director, Office II, AD/CVD Operations, re: *Analysis of Ministerial Error Allegation in the Final Determination* (April 11, 2025), P.R. 284.

On May 20, 2025, Commerce published the AD Order on Ferrosilicon from Kazakhstan in the *Federal Register* without making YDD's requested adjustments.  *See Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less Than Fair Value; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Antidumping Duty Orders,* 90 Fed. Reg. 21456 (Dep't Commerce May 20, 2025), P.R. 289.

## IV.    <u>STANDARD OF REVIEW</u>

In reviewing a challenge to Commerce's determination in an AD investigation, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The substantial evidence standard requires the agency to "take into account whatever in the record fairly detracts" from the weight of the evidence that supports the agency's conclusion.  *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951).  Commerce's determination will be held unlawful if it has acted differently in one case than it has consistently

acted in similar circumstances and failed to provide a reasonable explanation for the change in practice.  *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003).

Commerce abuses its discretion when it fails to correct an error that is egregious and obvious, and undermines the interests of justice.  *NSK Ltd. v. United States*, 798 F. Supp. 721, 725 (Ct. Int'l Trade 1992), aff'd, 996 F.2d 1236 (Fed. Cir. 1993) (Table).  Commerce has reached the limit of its discretion when the public interest in the correct result outweighs the agency's interest in finality of an administrative proceeding.  *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

## V.     ARGUMENT

### A.     Commerce Improperly Included Sales Destined for Canada in Its Calculation of YDD's Dumping Margin

YDD separately reported U.S. sales and sales destined for Canada in its responses to Commerce's antidumping questionnaire.  Commerce's practice is to exclude sales that are transshipped through the United States from the dumping margin calculation when the respondent provides documentation showing that it *knew* the sales were destined for another export market.  Yet, despite the extensive evidence YDD provided on the agency record that established its knowledge that certain sales were destined for Canada, Commerce failed to follow its own practice with respect to these sales and included them among YDD's sales used to calculate YDD's dumping margin.  Commerce's decision was arbitrary and unsupported by substantial evidence, and should be remanded to the agency.

In antidumping investigations, Commerce calculates a dumping margin by comparing the price at which the subject merchandise is sold in the exporting country (the "normal value") to the export price at which the subject merchandise is first sold for export to the United States (the "EP" or "U.S. price").  *See* 19 U.S.C. §§ 1677a(a), 1677b(a).  The dumping margin is the

"amount by which the normal value exceeds the export price." 19 U.S.C. § 1673. EP is the price at which the subject merchandise is "*first sold* (or agreed to be sold) before the date of importation" into the United States. *Id.* § 1677a(a) (emphasis added). Accordingly, Commerce's long-standing practice has been to exclude from the universe of sales used to derive EP in the dumping margin calculation subject merchandise that enters the United States for consumption but is not sold in the United States, including sales that are destined for other markets after importation into the United States. *See, e.g.*, *Extruded Rubber Thread From Malaysia, Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 33588, 33599 (Dep't Commerce June 20, 1997) ("*Extruded Rubber Thread From Malaysia*"); *Certain Large Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Over 4 1/2 Inches) From Japan: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 41366 (Dep't Commerce July 10, 2013) and accompanying Issues and Decision Memorandum, ACCESS Doc. 3143611-01 at Comment 2 (Dep't Commerce July 2, 2013) ("*Seamless Pipe from Japan*"), unchanged in *Final Results*, 78 Fed. Reg. 64475, 64476 (Dep't Commerce Oct. 29, 2013); *Torrington Co. v. United States*, 82 F.3d 1039, 1044-47 (Fed. Cir. 1996) (upholding Commerce practice of not using reexported sales in calculation of EP).

Commerce's practice is predicated on the purpose of the antidumping law and the fair administration of that law. The purpose of the antidumping law is to provide a remedy to U.S. industry which has been injured by reason of sales of subject merchandise in the United States at less than fair value. *See Torrington Co. v. United States*, 818 F. Supp. 1563, 1574 (Ct. Int'l Trade 1993), *aff'd* 82 F.3d 1039. If there has not been a sale in the United States, then U.S. industry has not been injured by reason of imports which were later reexported. *See id.*

Commerce's determination of whether to exclude sales as destined for another market turns on the exporter's knowledge that certain merchandise was, in fact, destined for a market other than the United States. Commerce relies upon the "knowledge test" described in *Tin Mill Products from the Netherlands*:

> Commerce's test for determining knowledge regarding the destination of merchandise is to consider whether the relevant party knew, or should have known, that the merchandise was destined for a different market. In determining whether a party knew, or should have known, the destination of merchandise, **Commerce's well-established practice is to consider such factors as: whether that party prepared or signed any certificates, shipping documents, contracts or other papers stating the destination of the merchandise**; whether that party used any packaging or labeling which stated that the destination; whether any unique features or specifications of the merchandise otherwise indicated the destination; **and whether that party admitted to Commerce that it knew that its shipments were destined for a particular market**.

*Tin Mill Products from the Netherlands: Final Negative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 1524 (Dep't Commerce Jan. 10, 2024), and accompanying Issues & Dec. Memo, ACCESS Doc. 4486070-02 at Cmt. 2 (Dep't Commerce Jan. 4, 2024) ("*Tin Mill Products from the Netherlands*") (citing *Carbon and Alloy Steel Wire Rod from the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, and Preliminary Negative Determination of Critical Circumstances*, 82 Fed. Reg. 50386 (Dep't Commerce Oct. 31, 2017), and accompanying Prelim. Dec. Memo at 7 (unchanged in *Final Determination*, 83 Fed. Reg. 13228 (Dep't Commerce Mar. 28, 2018)) (emphasis added).

Stated plainly, Commerce's "knowledge test" is a consideration of "documentary or physical evidence that the producer knew or should have known at the time of sale" that the merchandise was destined for a different market than the one in which the merchandise was initially sold. *Id.* Thus, where the respondent provides the requisite information to demonstrate that it did not intend to sell the merchandise in the United States, and the merchandise was in fact not sold in the United States, Commerce has accordingly considered these sales not subject to

antidumping duties. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of 1998–1999 Administrative Review, Partial Rescission of Review, and Determination Not To Revoke Order in Part*, 66 Fed. Reg. 1953 (Dep't Commerce Jan. 10, 2001) and accompanying Issues and Decision Memorandum at Comment 39.

Consistent with Commerce's normal practice, YDD made clear throughout its responses to Commerce's antidumping questionnaire that its sales to a particular customer, [          ], which were imported into the United States, were destined for [          ] customer in Canada. YDD reported a total quantity of [          ] in sales to [          ] which were ultimately destined for this Canadian customer. C.R. 53 at Ex. A-1. YDD noted that [          ] purchased the merchandise from YDD [

         ]. P.R. 78, C.R. 52, at 15-16. YDD clarified that it reported these sales as EP sales, but that they should not be included in the dumping margin calculation because "YDD had knowledge that the material was intended for the Canadian market." P.R. 87, C.R. 78 at C-16–C-17.

YDD provided Commerce with documentation to demonstrate that the final destination of these sales was [          ], Canada. This documentation included the purchase order from [          ] to YDD in which [          ] made an order in the amount of [          ] for the year 2024, which represents all the reexported sales at issue. C.R. 54-55 at Ex. A-8. As of the end of the POI, YDD had fulfilled [          ] of the order over [          ] separate shipments. *See* C.R. 192 at Ex. S1-4.3. The order stated that [          ] would [

                                                                                         ],

that the Canadian customer was the consignee of the goods, and that the final destination per

[      ] delivery terms was [          ], Canada.  *See* C.R. 54-55 at Ex. A-8.

Importantly, [          ]'s purchase order included terms and conditions of the order,

labeled "Specification No. 17," which, among other things, specified that the consignee of the

order was the Canadian customer and that the final destination was Canada.  *Id.*  Thus, YDD had

knowledge when it first received the order and began fulfilling it—*i.e.*, when the merchandise

was "first sold," 19 U.S.C. § 1677a(a)—that it was destined for Canada.

Further, YDD distinguished these sales destined for the Canadian market in its U.S. sales

database provided to Commerce, explaining that the company considered those sales a different

channel of distribution.  *See* P.R. 87, C.R. 78 at C-19–C-20 (noting that YDD had two channels

of distribution in the U.S. market during the POI, reported as Channel 1 ("Sales to unaffiliated

U.S. customer") and Channel 2 ("Sales to unaffiliated U.S. customer, intended to be transshipped

to Canada")).  YDD's U.S. sales reconciliation also distinguished these sales destined for

Canada, tracing the individual amounts of these sales and tying them to YDD's total quantity and

value of sales.  C.R. 79 at Ex. C-3.

When Commerce requested in a supplemental questionnaire that YDD provide the total

quantity and value of merchandise stored by [        ] at its U.S. warehouse, before being

shipped to Canada, YDD explained that it does not have information on the operations of its

unaffiliated customer, but provided a signed letter from that customer which explained that the

"full quantity" stored in warehouse in the United States would be shipped to the particular

Canadian customer pursuant to [                    ] with that Canadian customer.  *See* C.R. 192

at Ex. S1-6.1.  YDD also provided a movement schedule showing the quantity of YDD sales that

had entered the customer's warehouse, the quantity that had been shipped to Canada per the

customer's letter, and the quantity that remained in warehouse as of the date of the letter. *See id.*

at Ex. S1-6.2. Indeed, as noted above, Specification No. 17 of [      ]'s order for [      ]

in 2023 specified that the final destination of the ordered quantity was Canada, C.R. 54-55 at Ex.

A-8, and [      ] made clear in its letter that the remaining quantity was [                ]

to its Canadian customer.

Thus, YDD provided the documentary evidence needed to satisfy Commerce's

knowledge test proving that YDD knew *at the time of sale* that certain merchandise was destined

for the Canadian market rather than the U.S. market.

YDD also attempted to provide Commerce with updated shipment information showing

that additional quantities in [      ]'s warehouse had been shipped to Canada, to corroborate

the fact that these sales were destined for Canada, but Commerce declined to accept this

information. As explained in YDD's case brief before the agency, YDD provided updated

inventory movement information to Commerce officials during YDD's verification in an effort

to corroborate the inventory movement information provided in Ex. S1-6.1 of YDD's

supplemental questionnaire response. P.R. 238, C.R. 490 at 4 (citing C.R. 192). As a factual

matter, it was unreasonable for Commerce not to conclude that the remaining quantity in

warehouse would be reexported to Canada because it was subject to [                ] its

Canadian customer for the year 2024, and [                ] as

of the end of 2023. However, YDD's attempts to provide this documentary evidence was

consistent with Commerce's practice in proving knowledge as summarized above.

Commerce's decision not to accept this documentary evidence at verification was

inconsistent with its practice. Commerce has previously accepted a respondent's reporting of a

destination market at the end of a review period in which the respondent clarified which sales

had been made in the United States and which sales were reexported to Canada.  In *Extruded Rubber Thread from Malaysia*, a respondent noted that it did not know at the time of entry whether the merchandise would be sold in the United States or Canada.  62 Fed. Reg. at 33599. By the end of the review period, the respondent had become "aware of which entries were sold in the United States and which were re-exported," and it reported U.S. sales in its questionnaire response and re-exports to Canada in a supplemental response.  *Id.*  Commerce accepted this reporting and did not assess antidumping duties on the reexported sales.  *Id.*

Commerce's rejection of similar reporting at the end of this proceeding, in which YDD attempted to corroborate that these sales were destined for Canada by showing additional evidence of reexport to Canada, was arbitrary and an abuse of discretion.  *See, e.g.*, *Consol. Bearings Co.*, 348 F.3d at 1007 ("If . . . Commerce acted differently in this case than it has consistently acted in similar circumstances without reasonable explanation, then Commerce's actions will have been arbitrary.") (citation omitted).  Commerce made no reference to this additional documentary evidence, or why it failed to consider it, in the IDM.  *See* P.R. 272 at Comment 10.  Even if Commerce considered the additional documentary evidence to be late-filed factual information, the agency's regulatory deadline for submitting factual information is not a sufficient reason for rejecting the additional documentary evidence in this case.  Commerce has a history of accepting such evidence to prove destination of sales late in a proceeding, as in *Extruded Rubber Thread from Malaysia*.  62 Fed. Reg. at 33599.  And, Commerce needed to confirm the destination of these sales before using these transactions to calculate the dumping margin in this investigation—and imposing duties based on this margin on YDD's future sales to this U.S. customer.[3]  While acknowledging Commerce's discretion to set deadlines, the CIT has

---

[3]     At the conclusion of an investigation, Commerce issues an antidumping duty order which imposes duties on future entries based on this dumping margin.  *See* P.R. 289.

previously balanced this discretion against "the interests of accuracy and fairness," and credited a

respondent's diligence in seeking to submit correct information to the agency. *See, e.g.*, *Grobest*

*& I–Mei Industrial (Vietnam) Co., Ltd. v. United States*, 815 F.Supp.2d 1342, 1365-67 (Ct. Int'l

Trade 2012) (holding that Commerce must consider late-filed separate rate certification where

the burden of reviewing it was "not great" and the submission arrived in time for Commerce to

consider the information in issuing the final results of its review). Here, YDD was diligent in

updating the factual record to give Commerce an accurate count of the quantity of merchandise

that had been reexported to Canada, and the burden on Commerce of considering this brief

additional documentation was "not great" compared to the benefit of accuracy Commerce would

obtain from considering it. *Cf. id.*

The seminal purpose of the antidumping law is to provide a remedy to U.S. industry

which has been injured by reason of sales *in the United States* at less than fair value. *See*

*Torrington Co.*, 818 F. Supp. at 1574. If there has not been a sale in the United States, then U.S.

industry has not been injured. As the CIT previously concluded in *Torrington Co.*:

> The purpose and clear meaning of the language of the antidumping duty statute
> requires that there be some meaningful sale to, or in, the U.S. market which can
> be compared to {NV} to derive the dumping margin. . . . Also, it is impossible to
> meet the statutory requirement that, in order to assess antidumping duties, a U.S.
> industry must be injured by imports if these imports are never sold in the U.S.
> market.

*Id.* Accordingly, Commerce has consistently excluded from the calculation of EP sales imported

into the United States that were later reexported—*even where those sales were entered for*

*consumption*. *See Extruded Rubber Thread From Malaysia*, 62 Fed. Reg. at 33599.

Here, too, YDD's sales—which were entered for consumption in the United States, but

not sold to any U.S. customers and were instead reexported to Canada—have not had *any* effect

on U.S. industry, let alone injury. In accordance with Commerce's normal practice, YDD's sales

destined for Canada should have been excluded from the calculation of EP and Commerce should have accepted all of YDD's documentation proving its knowledge that these sales were destined for Canada. Commerce's refusal to follow its normal practice with respect to sales destined for Canada was arbitrary and unsupported by substantial evidence.

**B.** **YDD's Reporting Complied with Commerce's Requests for Information and Provided All Necessary Information on the Record**

Under the Tariff Act of 1930, *as amended* ("the Act"), Commerce may not apply AFA to a cooperating party that has not withheld information from the agency. Yet, Commerce did just that in applying partial facts available with adverse inferences to find that YDD withheld information regarding an affiliation with a particular customer. YDD placed on the record evidence clearly demonstrating that Petitioners' claim that YDD was affiliated with one of its customers through common controlling ownership was false and did not meet the test for finding an affiliation in which one party had the ability to exercise control over the other. Commerce's decision to accept Petitioners' evidence, but ignore YDD's, and to rely on partial facts available with an adverse inference—despite verifying various of YDD's claims—is not supported by substantial evidence, is not in accordance with law, is an abuse of discretion, and should be remanded to the agency.

**1.** **Commerce's determination that YDD was affiliated with one of its customers through common ownership was not supported by substantial evidence**

Commerce will find that two or more parties are affiliated where, as relevant here, they are "directly or indirectly controlling, controlled by, or under common control with, any person," 19 U.S.C. § 1677(33)(F), or where one party is an "officer or director" of the other, *id.* § 1677(33)(B). Under the Act, a person is "considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." *Id.*

§ 1677(33). Commerce's regulations define a "person" to include "any interested party as well as any other individual, enterprise, or entity, as appropriate." 19 C.F.R. § 351.102(b)(3). A finding of control "must be linked to a present and actual capacity or ability to exercise control," and cannot be based on a "hypothetical" ability to control. *TIJID, Inc. v. United States*, 366 F.Supp.2d 1286, 1296-97 (Ct. Int'l Trade 2005) (internal quotes and citation omitted).

Petitioners, in comments filed one week before Commerce's *Preliminary Determination*, alleged that YDD was affiliated with one of its customers through common ownership that created a controlling interest [          ]. P.R. 176, C.R. 325. As an initial matter, Petitioners alleged that YDD had an affiliation *with the customer to which it sold products that were ultimately reexported to Canada*—meaning that these were not U.S. sales and were therefore irrelevant to Commerce's investigation. *See* P.R. 181, C.R. 328-329. Therefore, if the Court agrees with YDD that its sales to Canada should not be considered in the dumping margin calculation, the Court should also find that the use of partial facts available, with adverse inferences, in calculating YDD's dumping margin is not warranted because it was based on findings with respect to these same sales.

Nonetheless, YDD substantively rebutted Petitioners' allegation before the agency, and the actual ownership percentages of the relevant companies demonstrate that a finding of affiliation based on controlling ownership is not supported by substantial evidence. Petitioners asserted that [          ], the CEO and Executive Director of [          ], concurrently served as "Chairman of the Board" of [          ], which Petitioners alleged was [

                                                        ]. C.R. 325 at 4-5. Petitioners' allegation of affiliation rests on its conclusion that [          ] could [

].  *Id.*

However, [            ] was not "Chairman of the Board," but, rather, a nominal director

of [        ].  There is no evidence on the record to suggest that he legally held a management

position at the company, let alone control over the company.  Petitioners submitted [

        ] showing that [            ] held a board position at [        ], which

YDD does not deny.  *Id.* at Ex. 4.  However, [            ] did not have any managerial

functions at [        ].  The "Mandate Agreement" with [

        ] that established [            ] role with [        ] makes clear that he was not

an actual employee and that his duties and powers were limited to administrative functions,

primarily signing company documents and filing them with Swiss authorities.  C.R. 328-329 at

Ex. 3.  For example, Article 1 of the "Mandate Agreement" states: [


        ].  *Id.*

[            ], a Swiss resident, was selected for this role to fulfill a formality of Swiss corporate

law, which requires that a Swiss resident have authority to sign documents on behalf of a limited

liability partnership established in Switzerland.  C.R. 328-329 at 3.  [        ] is a Swiss entity

domiciled in [            ].  *See id.* at Ex. 2.

Due to his ministerial role at [        ], [            ] was not in a position with "actual

capacity or ability to exercise control" under either § 1677(33)(B) or § 1677(33)(F).  *TIJID, Inc.*,

366 F.Supp.2d at 1296-97.  He was not an employee of [        ] or [            ].  In practice, he

was a director in name only.  He was granted power of attorney by [          ] to sign paperwork

as a Swiss resident on behalf of [          ] and to file it with Swiss authorities.

Moreover, Petitioners misrepresented—or miscalculated—the relevant shareholding

percentages, because [          ] was not, in fact, in a position to exercise control [          ] as

alleged.  Petitioners alleged that YDD and [          ] were affiliated through [          ]'s

position as a nominal director of [          ], which Petitioners asserted exercised control over

[

].  C.R. 325 at 5.

However, YDD is owned by [

], and an investment company, [

].  *See* C.R. 54 at Ex. A-4; *see also* C.R. 261-262 at

Ex. S5-2.1; P.R. 182, C.R. 330 (additional rebuttal factual information submitted by YDD

providing a narrative explanation of YDD's historical shareholder structure).  [          ] is not a

controlling shareholder in YDD; in fact, [          ] holds no shares in YDD at all.  *See* C.R. 54

at Ex. A-4.  A company that holds no shares in YDD hardly has "actual capacity or ability to

exercise control" over YDD.  *TIJID, Inc.*, 366 F.Supp.2d at 1296-97.

Separately, [          ] is the controlling shareholder of ASIA, holding [          ] in that

company, and KazSilicon, holding [          ] in that company.  C.R. 54 at Ex. A-4.  [

], not the other way around, as alleged by Petitioners.  *Compare id.*,

*with* C.R. 325 at 5.  [          ] does not have a controlling stake in either [          ] or

[          ], the parent company of YDD.  *Id.*  For financial statement purposes, companies

are consolidated into their parent.  Therefore, although YDD, ASIA, and KazSilicon were

collapsed and treated as a single entity, P.R. 184 at 5, they are ultimately consolidated into two

different parent companies: YDD is consolidated into [          ] while ASIA and

KazSilicon are consolidated into [          ]. Petitioners clearly misrepresented, or

misunderstood, the corporate structure at work here, and Commerce accepted their allegation

without the least amount of due diligence in checking Petitioners' numbers.

Despite these flaws in Petitioners' affiliation allegation, Commerce found, as facts

available, that YDD "sold subject merchandise to this U.S. customer and had knowledge of its

executive director's identity," that "this same individual also held a controlling position at the

parent company of ASIA and KazSilicon," and that YDD therefore "had knowledge of this

affiliation." *See* P.R. 184 at 7. Commerce relied on Petitioner's allegation in coming to this

conclusion, citing to that allegation in the Prelim. Decision Memo but failing to grapple at all

with the contrary evidence YDD submitted. *See id.* n.41; *see also Apple Inc. v. Int'l Trade

Comm'n*, 725 F.3d 1356, 1366 (Fed. Cir. 2013) (faulting ITC for "fail{ing} to grapple" with

strong evidence submitted by a party). Indeed, Commerce did not reference YDD's rebuttal

factual information at all, mischaracterizing its submission as an acknowledgement by YDD of

"the potential affiliation between {YDD} and its U.S. customer." P.R. 184 at 8.

Instead, Commerce focused on the 2023 consolidated financial statements of ASIA's and

KazSilicon's parent company, [          ], and YDD's inability to produce them because they

were not yet finalized. *See* P.R. 184 at 7. Given the discussion above demonstrating the actual

shareholding percentages and the fact that [          ] holds no shares in YDD (which was

already on the record, *see* C.R. 54 at Ex. A-4), Commerce's assumption that [          ]'s 2023

consolidated financial statements would resolve the question of affiliation was dubious from the

start. In any event, in a sales verification conducted roughly two weeks later, Commerce verified

as a factual matter that [          ]'s 2023 consolidated financial statements were not yet

finalized.  C.R. 481 at 4-6.  Thus, there was no factual gap in the record created by YDD.

Moreover, the information *actually on the record* did not point to an affiliation between YDD

and [          ] through [                    ]'s simultaneous positions as CEO of [        ] and

nominal position on [            ]'s board such that [                ], or [          ], had "actual

capacity or ability to exercise control" over YDD.  *TIJID, Inc.*, 366 F.Supp.2d at 1296-97.

Accordingly, Commerce's determination that YDD was affiliated with [          ] through

common controlling ownership was not supported by substantial evidence.

That Commerce did not have time to consider YDD's evidence prior to issuing the

*Preliminary Determination* is no answer for why Commerce maintained this finding in the *Final

Determination*.  *See* IDM, P.R. 272 at 31-32.  Commerce was certainly able to consider

Petitioners' allegation in the seven days between when it received the allegation and concluded

that the allegation was accurate.  Indeed, Commerce's acceptance of that allegation substantively

affected YDD's dumping margin in the *Final Determination*.  However, Commerce thoroughly

failed to consider the evidence submitted by YDD, which "fairly detracts" from the weight of

Petitioners' late-filed evidence Commerce relied upon to support its conclusion that YDD and

[          ] were affiliated during the POI.  *See Universal Camera Corp.*, 340 U.S. at 488.

### 2.    Commerce's application of adverse inferences to a cooperating party was not in accordance with law

Pursuant to Section 776(a) of the Act, Commerce will apply "facts otherwise available" if

necessary information is not on the record or if an interested party (a) withheld information

requested by Commerce, (b) failed to provide information by the deadlines and in the form and

manner requested by Commerce, (c) significantly impeded the proceeding, or (d) provided

information that cannot be verified.  19 U.S.C. § 1677e(a).  In selecting from the facts available,

Commerce "may" use an inference adverse to the party that failed to cooperate to the best of its

ability.  *Id.* § 1677e(b)(1)(A).  However, the Act requires Commerce to notify a respondent if its responses are deficient and provide an opportunity to remedy the deficiency.  19 U.S.C. § 1677m(d).  The Act further prohibits Commerce from declining to consider submitted information if (a) the information is submitted by the established deadline, (b) the information can be verified, (c) the information is not so incomplete that it cannot serve as a reliable basis for a determination, (d) the submitter acted to the best of its ability, and (e) the information can be used without undue difficulties.  19 U.S.C. § 1677m(e).

Nothing in the Act *requires* Commerce to apply AFA, and adverse inferences may only be drawn against parties that failed to cooperate.  *See id.* § 1677e(b); *see also Husteel Co. v. United States*, 98 F.Supp.3d 1315 (Ct. Int'l Trade 2015).  In determining whether a respondent has cooperated to the "best of its ability," the question is whether the respondent "has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

In the instant case, Commerce found that the record was missing necessary information and that YDD did not act to the best of its ability in complying with Commerce's requests for information because (a) it had failed to submit the 2023 consolidated financial statements of ASIA's and KazSilicon's parent company, despite YDD stating that it would when the statements were ready, and (b) the 2022 consolidated financial statements of ASIA's and KazSilicon's parent company, submitted on the record, did not include an auditor's statement or management statement.  *See* P.R. 184 at 6-10.  Commerce also found that YDD failed to "disclose" its "potential affiliation" with [        ] even though YDD maintains that Petitioners' allegation does not amount to an affiliation in fact.  *Id.*  Commerce continued to apply partial facts available, with adverse inferences, to YDD's sales to [        ] in the *Final Determination*,

based on Petitioners' affiliation allegation, without any further explanation beyond that supplied in the Prelim. Decision Memo.  *See* IDM, P.R. 272 at 31-32.

Although Commerce concluded in the Prelim. Decision Memo that "the record is missing necessary information concerning" YDD's sales to its allegedly affiliated U.S. customer, and that YDD "had knowledge of this affiliation, but did not disclose it to Commerce," this is not an accurate description of the record.  P.R. 184 at 7.

The record was *not* "missing necessary information."  P.R. 184 at 7.  Commerce merely took Petitioners' affiliation allegation at face value.  YDD proffered information to rebut Petitioners' affiliation allegation, P.R. 181-182, C.R. 328-330, but Commerce decided not to consider it.  *Id.* at 8 (noting that YDD's rebuttal information was submitted "one day prior" to the *Preliminary Determination*).  This was arbitrary.  *See Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46 (1983) (agency action is "arbitrary and capricious" where the agency "entirely failed to consider an important aspect of the problem"); *see also Universal Camera Corp.*, 340 U.S. at 488 (an agency "must take into account whatever in the record fairly detracts from its weight").

Nor does the record support a finding that YDD withheld information relevant to the affiliation finding in the 2022 and 2023 financial statements of ASIA's and KazSilicon's parent company, [          ].  P.R. 184 at 7.  With respect to [          ]'s 2022 financial statements, Commerce found fault with the fact that they did not include an auditor's statement or management statement.  *Id.*  However, two weeks after the *Preliminary Determination*, Commerce reviewed the full financial statements at a sales verification during which company officials explained that draft financial statements had inadvertently been submitted rather the final financial statements.  P.R. 238 at 8.  Commerce officials compared these documents and

28

noted no discrepancies.  C.R. 481 at 5-6.  With respect to [            ]'s 2023 financial statements, Commerce was able to verify—*just two weeks after the Preliminary Determination*—that the 2023 consolidated financial statements were not ready as of the date of the *Preliminary Determination*.  C.R. 368 at Ex. SVE-2.  Therefore, Commerce should not have maintained its finding that YDD had withheld the 2023 financial statements or had failed to cooperate to the best of its ability.  YDD cannot produce records that do not exist yet.

Therefore, YDD had not failed to cooperate by failing to provide this information; YDD had told Commerce the 2023 statements were not ready and that it could provide them once they were.  *Cf.* 19 U.S.C. § 1677e(a)(2)(A).  Nor had YDD submitted information that could not be verified.  *Cf.* 19 U.S.C. § 1677e(a)(2)(D).  To the contrary, Commerce *resolved outstanding questions with regard to the 2022 and 2023 financial statements at verification*.  Commerce was also able to "tie{} the ownership and share capital of YDD, ASIA, and KazSilicon to their respective {} 2023 financial statements."  C.R. 481 at 4.  Accordingly, because YDD was a cooperating party, Commerce was not permitted to apply AFA.  *See* 19 U.S.C. § 1677e(b); *see also Husteel Co. v. United States*, 98 F.Supp.3d 1315.  Yet, Commerce continued to apply AFA anyway.

Furthermore, YDD did not withhold necessary information in its earlier questionnaire responses.  YDD fully complied with all of Commerce's information requests, and went to great lengths to cooperate with Commerce in discussing not only its own company's affiliations but in attempting to provide information Commerce requested about its customer, [            ]'s, sales process.  *See, e.g.*, C.R. 192 at Exs. S1-6.1, S1-6.2.  YDD did so even though it had reasonably concluded, based on applicable law and Commerce's past practice, that the sales to this customer would not be taken into account *at all* because they were reexported to Canada.  The fact that the

CEO of one of YDD's customers had a nominal board position with a company that has no ownership interest in, or control over, YDD is not a basis for an affiliation finding. *See* 19 U.S.C. § 1677(33); *TIJID, Inc.*, 366 F.Supp.2d at 1296-97. Therefore, *even if* YDD was aware of this CEO's nominal board position in [          ], an imputed affiliation on the basis of AFA is an unreasonable application of the law based on an unreasonable assessment of YDD's demonstrated cooperation throughout the agency proceeding. *See Nippon Steel Corp.*, 337 F.3d at 1382 ("Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information.").

Commerce should have reversed its finding in the *Preliminary Determination* that YDD had failed to cooperate. Consistent with Commerce's obligation under the statute to consider submitted information, YDD submitted information within nearly as much time as Petitioners' allegation for Commerce to consider it; YDD's ability to provide specific information requested by Commerce was verified; YDD's proffered information was not so incomplete that it could not serve as the basis for a determination contrary to Petitioners' allegation; YDD acted to the best of its ability in responding to Commerce's information requests; and Commerce could have considered YDD's rebuttal factual information in time to revise its finding for the *Final Determination* without undue difficulties. 19 U.S.C. § 1677m(e).

Commerce may not, at the end of a proceeding, conclude that the respondent failed to answer questions that Commerce never asked. An AFA determination is unlawful where Commerce failed to notify the respondent of a deficiency in its responses and failed to provide an opportunity to cure that deficiency. *See Mukand, Ltd. v. United States*, 767 F.3d 1300, 1304 (Fed. Cir. 2014) ("Before resorting to facts otherwise available, Commerce must notify the

respondent of the nature of the deficiency and, to the extent practicable, provide an opportunity for the respondent to remedy or explain the deficiency.").

Here, Commerce did not identify an apparent deficiency until it issued the Prelim. Decision Memo, and even then, Commerce read a deficiency into YDD's responses on the affiliation issue when Commerce had not asked about affiliation in the applicable question. In its first supplemental questionnaire response, YDD stated that it "did not have information on the operations of" [          ]. P.R. 184 at 8 (quoting P.R. 123; C.R. 189 at 12). But Commerce did not identify this response as deficient, or request more information on this response, in the second supplemental questionnaire. *See* P.R. 131; C.R. 217. Moreover, YDD's statement that it did not have information on [          ]'s operations was in response to Commerce's question about the inventory movement in and out of [          ]'s warehouse. P.R. 123; C.R. 189 at 12. The question had nothing to do with YDD's affiliated parties, actual or potential, and could hardly have put YDD on notice that this was an implied question on affiliation. Thus, Commerce's references to this YDD response are a disingenuous attempt to reverse-engineer a gap in the record where there wasn't one.

Commerce concluded that YDD failed to disclose information pertinent to its affiliation finding, but it was <u>Commerce</u> that chose to accept Petitioners' late-filed factual information alleging the affiliation and then refused to consider YDD's rebuttal factual information that shed further light on Petitioners' allegation. Commerce has "broad authority to gather information," and "may not justify the absence of evidence by invoking procedural difficulties that were at least in part a creature of its own making." *Albemarle Corp. v. United States*, 821 F.3d 1345, 1358-59 (Fed. Cir. 2016) (internal quotation marks and citation omitted). It is unreasonable for

31

Commerce to refuse to accept information in such circumstances and then blame YDD for its

own gatekeeping of the administrative record.  *Id.*

> **3.** **Commerce's decision to accept Petitioners' untimely filed factual information alleging affiliation, but refusal to accept YDD's factual information rebutting that allegation, was an abuse of discretion**

Commerce declined to accept the documentation YDD provided to rebut Petitioners' late-

in-the-day allegation, stating in the Prelim. Decision Memo that it was "unable to consider this

information for the preliminary determination because it was submitted one day before the

statutory deadline."  P.R. 184 at 6.  Yet, Commerce had accepted Petitioners' factual information

used to support the allegation, which was itself untimely filed factual information.  Commerce's

decision to accept Petitioners' late-filed factual information alleging an affiliation, but refusal to

accept YDD's rebuttal factual information to defend itself from this allegation, was an abuse of

discretion.

As YDD pointed out in its letter rebutting Petitioners' allegation, Commerce's

regulations did not allow Petitioners to submit the new factual information it placed on the

record.  *See* P.R. 181, C.R. 328-329.  Under Commerce's regulations, a party may, within 10

days after a supplemental questionnaire response has been filed with Commerce, "submit factual

information to rebut, clarify, or correct factual information contained in the questionnaire

response."  19 C.F.R. § 351.301(c)(1)(v).  Although Petitioners styled their allegation as

comments on YDD's third supplemental questionnaire response, YDD noted that the information

"does not in any way 'rebut, clarify, or correct factual information contained in the questionnaire

response.'"  P.R. 181 at 2.  Petitioners' allegation related to [

]—none of which had been the subject of YDD's third supplemental questionnaire

response.  While the supplemental questionnaire had asked about affiliations, it had specifically

asked about YDD's affiliations with ASIA and KazSilicon.  *See* C.R. 260, P.R. 159.  Commerce

determined to collapse YDD, ASIA, and KazSilicon into a single entity. P.R. 184 at 5.

Petitioners' allegation, however, had nothing to do with these entities or with Commerce's

collapsing determination.

Commerce's disparate treatment of Petitioners and YDD represents an egregious

unfairness between the parties in an agency proceeding, and undermines the interests of justice.

*See NSK Ltd.*, 798 F. Supp. at 725. On remand, the Court should require Commerce to consider

YDD's factual information submitted to rebut Petitioners' affiliation allegation and revise the

*Final Determination* in accordance with its reconsideration of this factual information.

### C. Commerce's Application of Zeroing Is Contrary to Law

Commerce has a long-established practice of not using zeroing in antidumping

investigations in which it applies its sales comparison methodology known as the "average-to-

average" method. *See Antidumping Proceedings: Calculation of the Weighted–Average*

*Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77722

(Dep't Commerce Dec. 27, 2006) ("*Final Modification*"). Commerce departed from this long-

established practice in using zeroing when calculating YDD's dumping margin despite applying

the average-to-average sales comparison method for YDD's sales. Commerce's use of zeroing

in these circumstances was not in accordance with its own practice, and Commerce's failure to

explain its change in practice in this case is unlawful.

The Act defines "dumping margin" as the "amount by which the normal value exceeds

the export price or the constructed export price of the subject merchandise." 19 U.S.C.

§ 1677(35). In "normal investigations," Commerce determines the dumping margin by

comparing either (a) the weighted average of the normal values to the weighted average of the

export prices, or (b) the normal values of individual transactions to the export prices of

individual transactions. *See* 19 U.S.C. § 1677f–1(d)(1)(A); *see also U.S. Steel Corp. v. United*

33

*States*, 621 F.3d 1351, 1362 (Fed. Cir. 2010). The first of these comparison methods is referred to as the "average-to-average" method. As Commerce itself has recognized, both the Statement of Administrative Action ("SAA")[4] and Commerce's own regulations express a preference for the use of the average-to-average comparison method in investigations. *See Final Modification*, 71 Fed. Reg. at 77723 (citing H.R. Doc. No. 103-316, vol. 1, at 842-43 (1994) and 19 C.F.R. § 351.414(c)(1)).

In certain circumstances, Commerce has used a method called "zeroing" in which it sets negative dumping margins (*i.e.*, those sales in which the margins are above normal value and are therefore not dumped) to zero rather than aggregating these negative margins with positive margins. *See Union Steel v. United States*, 713 F.3d 1101, 1104 (Fed. Cir. 2013). The effect of zeroing is to increase the dumping margin because it prevents sales with negative margins (*i.e.*, non-dumped sales) from offsetting sales with positive margins (*i.e.*, dumped sales).

One other element of Commerce's price comparison methodology bears mentioning, if only to demonstrate that Commerce confirmed in the *Preliminary Determination* and the *Final Determination* that the average-to-average method was the proper comparison method to apply in this investigation. Commerce is permitted to use an alternative to the average-to-average price comparison method (such as the average-to-transaction method) when it determines that there is a "pattern" of prices "that differ significantly among purchasers, regions, or periods of time." *See* 19 U.S.C. § 1677f–1(d)(1)(A). In this case, Commerce determined, using its differential pricing methodology, that no such "pattern of prices" existed and therefore, YDD's sales data "do not support consideration of an alternative to the average-to-average method." C.R. 338 at 5; C.R. 502 at 4.

---

[4] The SAA is "recognized by Congress as an authoritative expression concerning the interpretation and application of the Tariff Act." *Albemarle Corp*, 821 F.3d at 1351 (citation omitted).

In 2006, in response to an adverse ruling by a World Trade Organization ("WTO") dispute settlement panel, Commerce determined in a notice-and-comment rulemaking that it would no longer use zeroing when applying the average-to-average comparison method. *Final Modification*, 71 Fed. Reg. 77722. This agency rule has been upheld by the CAFC and remains undisturbed in Commerce's normal practice. *See U.S. Steel*, 621 F.3d at 1362-63; *see also Union Steel*, 713 F.3d at 1105, 1109 n.9.

Thus, in accordance with its long-standing practice, Commerce should not have used zeroing in this case because it was applying the average-to-average method in an investigation. Yet, that is precisely what Commerce did.

In the average-to-average method, the weighted-average dumping margin calculation includes sales with negative dumping margins (*i.e.*, sales where the net U.S. price exceeds the normal value) because these sales are averaged together. The margin program language itself notes that the average-to-average method "offset{s} positive comparison results with negative comparison results." C.R. 341 at 104. Due to Commerce's application of partial AFA to YDD's sales to [          ], Commerce set a specific margin to sales to that customer in the margin calculation. C.R. 338 at 3. YDD's sales to other customers, which were coded [

                                          ] in Commerce's margin program, should have been treated normally under the average-to-average method, which would have meant including sales with negative dumping margins so that they would offset sales with positive dumping margins. *See id.* at 3, 5. However, in the "Comparison Market Output" Excel file accompanying the Prelim. Calc. Memo, Commerce set the total amount of dumping for non-[          ] sales to zero, C.R. 350, even though the total was in fact a negative number. *See* C.R. 344.

YDD attempted to bring this to Commerce's attention as a ministerial error because it appeared to be a simple calculation error on Commerce's part. *See* C.R. 358. However, Commerce rejected the ministerial error allegation, claiming that the agency had made a "methodological choice and not a ministerial error," and therefore would not amend its *Preliminary Determination* on the basis of a ministerial error allegation. *See* IDM, P.R. 272 at 33.

However, Commerce's calculation of U.S. price is incongruent with how the average-to-average method has long been understood. As the CAFC has previously explained, "Commerce justifies using zeroing in administrative reviews but not in investigations in part based on the different comparison methodologies used in each." *Union Steel*, 713 F.3d at 1108. The average-to-average method "justifies the use of offsetting (i.e., not zeroing)" because in average-to-average price comparisons, Commerce divides transactions into averaging groups based on physical characteristics and level of trade of each group. *See id.* Thus, in an average-to-average comparison, Commerce compares EP to normal value on the basis of individual EPs that have already been averaged together with high and low EPs. *See id.* In other words, in an average-to-average price comparison, high EPs already offset low EPs within each averaging group. *See id.* at 1109. The margin program language itself notes that the average-to-average method "offset{s} positive comparison results with negative comparison results." C.R. 341 at 104.

The fact that the average-to-average comparison already offsets low EPs makes zeroing in this case an excessively punitive exercise because it further discounts non-dumped sales that have already been averaged with lower-priced sales. Non-dumped sales (*i.e.*, those with higher EPs) have already been averaged *downward* by virtue of being averaged with lower-priced sales. Applying zeroing eliminates that offsetting that is supposed to be taken into account by the

average-to-average comparison.  Commerce's normal practice of not using zeroing in average-to-average comparisons therefore "reasonably reflects" an EP calculation process that is "unique" compared to the other comparison methodologies such as the average-to-transaction method.  *See Union Steel*, 713 F.3d at 1108-09.

Moreover, if Commerce did in fact make a "methodological choice"—which would be an alteration to how it typically applies the average-to-average method—Commerce failed to explain what that methodological choice was.  In a single paragraph in the IDM, Commerce justified its use of zeroing by referring back to its *Preliminary Determination*, stating in a conclusory fashion that "Commerce's analysis and determination regarding the methodology for calculating {YDD's} margin is best explained within the *Preliminary Determination* and {YDD's} Preliminary Calculation Memorandum."  P.R. 272 at 33.  However, the Preliminary Calculation Memorandum explains that, due to Commerce's application of partial AFA to YDD's sales to [          ], Commerce set a specific margin to sales to that customer in the margin calculation.  C.R. 338 at 3.  This should not have effected YDD's sales to other customers, which were labeled [                                              ] in Commerce's margin program and which were considered using the average-to-average method. *See id.* at 3, 5.  As already noted above, the margin program language included in Attachment II to Commerce's Preliminary Calculation Memorandum states that the average-to-average method "offset{s} positive comparison results with negative comparison results."  C.R. 341 at 104.

Yet, as YDD explained in its ministerial error allegation, Commerce set the negative (*i.e.*, non-dumped) non-[          ] sales to zero in the margin calculation.  *Compare* C.R. 358 at Att. 1, *with id.* at Att. 2.  In the IDM, Commerce failed to offer any explanation of its reasoning for setting these sales to zero.  Contrary to Commerce's claim in the IDM, the Preliminary

Calculation Memorandum does not provide an explanation for why Commerce used zeroing in

calculating the margins for the non-[        ] sales.

Where, as here, Commerce acts differently in one case than it has consistently acted in

similar circumstances without providing a reasonable explanation, its actions are arbitrary.

*Consol. Bearings Co.*, 348 F.3d 997, 1007; *Motor Vehicles Mfrs. Ass'n of U.S.* at 463 U.S. 57

(1983) ("an agency changing its course must supply a reasoned analysis") (citation omitted).

Commerce's failure to provide an adequate explanation for its reversal of long-standing agency

practice requires a remand for Commerce to explain its reasoning, or else revise its determination

based on substantial evidence. *See Hyundai Steel Co. v. United States*, 415 F. Supp. 3d 1293,

1301-03 (Ct. Int'l Trade 2019) (remanding Commerce's calculation of a combined rate for

affiliated importers where there was no evidence of possible manipulation, a departure from

Commerce's prior practice without reasonable explanation).

> ### D. Commerce's Calculation of the Partial AFA Portion of YDD's Final Antidumping Duty Margin Was Incorrect and Therefore Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law

In the *Final Determination*, Commerce did not correctly calculate the partial AFA

portion of YDD's final weighted-average dumping margin. Commerce used a "highest

transaction-specific margin" that does not appear in the data despite stating that it made no

methodological change from the *Preliminary Determination*. YDD raised this issue in its

ministerial error allegation, P.R. 281, C.R. 521, but Commerce determined that YDD's allegation

was "methodological, and not ministerial, in nature" and rejected YDD's claim. P.R. 284 at 2.

Commerce's decision not to correct the ministerial error was arbitrary and an abuse of discretion.

Commerce has a statutory obligation to correct ministerial errors "within a reasonable

time after {final} determinations are issued." 19 U.S.C. § 1673d(e) (defining ministerial errors

to include "errors in addition, subtraction, or other arithmetic function, clerical errors resulting

from inaccurate copying, duplication, or the like, and any other type of unintentional error"). Commerce's refusal to correct a ministerial error is an abuse of discretion. *See, e.g.*, *NTN Bearing Corp.*, 74 F.3d at 1207-09 (reversing CIT to hold that information provided by respondent was not new factual information, as suggested by Commerce, but identification of clerical errors that were ministerial errors Commerce should have corrected in the final determination).[5]

As explained in YDD's ministerial error allegation, as partial AFA, Commerce applied what it termed the "highest transaction-specific margin" calculated on a YDD sale to the [    ] U.S. sales made to [        ] during the POI.  P.R. 281, C.R. 521 (citing P.R. 190, C.R. 338 at 3).  In the *Preliminary Determination*, Commerce had used the highest transaction-specific margin of 35.61 percent as the AFA rate for these sales, as explained in Commerce's Prelim. Calc. Memo.  P.R. 190, C.R. 338 at 3.

In the *Final Determination*, Commerce continued to use the same methodology to calculate the AFA portion of YDD's final antidumping duty margin.  Indeed, in its analysis memo responding to YDD's ministerial error allegation, Commerce stated that it "made no change to its methodology for purposes of the *Final Determination*."  P.R. 284 at 2.  However, despite Commerce having made no methodological change, a new "highest transaction-specific margin" of [    ] percent appeared in Commerce's final calculation documents.  *See* C.R. 502 (Final Calc. Memo), C.R. 504 (Attachment II).

Commerce derived the final dumping margin by weight-averaging the dumping margin for the partial AFA [        ] sales (coded "EQ" in the margin program) and the dumping

---

[5]  Although *NTN Bearing Corp.* involved an appeal from an administrative review, and cites a different statutory provision, Commerce has the same obligation to correct ministerial errors in investigations and periodic reviews.

margin for sales to all other customers (coded "NE" in the margin program), as explained in the

Prelim. Calc. Memo. P.R. 190, C.R. 338 at 3. Commerce calculated the final cash deposit rate

for each "customer group" (the [     ] [          ] sales and the non-[          ] sales) as the total

amount of dumping divided by the total sales value, as it did in the *Preliminary Determination*.

*Compare* C.R. 340 (Prelim. Comparison Market Output Excel File), *with* C.R. 506 (Final Calc.

Memo at Att. IV).[6]

The "total amount of dumping" is calculated by multiplying the total value of sales by the

cash deposit rate which, in the case of the [          ] sales, was the highest transaction-specific

margin calculated in Commerce's SAS computer program. Commerce's final calculation in

Attachment IV shows a "total amount of dumping" of [          ] for the [          ] sales with

a highest transaction-specific margin of [          ] percent. C.R. 506. However, the underlying

margin summary in Attachment II shows that the "total amount of dumping" for [          ] sales

is [          ]. C.R. 504 at 42. In addition, that same output shows that the highest individual

margin calculated is [          ] percent. *Id.*

YDD argued that in order to correct the margin by using Commerce's methodology, the

revised Total Amount of Dumping should equal:

the highest transaction-specific margin of [          ]% * TOTVAL of [          ].

P.R. 281, C.R. 521 at 3. As a result, the Total Amount of Dumping should be [          ] and

the corrected final cash deposit rate with the application of partial AFA should have been 4.22

percent.

---

[6]     The headings in the Excel files contain the calculation formulae. For Cash Deposit Rates, the formula is C = B("Total Amount of Dumping")/A("TOTVAL").

Instead, the cash deposit rate of [     ] percent was inserted into Commerce's calculations, and the Total Amount of Dumping was calculated as the cash deposit rate of [     ] percent times the TOTVAL of [          ]. C.R. 506. Because the Total Amount of Dumping calculation relies on the cash deposit rate (in this case, the highest transaction-specific margin), it is not possible to work backwards to calculate the [     ] percent number. Thus, it is not clear to YDD how Commerce arrived at [     ] percent as the highest transaction-specific margin.

YDD has replicated Commerce's margin calculation and found that there is not a single sale for which the highest individual dumping margin is [     ] percent. In actuality, the highest transaction-specific dumping margin is [     ] percent, as reflected in the Prelim. Calc. Memo. C.R. 338 at Att. II.

As noted above, Commerce rejected YDD's ministerial allegation by concluding that the allegation was methodological. According to Commerce, "the results of the margin program state the 'maximum transaction margin' and disclose the highest transaction-specific margin that Commerce used for the partial AFA calculation." P.R. 284 at 3. However, Commerce did not address YDD's contention that the highest transaction-specific dumping margin is [     ] percent rather than [     ] percent. Commerce simply relied on the printout of the highest transaction-specific margin but did not indicate if it investigated whether that margin was correctly calculated. According to Commerce, it "used certain language in each of the margin programs to print the highest transaction-specific margin under 'maximum transaction margin' in the results section of each program." *Id.*

However, evidence on the record suggests that the underlying datafile used to produce Commerce's SAS printout for the *Final Determination* was incorrect. Page 226 of the margin

calculation log provides the SAS language for the printout of the maximum transaction margin

for the [    ] [        ] sales.  C.R. 505.  According to this language, the file that Commerce

used in the SAS program, and that resulted in the printout, was not from the *Final*

*Determination*, but apparently some kind of "preliminary" file:

> 10187    proc sort data=company.ydd_invest_**prelim**_tranmarg out= max_tranmarg;
> 10188        by descending pctmarg;
> 10189    run;

*Id.* (emphasis added).  Even though the language refers to "prelim," the maximum transaction

margin result does not match the maximum transaction margin found in the *Preliminary*

*Determination.*

The final maximum transaction margin of [        ] percent is a mystery rate that does not

otherwise appear in the underlying SAS program data, and there is no indication of the origin of

that margin in Commerce's SAS program.  C.R. 521 at 2.  Clearly, Commerce made a ministerial

error—an error "in addition, subtraction, or other arithmetic function," or a "clerical error{}

resulting from inaccurate copying, duplication, or the like," 19 U.S.C. § 1673d(e)—by

inadvertently applying the non-existent highest transaction-specific dumping rate of [        ]

percent as the AFA rate applied to YDD's [        ] sales.

Elsewhere in the record, the final margin output printout indicates that the highest

transaction-specific margin was [        ] percent.  *See* C.R. 504 at Att. 2, p.42.  Thus, the record

suggests that the rate of [        ] percent used by Commerce was not actually calculated based on

YDD's sales, but was inserted in error.  But this went unaddressed in Commerce's final

ministerial analysis memo in response to YDD's ministerial error allegation.  Therefore, the

Court should remand this issue to Commerce for further analysis and explanation as to the actual

highest transaction-specific margin for use as the partial facts available rate.

## VI.    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court hold that

Commerce's *Final Determination* is not supported by substantial evidence and otherwise not in

accordance with law, remand the *Final Determination* to Commerce for reconsideration

consistent with the opinion of this Court, and order such other relief that the Court deems just

and proper.

Respectfully submitted,

Matthew J. McConkey
Ryan R. Migeed
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3235
*Counsel to YDD Corporation LLP*

Dated: November 7, 2025

## CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURES 2(B)(1)

The undersigned hereby certifies that this brief contains 12,539 words, exclusive of the corporate disclosure statement, table of contents, table of authorities, glossary of case-specific acronyms and abbreviations, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation as set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

Matthew J. McConkey
Ryan R. Migeed
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3235
*Counsel to YDD Corporation LLP*

## CERTIFICATE OF SERVICE

Pursuant to Rule 5(f) and 5(g) of the Rules of the U.S. Court of International Trade, I, Steven Elliott, Mayer Brown LLP, hereby certify that on November 7, 2025, copies of the foregoing Rule 56.2 Motion For Judgment On The Agency Record and Memorandum In Support Thereof were served upon the individuals listed below. On November 5, 2025, Christine M. Streatfeild of Baker McKenzie, LLP, lead attorney for Consolidated Plaintiff TNC Kazchrome JSC, consented to receive service of this confidential document electronically. On November 6, 2025, Adam Henry Gordon of The Bristol Group PLLC, lead attorney for Defendant-Intervenors CC Metals and Alloys, LLC, and Ferroglobe USA, Inc., also consented to receive service of this confidential document electronically. Therefore, service to the below will be effectuated via secure file transfer unless otherwise noted:

Defendant United States:
Emma E. Bond
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
emma.e.bond@usdoj.gov **(via paper copy)**

Consolidated Plaintiff TNC Kazchrome JSC:
Christine M. Streatfeild
Baker McKenzie, LLP
815 Connecticut Avenue, NW.
Suite 900
Washington, DC 20006-4078
christine.streatfeild@bakermckenzie.com

Defendant-Intervenors CC Metals and Alloys, LLC, and Ferroglobe USA, Inc.:
Adam Henry Gordon
The Bristol Group PLLC
1707 L Street, NW
Suite 1050
Washington, DC 20036
adam.gordon@bristolgrouplaw.com