# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| YDD CORPORATION LLP, and<br>TNC KAZCHROME JSC, | ) |
| Plaintiffs, | ) |
| v. | ) Consol. Court No. 25-00100 |
|  | ) **PUBLIC VERSION** |
| UNITED STATES, | ) (BPI information removed from |
| Defendant, | ) pages 4, 6, 12) |
| and | ) |
| CC METALS AND ALLOYS, LLC and<br>FERROGLOBE USA, INC., | ) |
| Defendant-Intervenors. | ) |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

BRETT A. SHUMATE
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:
BRIEN STONEBREAKER
Attorney
Office of the Chief Counsel
  for Trade Enforcement & Compliance
U.S. Department of Commerce

CLAUDIA BURKE
Deputy Director
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-7568
Fax: (202) 307-0972
Email: claudia.burke@usdoj.gov

Dated: February 9, 2026

Attorneys for Defendant

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ..................................................................2

    I.    Administrative Determination Under Review ........................................2

    II.   Issues Presented for Review ..................................................................2

STATEMENT OF THE FACTS................................................................................3

    I.    The Antidumping Investigation ............................................................3

        A.  Commerce's Investigation of YDD's U.S. Sales and Affiliations ....................4

        B.  Preliminary and Final Determinations for YDD.................................5

        C.  Commerce's Investigation of Kazchrome's Date of Sale ..................7

        D.  Preliminary and Final Determinations for Kazchrome......................7

        E.  Ministerial Error Allegations ...........................................................9

SUMMARY OF THE ARGUMENT .........................................................................9

ARGUMENT .......................................................................................................11

    I.    Standard of Review................................................................................11

    II.   Record Evidence Demonstrates that YDD's Sales Were to a U.S. Customer.........12

    III.  Commerce's Decision To Apply Partial  Available with Adverse Inferences Is Supported by Substantial Evidence and Is Otherwise in Accordance with Law ....14

        A.  Legal Framework for Using Facts Available ...................................15

        B.  YDD Failed To Provide Necessary Information Requested by Commerce and Impeded the Investigation.................................................................16

        C.  Commerce's Selection of the Partial AFA Rate Was Not a Ministerial Error...22

    IV.  Commerce's Calculation Of YDD's Weighted Average Dumping Margin Was Lawful and Supported by the Record.................................................................26

    V.   Commerce's Determination To Use the Shipment Date as the Date of Sale Is Supported by Substantial Evidence and Otherwise in Accordance with Law ........30

i

CONCLUSION...................................................................................................................33

# TABLE AUTHORITIES

**Cases**                                                                                      **Page(s)**

*ABB Inc. v. United States*,
    355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ........................................................... 21

*Allied Tube & Conduit Corp. v. United States*,
    127 F. Supp. 2d 207 (Ct. Int'l Trade 2000) ............................................................ 29

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)................................................................................................11

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ...............................................................................................11

*Euro SME SDN BHD v. United States*,
    2024 WL 550334 (Ct. Int'l Trade 2024) ................................................................ 23

*Hitachi Energy USA Inc. v. United States*,
    34 F. 4th 1375 (Fed. Cir. 2022) ............................................................................. 17

*Hyundai Elec. & Energy Sys. Co. v. United States*,
    15 F. 4th 1078 (Fed. Cir. 2021) ............................................................................. 20

*Linyi Chengen Imp. & Exp. Co. v. United States*,
    391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ......................................................... 19

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984) ...............................................................................11

*Maverick Tube Corp. v. United States*,
    857 F. 3d 1353 (Fed. Cir. 2017) ............................................................................ 20

*Mittal Steel Point Lisas Ltd. v. United States,*
    548 F.3d 1375  (Fed. Cir. 2008) ............................................................................ 29

*Mosaic Co. v. United States*,
    No. 24-1593, 2025 WL 3493279 (Fed. Cir. Dec. 5, 2025) .....................................11

*Nakornthai Strip Mill Pub. Co. Ltd. v. United States*,
    614 F. Supp. 2d 1323 (Ct. Int'l Trade 2009) ......................................................... 29

*Nat'l Nail Corp. v. United States*,
    390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019) ......................................................... 17

*Nippon Steel Corp. v. United States*,
　337 F.3d 1373 (Fed. Cir. 2003) ........................................................... 15

*Nippon Steel Corp. v. United States*,
　458 F.3d 1345 (Fed. Cir. 2006) ...........................................................11

*Papierfabrik August Koehler SE v. United States*,
　843 F.3d 1373 (Fed. Cir. 2016) ........................................................... 20

*QVD Food Co., LTD., v. United States*,
　658 F. 3d 1318 (Fed. Cir. 2011) .......................................................... 23

*Saha Thai Steel Pipe Public Company Ltd. v. United States*,
　663 F. Supp. 3d 1356 (Ct. Int'l Trade 2023) ................................. 17, 18, 20

*Sahaviriya Steel Indus. Public Co. v. United States*,
　714 F. Supp. 2d 1263 (Ct. Int'l Trade 2010), *aff'd*, 649 F.3d 1371 (Fed. Cir. 2011) .......... 28, 29

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*,
　605 U.S. 168 (2025) ............................................................................11

*Shandong Dongfang Bayley Wood Co. v. United States*,
　375 F. Supp. 3d 1339 (Ct. Int'l Trade 2019) ...................................... 20

*Timken Co. v. United States*,
　354 F.3d 1334 (Fed. Cir. 2004) ........................................................... 27

*Tianjin Magnesium Int'l Co. v. United States*,
　844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ...................................... 15

*U.S. Steel Corp. v. United States*,
　621 F.3d 1351 (Fed. Cir. 2010) ........................................................... 27

*Universal Camera Corp. v. NLRB*,
　340 U.S. 474 (1951) ............................................................................11

*Viraj Group, Ltd. v. United States*,
　343 F.3d 1371 (Fed. Cir. 2003) ..................................................... 29, 30

*Zhaoqing New Zhongya Aluminum Co. v. United States*,
　70 F. Supp. 3d 1298 (Ct. Int'l Trade 2015) ...................................... 18

**Statutes**

19 U.S.C. § 1516a(b) ...................................................................................................11

19 U.S.C. § 1673d(e) ............................................................................................. 22, 24

19 U.S.C. § 1677(33) ............................................................................................. 17, 18

19 U.S.C. § 1677(33)(E) ............................................................................................ 16

19 U.S.C. § 1677(33)(G) ........................................................................................... 16

19 U.S.C. § 1677e ...................................................................................................... 10

19 U.S.C. § 1677e(a) ....................................................................................... 6, 14, 21

19 U.S.C. § 1677e(b) ......................................................................................... *passim*

19 U.S.C. § 1677e(d) ................................................................................................. 15

19 U.S.C. § 1677m(d) ......................................................................................... 19, 20

**Rules**

RCFC 56.2 .................................................................................................................. 1

**Regulations**

19 C.F.R. § 351.224(f) ...................................................................................... *passim*

19 C.F.R. § 351.224(g) ......................................................................................... 22, 24

19 C.F.R. § 351.308(c) .............................................................................................. 15

19 C.F.R. § 351.401(i) .................................................................................... 8, 28, 29

19 C.F.R. § 351.414(c) .............................................................................................. 26

**Administrative Determinations**

*Antidumping Duties; Countervailing Duties: Final Rule,*
    62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) ............................. 8, 28, 29

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Antidumping Duty Proceedings*,
77 Fed. Reg. 8,101 (Feb. 14, 2012) ......................................................................... 26

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*,
71 Fed. Reg. 77,722 (Dep't Commerce Dec. 27, 2006) .......................................... 26

*Ferrosilicon From Brazil, Kazakhstan, Malaysia, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*,
89 Fed. Reg. 31,137 (Dep't of Commerce April 24, 2024) ....................................... 3

*Ferrosilicon From Kazakhstan: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*,
90 Fed. Reg. 14,077 (Dep't of Commerce Mar. 28, 2025), and accompanying Issues and Decision Memorandum................................................................................. *passim*

*Ferrosilicon From Kazakhstan: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*,
89 Fed. Reg. 88,007 (November 6, 2024)................................................................... 5

*Tin Mill Products from the Netherlands:  Final Determination of Sales at Less Than Fair Value*,
89 Fed. Reg. 1524 (Dep't Commerce Jan. 10 2024), and accompanying Issues and Decision Memorandum......................................................................................... 12, 13

Statement of Administrative Action for Uruguay Round Agreements Act,
H.R. Rep. No. 103-316, vol. I (1994). ............................................................... 26, 27

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| YDD CORPORATION LLP, and ) <br> TNC KAZCHROME JSC, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant, ) <br> ) <br> and ) <br> ) <br> CC METALS AND ALLOYS, LLC and ) <br> FERROGLOBE USA, INC., ) <br> ) <br> Defendant-Intervenors. ) | Consol. Court No. 25-00100 <br> **PUBLIC VERSION** <br> (BPI information removed from <br> pages 4, 6, 12) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,

respectfully responds in opposition to the motions for judgment on the agency record filed by

YDD Corporation LLP (YDD) and TNC Kazchrome JSC (Kazchrome), challenging the U.S.

Department of Commerce's (Commerce's) final determination in the antidumping investigation

of Ferrosilicon from Kazchstan.  *See* ECF No. 32 (YDD Br.); ECF No. 30 (Kazchrome Br.).

Commerce's determinations regarding (1) the treatment of YDD's sales as U.S. sales; (2) an

adverse inference applied to YDD; (3) the methodology used to calculate YDD's weighted-

average dumping margin (including treatment of offsets and the alleged ministerial error); and

(4) the use of shipment date as the date of sale for Kazchrome, are all supported by substantial

evidence and otherwise in accordance with law.  Accordingly, we respectfully request that the

Court deny YDD's and Kazchrome's motions and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.      Administrative Determination Under Review

YDD and Kazchrome challenge certain aspects of Commerce's final determination in the

antidumping investigation of Ferrosilicon from Kazakhstan.  *Ferrosilicon From Kazakhstan:*

*Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative*

*Determination of Critical Circumstances*, 90 Fed. Reg. 14,077 (Dep't of Commerce Mar. 28,

2025) (P.R. 280) (*Final Determination*), and accompanying Issues and Decision Memorandum

(IDM) (P.R. 272).

### II.     Issues Presented for Review

1.      Whether Commerce's use of YDD's sales to a specific U.S. customer as U.S. sales

was supported by substantial evidence when documentation showed the destination and final

customer to be in the United States.

2.      Whether Commerce's decision to apply partial facts available with adverse

inferences to YDD was lawful when YDD had multiple chances to disclose potential affiliation

but waited until the day before Commerce's statutory deadline to submit any evidence.

4.      Whether Commerce's calculation of YDD's weighted-average dumping margin

reflects a methodological decision and is supported by substantial evidence when Commerce was

merely accounting for both the adverse inference sales and the non-adverse inference sales.

4.      Whether Commerce's determination to use the shipment date as the date of sale

for Kazchrome is supported by substantial evidence and otherwise lawful when the shipment

date better reflected when the terms of the sale were finalized.

## STATEMENT OF THE FACTS

### I.    The Antidumping Investigation

On March 28, 2024, CC Metals and Alloys, LLC and Ferroglobe USA, Inc. (collectively, Petitioners) filed antidumping duty petitions alleging that ferrosilicon from the Republic of Kazakhstan was being sold in the United States at less than fair value.  (P.R. 8; C.R. 8).  Commerce initiated the investigation on April 24, 2024, covering the period of investigation from January 1, 2023, through December 31, 2023.  *Ferrosilicon From Brazil, Kazakhstan, Malaysia, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 31,137 (Dep't of Commerce Apr. 24, 2024) (P.R. 24).

Commerce selected YDD and Kazchrome as mandatory respondents,[1] and in May 2024, the U.S. International Trade Commission issued an affirmative preliminary injury determination.  *See* United States Int'l Trade Comm'n Memorandum (May 20, 2024) (P.R. 48).  Commerce issued antidumping questionnaires to both mandatory respondents in June 2024.  Commerce also issued supplemental questionnaires during the investigation, which received timely responses.  Commerce conducted on-site verification of YDD and Kazchrome, issuing reports in December 2024 and February 2025.[2]

---

[1]    *See* Respondent Identification Memorandum on June 10, 2024, in which Commerce clarified its earlier Respondent Selection Memorandum where it had initially selected TELF AG as a mandatory respondent.  (P.R. 55; C.R. 37).

[2]    *See* Verification of Sales Response of YDD in the Less-Than-Fair-Value Investigation of Ferrosilicon from Kazakhstan (December 27, 2024) (YDD Sales Verification Report) (P.R. 226; C.R. 481); Verification of the Cost Response of YDD in the Less-Than-Fair-Value Investigation of Ferrosilicon From Kazakhstan (February 10, 2025) (YDD Cost Verification Report) (P.R. 251; C.R. 494); Verification of Sales Response of Kazchrome in the Less-Than-Fair-Value Investigation of Ferrosilicon from Kazakhstan (December 27, 2024) (Kazchrome Sales Verification Report) (P.R. 227; C.R. 482); Verification of the Cost Response of Kazchrome in the Less-Than-Fair-Value Investigation of Ferrosilicon From Kazakhstan (February 10, 2025) (Kazchrome Cost Verification Report) (P.R. 252; C.R. 495).

### A.    Commerce's Investigation of YDD's U.S. Sales and Affiliations

During the investigation, Commerce requested that YDD identify all affiliations and disclose information about its U.S. sales, including any relationships that could affect pricing or sales of subject merchandise.  Preliminary Determination Memorandum (October 31, 2024) (PDM) at 2-3, 6-7 (P.R. 184); *see also* YDD AD Questionnaire (P.R. 56 at A-3-A6); Supplemental Section A-C Questionnaire (September 3, 2024) (YDD ACQ) (P.R. 109). Commerce's questionnaire instructed respondents to report potential affiliations and to seek clarification from Commerce if uncertainty existed regarding whether a relationship constituted an affiliation.  YDD Initial Questionnaire (June 10, 2024) (YDD IQ) (P.R. 56 at G-10).  YDD referred to [                    ] (U.S. customer) as unaffiliated and reported its sales to this customer  *See* YDD Section A Questionnaire Response, at 15-16 (July 10, 2024) (YDD's AQR) (P.R. 78; C.R 52); Section C Questionnaire Response, at C-16, C-17 (July 31, 2024) (YDD's CQR) (P.R. 87; C.R. 78-101).

On October 24, petitioner submitted information indicating that an individual associated with YDD's parent company also held a position with a U.S. customer of YDD, [        ].  (P.R. 176; C.R. 325).  YDD responded to the allegation on October 30, contending first, that petitioner's information was untimely, second, that petitioner had misunderstood the relevant corporate structure, and last, that the sale at issue was destined for the Canadian market in any event, and so affiliation was irrelevant.  *See* Response to Petitioners' October 24, 2024, Pre-Preliminary Comments (October 30, 2024) (YDD's October 30 Comments) (P.R. 181; C.R. 328-329).

### B.    Preliminary and Final Determinations for YDD

Commerce signed its Preliminary Determination on October 31, 2024, the statutory deadline. *See Ferrosilicon From Kazakhstan: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 88,007 (Dep't of Commerce Nov. 6, 2024) (P.R. 199).

Commerce determined that YDD did not disclose information necessary to evaluate whether a potential affiliation existed between YDD and the U.S. customer and did not provide documentation sufficient to permit Commerce to assess the nature of the relationship. PDM at 6-7 (P.R. 184). Specifically, Commerce stated it was "unable to consider" the rebuttal information submitted by YDD because "it was submitted only one day before the statutory deadline." *Id.* at 6. Because YDD had not disclosed the potential affiliation, despite record evidence that it "had knowledge of" the relevant person's identity, "Commerce did not have the opportunity to examine the nature of {YDD's} relationship with this particular U.S. Customer in the context of this preliminary determination." *Id.* at 6-7. And, "{g}iven that the record is missing necessary information" about YDD's sales to this U.S. customer, Commerce determined to rely on facts otherwise available. *Id.* at 7.

Further, Commerce preliminarily determined to apply an adverse inference to YDD pursuant to sections 19 U.S.C. § 1677e(a) and (b). *Id.* at 7-8. Commerce found that YDD had withheld requested information, failed to provide information in the form and manner requested, and significantly impeded the investigation. *Id.* As an adverse inference, Commerce applied the highest transaction-specific dumping margin calculated for any respondent (35.61 percent) to

those sales.  Preliminary Determination Margin Calculation for YDD (October 31, 2024); (YDD

Preliminary Calculation Memorandum) (P.R. 190; C.R. 338).

Commerce continued to apply partial AFA in the *Final Determination*.  IDM 31-32.

Commerce first responded to YDD's contention in its case brief that the affiliation issue was

irrelevant because it did not concern a U.S. sale.  Commerce's investigation compares home

market sales to U.S. sales and as such, Commerce does not consider as U.S. sales, imports that

are not likely to be sold in the U.S.  IDM at 28.  YDD claimed that sales to [          ] were

destined for Canada and therefore not U.S. sales at all.  Commerce determined that "these sales

were shipped, and entered for consumption, into the United States without any qualification or

limitation of U.S. entry, such as through a bonded warehouse . . . .".  IDM at 29-30.  Commerce

also noted that YDD "did not provide signed documentation, certificates, or contracts that

disclose the final destination as Canada.  In the international freight invoices provided by

{YDD}, the signed invoices indicate the United States as the destination of the subject

merchandise. . . .".  *Id*. at 30.

Assuming then, that YDD should have considered these sales as U.S. sales, Commerce

explained that YDD's failure to disclose information concerning its relationship with a U.S.

customer prevented Commerce from accurately assessing U.S. sales and impeded the

investigation.  *Id*.  Commerce further determined that YDD had failed to cooperate by not acting

to the best of its ability in responding to Commerce's requests for information.  *Id*.  Although

Commerce's decision from the *Preliminary Determination* did not change, the highest

transaction-specific margin under the "Maximum Transaction Margin" results increased to 50.68

percent.  *See* YDD Final Analysis Memorandum at Attachment III, p. 60 (March 21, 2025) (YDD

Final Calculation Memorandum) (P.R. 273-274; C.R. 502-513).

Commerce also addressed YDD's contention that Commerce committed a ministerial error by incorrectly using its abandoned zeroing methodology in calculating YDD's weighted average dumping margin.  Commerce explained that YDD's allegation did not identify a clerical or arithmetic error, but instead challenged Commerce's methodological choices in implementing the partial adverse inference and applying the A-A comparison method to YDD's U.S. sales after the differential pricing analysis showed that only 11.26 percent of sales passed the test. Commerce further explained that, in implementing partial AFA, it created two margin programs, combined the results, and reported zero as the total amount of dumping for sales not subject to AFA because the SAS margin program aggregated positive and negative comparison results and yielded a net zero dumping amount for those sales. Commerce therefore determined that its calculations accurately reflected its intended methodology and properly rejected YDD's allegation as outside the scope of a ministerial error.

### C.    Commerce's Investigation of Kazchrome's Date of Sale

In its questionnaire responses, Kazchrome stated that 100% of its sales were to TELF and governed by a long-term contract.  Initially, Kazchrome reported the shipment date as the date of sale.  BCQR at B-18 and 19 (P.R. 89-90, C.R. 103-104).  Then, in a later response, Kazchrome stated that the final invoice date should be the date of sale because that was when the final prices were set.  Second SQR at 1 (P.R. 150, C.R. 250).

### D.    Preliminary and Final Determinations for Kazchrome

Commerce's regulations establish a presumption that the date of sale is the invoice date. *See* 19 C.F.R. § 351.401(i).   Section 351.401(i) provides that Commerce normally "will use the date of invoice, as recorded in the exporter or producer's records" to identify the date of sale. *Id.*  Commerce has elaborated that "price and quantity are often subject to continued negotiation

between the buyer and the seller until a sale is invoiced," and that the date of an enforceable sale

"is not necessarily the date on which the terms of sale actually are established." *Antidumping*

*Duties; Countervailing Duties: Final Rule*, 62 Fed. Reg. 27,296, 27,348-49 (Dep't of Commerce

May 19, 1997) (*Preamble*).    Further, Commerce's longstanding practice is to use a uniform date

of sale for each respondent rather than a different date of sale for each sale.  *See id.* at 27,349.

In its *Preliminary Determination*, Commerce applied its normal practice of using the earlier of

shipment date or invoice date and found that, for Kazchrome's U.S. sales, the shipment date

consistently preceded the invoice date.  PDM at 15; *see also* Preliminary Determination Margin

Calculation for TNC Kazchrome J.S.C. (October 31, 2024) (C.R. 331).  During verification,

Commerce observed Kazchrome's date of sale reported as part of its review of selected sales.

*See* Verification of the Sales Responses of TNC Kazchrome JSC at 6-7, Exhibit SVE-4, Exhibits

SVE-7 – SVE-17 (December 23, 2024) (Kazchrome Verification Report) (P.R. 227; C.R. 482).

In the *Final Determination*, Commerce found that the material terms of sale of Kazchrome's

U.S. sales were set prior to the final invoice.  IDM at 6-7; *see also* Kazchrome Verification

Report at 10.

 In the *Final Determination*, Commerce reaffirmed its preliminary decision to use the

shipment date as the date of sale.  Commerce specifically noted its longstanding position

discussed in its final rule, which states "price and quantity are often subject to continued

negotiation between the buyer and the seller until a sale is invoiced," and that the date of an

enforceable sale "is not necessarily the date on which the terms of sale actually are established."

*See Antidumping Duties; Countervailing Duties: Final Rule*, 62 Fed. Reg. 27,296, 27,348-49

(Dep't of Commerce May 19, 1997) (*Preamble*).    Commerce explicitly considered Kazchrome's

comments, including that the final invoice date or title transfer date should serve as the date of

sale. IDM at 5-7. Commerce found that the record did not support using a later date, noting that title transfer dates were not reported in the U.S. sales database and that Kazchrome did not provide documentation demonstrating that title transfer reflected the point at which material terms of sale were established. *Id*.

     **E.**    **Ministerial Error Allegations**

     After Commerce issued the final determination, YDD filed a ministerial error allegation, again arguing that Commerce had incorrectly used zeroing in its calculations. P.R. 281, C.R. 521. Commerce rejected the allegation, explaining that:

> to apply AFA to the YDD Single Entity's sales to a specific customer, it created two margin programs, combined data from both programs, and applied AFA to the specific sales to calculate the YDD Single Entity's weighted average dumping margins. Commerce correctly listed zero, as the "total amount of dumping" for the YDD Single Entity's sales for which it did not apply AFA because the results of the margin program for these sales lists "zero" as the "total amount of dumping" pursuant to the A-A methodology. The results of the margin program state the "total amount of dumping" is zero, because in the A-A methodology, the total amount of dumping is the sum of the total positive comparison results and the total negative comparison results only if the result is greater than zero. In this case, the sum of the positive and negative comparison results was not greater than zero, therefore the program correctly listed zero as the correct amount of total dumping for the sales for which we did not apply AFA and this is the value Commerce used in its spreadsheet. Therefore, Commerce's calculations reflected Commerce's intent, which was to combine the amount of dumping for the sales for which it did not apply AFA (i.e. zero) from its SAS program with the dumping calculated when applying the AFA to YDD's sales to a specific U.S. customer. Therefore, YDD's allegation is a methodological argument which does not meet the definition of a ministerial error.

P.R. 220 at 3.

## **SUMMARY OF THE ARGUMENT**

     Commerce's Final Determination should be sustained. First, Commerce correctly treated YDD's sales to a specific U.S. customer as U.S. sales included in the margin calculation. Commerce applied the statutory export price framework and relied on record evidence showing

the customer was located in the United States, the merchandise was delivered to the United States, and the entries were made for consumption. Commerce reasonably rejected YDD's assertions that the merchandise was "destined for Canada," because the contemporaneous shipping and freight documentation identified the United States as the destination and the record did not establish that YDD knew the merchandise was destined for another market at the time of sale.

Second, Commerce was well within its discretion to apply partial facts available with an adverse inference to address record gaps caused by YDD's failure to provide requested information regarding potential affiliations. Commerce identified missing necessary information and determined that YDD had withheld requested information and significantly impeded the investigation. Commerce further found that YDD did not cooperate by not acting to the best of its ability, warranting an adverse inference. This measured application of partial AFA was supported by substantial evidence and consistent with 19 U.S.C. § 1677e.

Third, YDD challenges Commerce's weighted-average dumping margin calculation, claiming Commerce made a ministerial error in using zeroing. YDD actually disputes Commerce's methodological approach in combining results for AFA and non-AFA sales. Commerce's calculation reflects a reasoned, intentional methodological application of the margin program outputs and does not constitute unlawful zeroing.

Finally, Commerce's use of shipment date as the date of sale for Kazchrome's U.S. transactions is supported by substantial evidence because Kazchrome failed to demonstrate that the material terms of sale were established at a later point. Although Kazchrome argued that final invoice date should control, the record showed that shipment consistently preceded invoicing and did not establish that price or other material terms remained open after shipment.

10

## ARGUMENT

### I.    Standard of Review

In reviewing Commerce's antidumping duty determinations, the Court of International Trade must sustain any determination, finding or conclusion found by Commerce unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

When an agency exercises discretion granted by a statute, "judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and capricious standard." *Mosaic Co. v. United States*, No. 24-1593, 2025 WL 3493279, at *4 (Fed. Cir. Dec. 5, 2025) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168, 179–80 (2025)).  "Under that standard," the Federal Circuit explained, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Id*.

## II.        Record Evidence Demonstrates that YDD's Sales Were to a U.S. Customer

Commerce's treatment of YDD's sales as U.S. sales is supported by substantial evidence and in accordance with law.  In its central calculation, Commerce compares the home market price to the price in the United States.  To determine the price in the United States, Commerce analyzes U.S. sales, and to determine whether a sale should be considered, Commerce considers whether the unaffiliated customer is located in the United States, whether the merchandise was delivered to the United States, and whether the goods entered for consumption.  Here, Commerce determined that "these sales were shipped, and entered for consumption, into the United States without any qualification or limitation of U.S. entry, such as through a bonded warehouse . . . .".  IDM at 29-30.   In other words, the documentation at entry bore no indication that the merchandise would be sold outside the United States.

Neither did YDD's additional documentation demonstrate subsequent sale outside the United States.  YDD first contends that a letter from [            ] to YDD was in the precise amount of the reexported sales.  C.R. 55 at Ex. 8.  Although the letter states the "final destination" of the merchandise is Canada, it otherwise confirms that delivery was in the United States to [         ].  It gives no further information about the terms or timing of the final destination, or any indication that the consignee, ArcelorMittal Dofasco was in fact "the Canadian customer," as YDD asserts.  *Id.*  When Commerce asked for additional information about the merchandise in [                      ], YDD responded that it did not have information on the operations of its unaffiliated customer and instead provided a letter from the alleged Canadian customer that the "full quantity" of the warehouse would be shipped to the Canadian customer.  C.R. 192 Ex. S1-6.1.

YDD contends that this documentation satisfies the "knowledge test" set forth in *Tin Mill Products from the Netherlands: Final Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 1524 (Dep't of Commerce Jan. 10 2024). But it is actually Commerce's approach that is fully consistent with *Tin Mill*. In *Tin Mill*, Commerce explained its "well-established practice is to consider such factors as: whether {the} party prepared or signed any certificates, shipping documents, contracts or other papers stating the destination of the merchandise; whether that party used any packaging or labeling which stated the destination; whether any unique features or specifications of the merchandise otherwise indicated the destination; and whether that party admitted to Commerce that it knew its shipments were destined for a particular market." *Id.* at accompanying Issues and Decision Memo, Cmt 2.

Here, YDD did not offer any signed certificates, shipping documents, contracts, packaging, or labeling stating the destination of the merchandise. At most, it offered a letter that confirms a U.S. shipment destination and merely mentions Canada as the final destination. And although the letter itself mentions the possibility of shipping documents to show shipment to Canada, YDD did not actually submit any of those documents. Although the letter may reflect a future intent or possibility of onward shipment, it does not establish that YDD knew, at the time of sale, that the merchandise was destined for Canada, nor does it negate the fact that the merchandise entered the United States for consumption. *Id.* Commerce noted the lack of documentation, stating that YDD "did not provide signed documentation, certificates, or contracts that disclose the final destination as Canada. In the international freight invoices provided by {YDD}, the signed invoices indicate the United States as the destination of the subject merchandise. . . .". IDM at 30. The sales terms between YDD and the U.S. customer were delivered at place, further supporting Commerce's conclusion that the sale was completed

to a U.S. customer in the United States.  IDM at 29–30. Commerce's reliance on signed invoices and the entry information was therefore reasonable and supported by substantial evidence.

Contrary to YDD's assertions, Commerce was not required to exclude these sales merely because the U.S. customer may have later re-exported the merchandise.  As Commerce noted it has found, downstream actions by an unaffiliated customer do not alter the nature of the exporter's sale where the record demonstrates that the sale was made to a U.S. customer, delivered in the United States, and entered for consumption.  IDM at 30 n.37.  YDD's arguments amount to mere disagreement with Commerce's weighing of the evidence, and do not undermine the substantial evidence supporting Commerce's determination.

**III.    Commerce's Decision To Apply Partial  Available with Adverse Inferences Is Supported by Substantial Evidence and Is Otherwise in Accordance with Law**

Commerce was within its discretion to apply partial adverse inferences to remedy gaps in the evidentiary record created by YDD's failure to report certain affiliations with its U.S. customer.

First, because YDD failed to report its connection to the U.S. customer, Commerce reasonably concluded that necessary information was missing from the record pursuant to 19 U.S.C. § 1677e(a)(1).  *See* PDM at 7 (unchanged in the final).  Second, in failing to report its ties with the U.S. customer as Commerce requested, YDD withheld information, failed to provide such information in a timely manner or in the form or manner requested, and significantly impeded this review under 19 U.S.C. § 1677e(a)(2)(A)-(C).  *Id*.  Finally, pursuant to 19 U.S.C. § 1677e(b), Commerce reasonably determined that, because YDD had failed to report such information despite having had multiple opportunities to do so, it had failed to cooperate to the best of its ability when responding to Commerce's requests for information.

14

A.     **Legal Framework for Using Facts Available**

Commerce shall apply facts otherwise available to make a determination when necessary information is unavailable, or when an interested party withholds information requested by Commerce, fails to provide the information by the deadline, significantly impedes the proceeding, or provides information that cannot be verified.  *See* 19 U.S.C. § 1677e(a)(1)-(2).  Commerce may also apply an adverse inference in selecting among the facts otherwise available if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b)(1).

A respondent's failure to cooperate to the "best of its ability" is "determined by assessing whether {the} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries{.}"  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  The statutory trigger for an adverse inference "is simply a failure to cooperate to the best of respondent's ability, *regardless of motivation or intent*."  *Id.* at 1383 (emphasis added).  Although this standard does not require perfection and recognizes that mistakes sometimes occur, "it does not condone inattentiveness, carelessness, or inadequate record keeping."  *Id.* at 1382.  Ultimately, "Commerce enjoys broad discretion when considering whether to apply adverse facts available in antidumping proceedings."  *Tianjin Magnesium Int'l Co. v. United States*, 844 F. Supp. 2d 1342, 1346 (Ct. Int'l Trade 2012).

When selecting an AFA rate, Commerce may rely on information from (1) the petition; (2) the final determination in the investigation; (3) any previous administrative review; or (4) any other information on the record.  19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c).  Commerce "is not required to determine, or make any adjustments to, a . . . weighted average dumping margin based on any assumptions about information the interested party would have provided if

15

the interested party would have complied with the request for information."  19 U.S.C. §
1677e(b)(1)(B).  Further, Commerce is not required to demonstrate that the dumping margin
selected "reflects an alleged commercial reality of the interested party."  19 U.S.C. §
1677e(d)(3)(B).

### B. YDD Failed To Provide Necessary Information Requested by Commerce and Impeded the Investigation

Commerce reasonably determined that necessary information was missing from the
record regarding YDD's potential affiliation with one of its U.S. customers during the period of
investigation.  *See* IDM at 30-32.

In its initial questionnaire, Commerce requires that a mandatory respondent disclose all
potential affiliations with its customers.  In this review, Commerce issued its initial questionnaire
with questions requesting information regarding all of YDD's potential affiliations with
customers.  *See, e.g.*, YDD IQ at A2, Appendix I (P.R. 56)  Consistent with the statute,
Commerce provided detailed instructions on who is affiliated person, including:

> (5) any person directly or indirectly owning, controlling, or
> holding with power to vote, 5 percent or more of the outstanding
> voting stock or shares of any organization and that organization;
> (6) two or more persons directly or indirectly controlling,
> controlled by, or under common control with, any person; and (7)
> any person who controls any other person and that other person.
> *See* Initial Questionnaire at A2, Appendix I; *see also* 19 U.S.C. §
> 1677(33)(E)-(G).

Control exists when a person is legally or operationally in a position to exercise restraint
or direction over another person.  *See* 19 U.S.C. § 1677(33)(G).  A control relationship should
also have the potential to affect decisions concerning the production, pricing, or cost of the
merchandise under investigation or review.  *See* PDM at 5-7 (unchanged in the final).
Commerce directs respondents that if they are:

(a) uncertain whether a company is affiliated with it; (b) you do not
believe you are able to prepare a response that includes the
information of a known affiliate; or (c) you do not believe it is
appropriate to prepare a response that include{s} the information
of a known affiliate, contact the official in charge immediately.

*Id*.

Commerce attempted to gather YDD's affiliation information on three separate occasions

between June 10, 2024, and October 9, 2024, seeking information not only about "affiliation in

fact," but also information of any *potential* affiliation. *See* PDM at 9; *see also Saha Thai Steel*

*Pipe Public Company Ltd. v. United States*, 663 F. Supp. 3d 1356, 1375 (Ct. Int'l Trade 2023)

(sustaining Commerce's application of partial AFA to a respondent who failed to disclose

information about potentially affiliated customers). Notably, YDD's reply when specifically

asked about its sales to this U.S. customer, was to state that it did not have knowledge of the

details about the operation of this unaffiliated U.S. customer. *See* YDD A-C SQR at 12 (P.R.

122, C.R. 192). To demonstrate YDD's lack of knowledge regarding this unaffiliated producer,

YDD submitted a letter Commerce from this U.S. customer signed by the very individual the

petitioners alleged held a position in YDD's parent company, indicating that YDD had

knowledge of this individual but failed to disclose this involvement in ASIA and KazSilicon's

parent company. *Id*. at Exhibit S1-6.1. This failure precluded Commerce from ascertaining the

nature of the affiliation. *See* PDM at 9.

When necessary information is not available on the evidentiary record, Commerce is

authorized to consider whatever other facts are available and to "use an inference that is adverse

to the interests of that party in selecting from the facts otherwise available" when the party has

"failed to cooperate by not acting to the best of its ability to comply with a request for

information." *Hitachi Energy USA Inc. v. United States*, 34 F. 4th 1375 (Fed. Cir. 2022) (quoting

19 U.S.C. § 1677e(b)(1)); *see also Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1373 (Ct. Int'l Trade 2019) ("{T}he use of facts otherwise available to fill gaps, applies when necessary information is lacking, regardless of the reason for its absence.") (cleaned up).

Although nothing in the statute defines what constitutes "necessary" information, this Court's precedent demonstrates that Commerce must possess certain information to analyze affiliation relationships between respondents and customers under 19 U.S.C. § 1677(33). *See Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298, 1308 (Ct. Int'l Trade 2015); *see also Saha Thai*, 663 F. Supp. 3d at 1375-76 ("Even accepting the premise that Commerce had all the data it needed to calculate an accurate antidumping margin, the agency lacked the data necessary to flag the companies as affiliates until {petitioner} provided the rest of the story."). YDD's assertion that it "did not know" the details of the U.S. customer's operations merely confirms that the record lacked the predicate affiliation information Commerce needed to analyze potential control or influence under 19 U.S.C. § 1677(33). YDD Br. at 16-18. Even more than that, YDD ignores that it knew about its parent company's ties to the U.S. customer—knowledge that should have led YDD to disclose the potential affiliation.

YDD contends that it *did* submit information regarding the U.S. customer and that Commerce unfairly rejected the information. YDD Br. at 32-33. YDD further contends that Commerce abused its discretion by accepting petitioner's submission while refusing YDD's. *Id*. at 32. But YDD ignores the timing. Petitioner submitted its information on October 24, 2024, nearly one week before the preliminary determination's due date. *See* Petitioner's October 24 Comments (C.R. 324). Instead of sending an immediate response, YDD waited a week, sending comments on October 30, 2024, the day before the statutory deadline for the preliminary determination. *See* YDD's October 30 Comments (C.R. 330). Commerce simply did not have

the time to analyze the submission.  Importantly, Commerce did not accept at face value petitioner's allegation.  Instead, it found that necessary information was not on the record to determine whether an affiliation existed.   IDM at 31.  This is precisely the sort of circumstance requiring the use of facts otherwise available.

Nor was Commerce required to provide YDD yet another opportunity to submit the information.  YDD references Commerce's duty to notify respondents of any deficiencies in the data provided to allow for the party to "remedy or explain the deficiency."  YDD Br. at 30-31 (citing 19 U.S.C. § 1677m(d)).  But petitioner's October submission was not the first time YDD should have known it had to disclose potential affiliations.  YDD was provided with multiple opportunities to furnish necessary information requested regarding any affiliations.  *See e.g.* Initial Questionnaire; YDD Supplemental Questionnaire, August 29, 2024; *See also* Petitioners October 24 Submission.

This Court has held that Commerce fulfills its obligation to provide a respondent with an opportunity to rebut a claim with additional evidence under 19 U.S.C. § 1677m(d) so long as Commerce:

> {I}ssues a supplemental questionnaire specifically pointing out and requesting clarification of the party's deficient responses . . . Nothing in the language of the statute compels Commerce to treat intentionally incomplete data as a deficiency and then to give a party that has intentionally submitted incomplete data an opportunity to remedy as well as to explain.

*Linyi Chengen Imp. & Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1287 (Ct. Int'l Trade 2019) (holding that a respondent fails to cooperate to the best of its abilities by not disclosing the full extent of its familial affiliations as requested by Commerce's initial and supplemental questionnaires) (cleaned up).  Commerce more than met this obligation.

Commerce's supplemental questionnaire inquired further as to the nature of YDD's affiliations. *See* Supplemental Questionnaire (P.R. 109). Commerce asked YDD to explain the relationships between known individuals that directly or indirectly owned YDD, ASIA, and KazSilicon through shareholding. *Id*. at 5. Also, Commerce clarified that YDD was to "provide the names of any officers, directors and/or managerial employees of one company who are also officers, directors and/or managerial employees of the other company or of a company that is affiliated with both your company and the other producer." *Id*. at 4. This satisfied Commerce's statutory obligations under section 1677m(d). *See Saha Thai*, 663 F. Supp. 3d at 1374 ("Having given Plaintiff at least two opportunities to report the companies' information, Commerce was not required to issue an additional supplemental questionnaire to the effect of, 'Are you sure?'. The agency's multiple requests for the information complied with the notice requirements of Section 1677m(d).") (internal citations omitted); *see also Shandong Dongfang Bayley Wood Co. v. United States*, 375 F. Supp. 3d 1339, 1345 (Ct. Int'l Trade 2019) ("Commerce satisfies its obligations under § 1677m(d) when it issues a supplemental questionnaire specifically pointing out and requesting clarification of the party's deficient responses.") (cleaned up).

YDD's failure to provide Commerce with the necessary affiliation information despite multiple requests substantiates Commerce's finding that YDD had failed to cooperate by not acting to the best of its ability. *See Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F. 4th 1078, 1090 (Fed. Cir. 2021) ( holding that an "adverse inference may be appropriate where an interested party has been notified of a defect in its questionnaire response yet continues to provide a defective response."); *Maverick Tube Corp. v. United States*, 857 F. 3d 1353, 1361 (Fed. Cir. 2017) ("{Appellees} had already failed to provide the information requested in

Commerce's original questionnaire, and the supplemental questionnaire notified {Appellees} of that defect. § 1677m(d) does not require more.").

YDD attempts to analogize its situation with one involving the International Trade Commission (ITC) by contending that Commerce, much like the ITC, failed to grapple with strong evidence submitted by a party.  *See* YDD Br. at 25.  However, this ignores that YDD submitted its response only one day before the statutory deadline for the preliminary determination.  PDM at 9.   When asked about this U.S. customer, YDD continually referred to this U.S. customer as unaffiliated.  *Id*.  Commerce is not obligated to notify YDD of its own seemingly intentional reporting deficiencies.  As the Federal Circuit explained in *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016), 19 U.S.C. § 1677m(d) does not require Commerce to consider an "intentionally incomplete" report as a "deficiency:"

> But nothing in that language compels Commerce to treat intentionally incomplete data as a "deficiency" and then to give a party that has intentionally submitted incomplete data an opportunity to "remedy" as well as to "explain."  The consequence of such a reading would be to permit respondents to submit fraudulent data with the knowledge that, should their misconduct come to light, they can demand an opportunity to remedy their intentionally deficient data and avoid the otherwise authorized adverse inferences.  The language of § 1677m(d) does not compel that reading.  It permits Commerce not to deem such misconduct to be a "deficiency" or to provide only an opportunity to "explain" (but not "remedy") such misconduct.

*Id*.

But, even assuming that Commerce had given YDD insufficient notice of the specific deficiency, this Court has held:

> Inherent in the requirement of § 1677m(d) is a finding that Commerce was or should have been aware of the deficiency in the questionnaire response. When a respondent provides seemingly complete, albeit completely inaccurate, information, § 1677m(d) does not require Commerce to issue a supplemental questionnaire

21

> seeking assurances that the initial response was complete and
> accurate.

*ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018).  Here, YDD

provided a seemingly complete and accurate list of affiliates, and Commerce was not obligated to

reissue multiple supplemental questionnaires asking, whether its responses were complete and

accurate  YDD attempts to gloss over this by saying the "allegation does not amount to an

affiliation in fact."  *See* YDD Br. at 27.  YDD's assertion that the U.S. customer was not an

"affiliation in fact" is its attempt to selectively decide which entities to include in its affiliation

response, rather than reporting all potential affiliates as directed.

Finally, Commerce's decision to apply an adverse inference is fully consistent with 19

U.S.C. § 1677e(a)(2)(C).  YDD had multiple changes to provide affiliation information, but it

repeatedly withheld information and failed to report its *possible affiliation* with its U.S.

customer. This delay significantly impeded Commerce's ability to investigate the extent to which

the affiliation relationships between YDD and its U.S. customer affected its weighted-average

dumping margin.  *See* PDM at 9 (unchanged in the final).  Applying an adverse inference was

well-within Commerce's discretion under these circumstances.

### C.    Commerce's Selection of the Partial AFA Rate Was Not a Ministerial Error

YDD's contention that Commerce committed a ministerial error in its Final

Determination is not supported by the record.  A "ministerial error" is defined as including errors

in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate

copying, duplication, or the like, and any other type of unintentional error which Commerce

considers ministerial.  *See* 19 U.S.C. § 1673d(e); *see also* 19 C.F.R. § 351.224(f).  A ministerial

error is considered to be "significant" if its correction, either singly or in combination with other

errors, would result in: (1) a change of at least five absolute percentage points in, but not less

than 25 percent of, the weighted-average dumping margin calculated in the preliminary

determination; or (2) a difference between a weighted-average dumping margin of zero (or *de*

*minimis*) and a weighted-average dumping margin of greater than *de minimis* or vice versa.  *See*

19 C.F.R. § 351.224(g).

Here, Commerce's application of partial AFA to certain U.S. sales was consistent with

established practice, well-documented in the administrative record, and a reasoned exercise of

discretion.  Commerce applied the highest transaction-specific dumping margin calculated for

YDD, as explicitly printed in the SAS margin program output under the "maximum transaction

margin" heading, to those sales for which partial AFA was deemed appropriate, and updated the

margin in the final determination.  *See* Preliminary Determination Margin Calculation for YDD

Corporation LLP; Asia FerroAlloys LLP; and KazSilicon Metallurgical Combine LLP at 3 and

Attachment III (Oct. 31, 2024) (Preliminary Determination Margin Calculation) (C.R. 338); IDM

at 33.

Commerce's application was methodologically consistent. The highest transaction-

specific margin used for partial AFA was: (1) clearly calculated and printed in the SAS margin

program output as the "maximum transaction margin;" (2) applied directly to the sales for which

partial AFA was warranted; and (3) weighted appropriately in combination with non-AFA sales

to calculate the final estimated weighted-average dumping margin.  *See* Preliminary

Determination Margin Calculation at Attachment III; *see also* Final Analysis Memorandum for

YDD Corporation LLP; Asia FerroAlloys LLP; and KazSilicon Metallurgical Combine LLP,  at

Attachment III page 56 (March 21, 2025) (Final Analysis Memo).

YDD contends that Commerce applied a "non-existent" highest transaction-specific

margin.  YDD Br. at 42.  Specifically, YDD contends that Commerce's updated margin in its

final determination is incorrect and that Commerce should have used the margin calculated in the preliminary determination. *Id.* at 41.

At the *Preliminary Determination*, Commerce applied partial AFA to YDD's U.S. sales to one U.S. trading customer and, consistent with its practice, selected as the partial AFA rate the highest transaction-specific margin calculated for any respondent during the proceeding. Commerce explained that it relied on the highest transaction-specific margin (*i.e.*, 35.61 percent) identified through the SAS margin program's "Maximum Transaction Margin" output. Preliminary Determination Margin Calculation at 3; see also PDM at 11. The Preliminary Determination Margin Calculation specifically described the SAS programming language used to identify and print this maximum transaction-specific margin, thereby ensuring that the selected rate reflected actual transaction-specific results derived from YDD's own data rather than an inferred or externally derived rate. *See* Preliminary Determination Margin Calculation.

Commerce continued to apply the identical partial AFA methodology at the *Final Determination*. The sole difference between the preliminary and final partial AFA rates stems from revisions to YDD's reported data that Commerce accepted before verification. Following the *Preliminary Determination*, YDD submitted minor corrections prior to verification that resulted in the submission of revised home market, U.S. sales, and cost databases. *See* YDD Minor Corrections Presented at Sales Verification (November 14, 2024) (Minor Corrections) (P.R. 203; C.R. 360); YDD Sales Verification Report at 2-3, 14, Exhibit SVE-1 (December 23, 2024) (P.R. 226; C.R. 481). Commerce accepted these corrections after confirming them at verification, which required Commerce to incorporate revised sales and cost information into the final margin programs.

The accepted corrections produced programmatic changes that affected transaction-level calculations, including adjustments to the cost of production buildup and the acceptance of a revised cost database. YDD Cost Verification Report at 2-5, Exhibit CVE-1 (February 7, 2025) (P.R. 251; C.R. 494); YDD Final Cost Calculation Memorandum (March 21, 2025). Commerce also incorporated verified corrections to movement and selling expenses, including adding the reported exit customs declaration expense to U.S. domestic movement expenses, adding late payment expenses to U.S. discounts and rebates, and correcting a reported inland freight error for a U.S. sale. YDD Cost Verification Report; YDD Final Cost Calculation Memorandum. These verified database revisions altered the underlying transaction-specific dumping calculations generated by the final SAS margin programs.

Because Commerce continued to apply the same methodology, selecting the highest transaction-specific margin identified by the "Maximum Transaction Margin" output, the change in the partial AFA rate reflects only the updated transaction-specific results derived from YDD's corrected and verified data. At the *Final Determination*, the SAS margin programs identified a highest transaction-specific margin of 50.68 percent, which Commerce applied as partial AFA consistent with its preliminary approach. *See* YDD Final Sales Calculation Memorandum at 60 (March 24, 2025) (YDD Final Sales) (P.R. 273; C.R. 502). Accordingly, the increase from 35.61 percent to 50.68 percent results from Commerce's application of the same partial AFA methodology to revised, verified databases, rather than any change in Commerce's analytical approach.

YDD mischaracterizes a policy-driven, methodological decision as a clerical mistake. *See* 19 C.F.R. § 351.224(f) (defining ministerial errors as "errors in addition, subtraction, or similar clerical or transcription errors"). This Court and the Federal Circuit have recognized that

Commerce's methodological choices in applying AFA are not ministerial errors. *See Euro SME SDN BHD v. United States*, 2024 WL 550334, 12-13 (Ct. Int'l Trade 2024) (distinguishing between ministerial errors and methodological decisions); *see also QVD Food Co., LTD., v. United States*, 658 F. 3d 1318, 1327 (Fed. Cir. 2011) ("the error alleged was not an arithmetic or clerical error or similar inadvertent mistake, it does not fall within the statutory definition of "ministerial error""). Any difference between the preliminary and final determinations in reported numbers reflects the updating of the record and the application of Commerce's established methodology, not a clerical or ministerial error.

## IV.    Commerce's Calculation Of YDD's Weighted Average Dumping Margin Was Lawful and Supported by the Record

YDD contends that Commerce ministerially erred in its calculation of a weighted dumping margin by using the wrong comparison methodology, but YDD ignores the inherently methodological decisions that went into the comparison.

In the Preliminary Determination, Commerce found that only 11.26% of YDD's U.S. sales passed its differential pricing analysis. *See* PDM at 13 (unchanged in IDM). This meant that the results did not show a pattern of prices that differ significantly by purchaser, region, or time period. Because no pattern was found, Commerce applied the average-to-average comparison method to all YDD's U.S. sales when calculating YDD's weighted-average dumping margin. *Id*. After the PDM was issued, YDD submitted a ministerial error allegation, arguing that Commerce should have used the sum of the negative and positive comparison results from the SAS margin program output as the total amount of dumping for YDD's sales, for which Commerce did not apply AFA, instead of using zero as the total amount of dumping for these sales.

Commerce found that the allegation did not constitute a ministerial error within the meaning of 19 C.F.R. § 351.224(f) or a significant ministerial error, as envisioned by 19 C.F.R. 351.224(g).  *See* Analysis of Ministerial Error Allegation in the Preliminary Determination (P.R. 220).  A "ministerial error" is defined as including errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which Commerce considers ministerial.  *See* 19 U.S.C. § 1673d(e); *see also* 19 C.F.R. § 351.224(f).  Commerce's methodological choices are not ministerial.

   Commerce explained that, to apply AFA to YDD's sales to a specific customer, it created two margin programs, combined data from both programs, and applied AFA to the specific sales to calculate YDD's weighted-average dumping margins.  *See* Preliminary Determination Margin Calculation for YDD Corporation LLP; Asia FerroAlloys LLP; and KazSilicon Metallurgical Combine LLP at 3 and Attachment III (Oct. 31, 2024) (Preliminary Determination Margin Calculation) (C.R. 502-505).  Commerce listed as zero as the "total amount of dumping" for YDD's sales for which Commerce did not apply AFA because the results of the margin program for these sales lists "zero" as the "total amount of dumping."  *Id*. at 56 and Attachment II.

   These calculations reflect Commerce's intent by combining the dumping amount for the sales not subject to AFA (which was zero under the A-A method), and the dumping calculated using partial AFA for sales to a specific U.S. customer.  Because the margin program produced a zero total dumping amount for the non-AFA sales, Commerce's calculations accurately reflected that intent. There was no error or inconsistency between Commerce's methodology and its calculations.  PDM at 9-14.  Because YDD's claim challenges Commerce's methodological

choices in the investigation, rather than a clerical or mathematical error, Commerce properly rejected the claim as outside the scope of a ministerial error.

YDD inaccurately describes Commerce's methodology as zeroing, stating that "Commerce has a long-established practice of not using zeroing in antidumping investigations in which it applies its sales comparison methodology known as the {A-A} methodology." *See* YDD Br. at 33 (citing *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77,722, 77,723 (Dep't of Commerce Dec. 27, 2006) (*Final Modification*)).

"Zeroing" is the practice by which Commerce, in calculating an overall dumping margin, disregards negative dumping margins by setting them to zero, thereby preventing non-dumped sales from offsetting dumped sales. *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings*, 77 Fed. Reg. 8,101, 8,103–04 (Dep't of Commerce Feb. 14, 2012) (explaining that zeroing occurs when "negative dumping margins are not used to offset positive dumping margins"); *see also, The Year In Trade 2006*, Operation of the Trade Agreements Program 58th Report, United States International Trade Commission, USITC Pub. 3927 at 3-14 (Jul 2007) (describing zeroing as treating negative margins as zero). In zeroing, only positive comparison results contribute to the final margin, even where negative results would otherwise reduce or eliminate dumping.

Critically, zeroing concerns the exclusion of negative comparison results, not the reporting of a zero margin after offsets have been fully applied. As discussed above, Commerce applied the A-A comparison methodology and provided full offsets for non-dumped comparisons, consistent with its post-WTO-compliance practice. *See Final Modification*, 71 Fed. Reg. at 77,723 (citing SAA at 842–43; 19 CFR 351.414(c)(1)). Specifically, for the sales

not subject to AFA: (1) Commerce's SAS margin program included both positive and negative comparison results; (2) those comparison results were aggregated together, allowing negative results to offset positive ones; (3) under the A-A methodology, the program reports "total amount of dumping" as zero where the net sum of positive and negative comparison results is not greater than zero.  *See* Final Analysis Memorandum at Attachment III page 56 (March 21, 2025).

Thus, the zero-value used by Commerce was not the product of disregarding negative results; rather, it reflected that negative comparison results fully offset positive comparison results. Commerce therefore complied with its obligation to provide offsets for non-dumped comparisons. This outcome is fundamentally different from zeroing, which would have required Commerce to discard the negative results before aggregation, thereby producing a positive dumping amount even where offsets eliminate dumping.

YDD's argument reflects a misunderstanding of both the A-A methodology and the legal meaning of zeroing.  First, YDD equates a reported total dumping amount of zero with zeroing. Those are not the same.  Zeroing occurs when negative comparison results are excluded from the calculation, not when they are included and eliminate dumping.  The mere fact that the final net result is zero does not indicate zeroing; it indicates that offsets were effective.

Second, YDD's argument would require Commerce to recognize and carry forward a negative total dumping amount once offsets exceed positives.  Neither the statute nor Commerce's A-A methodology requires, or permits, Commerce to calculate negative dumping margins.  The obligation to provide offsets requires that non-dumped sales be counted, not that Commerce generate negative dumping outcomes.  Third, YDD's position would collapse the distinction between unlawful zeroing (discarding negative results), and lawful offsetting (including negative results but capping the total at zero).  Where negative comparison results are

included and offset positives, Commerce has not used zeroing, even if the final dumping amount is zero.

**V.      Commerce's Determination To Use the Shipment Date as the Date of Sale Is Supported by Substantial Evidence and Otherwise in Accordance with Law**

Commerce's decision to use Kazchrome's shipment date as the date of sale is consistent with the statute as well as with Commerce's practice.  Commerce's antidumping comparisons of United States sales with concurrent home market or third country sales require Commerce to establish dates of sale for the sales being compared.  Neither the statute nor the SAA provide a methodology for determining date of sale; however, the SAA instructs that the "date of sale" for purposes of currency conversion should be understood as the "date when the material terms of sale are established."  *See* Statement of Administrative Action for Uruguay Round Agreements Act (SAA), H.R. Rep. No. 103-316, vol. I, at 810 (1994).  Commerce considers "material terms of sale" to include terms such as price, quantity, delivery, and payment.  *See Sahaviriya Steel Indus. Public Co. v. United States*, 714 F. Supp. 2d 1263, 1279-80 (Ct. Int'l Trade 2010), *aff'd*, 649 F.3d 1371 (Fed. Cir. 2011) (citations omitted).

Consistent with the SAA, to determine on which date a sale occurs, and which sales to compare on a temporal basis, Commerce's regulations establish a presumption that the date of sale is the invoice date.   *See* 19 C.F.R. § 351.401(i).  Section 351.401(i) provides that Commerce normally "will use the date of invoice, as recorded in the exporter or producer's records" to identify the date of sale.   *Id.*  Commerce has elaborated that "price and quantity are often subject to continued negotiation between the buyer and the seller until a sale is invoiced," and that the date of an enforceable sale "is not necessarily the date on which the terms of sale actually are established."  *Antidumping Duties; Countervailing Duties: Final Rule*, 62 Fed. Reg. 27,296, 27,348-49 (Dep't of Commerce May 19, 1997) (*Preamble*).   Further, Commerce's

longstanding practice is to use a uniform date of sale for each respondent rather than a different date of sale for each sale.  *See id.* at 27,349.

This Court has sustained Commerce's date of sale regulation and practice.  *See*, *e.g.*, *Sahaviriya Steel*, 714 F. Supp. 2d at 1279-82; *Nakornthai Strip Mill Pub. Co. Ltd. v. United States*, 614 F. Supp. 2d 1323, 1333-34 (Ct. Int'l Trade 2009); *see also Mittal Steel Point Lisas Ltd. v. United States,* 548 F.3d 1375 1379-80 (Fed. Cir. 2008) (recognizing Commerce's date of sale practice).  Specifically, this Court has held that "unless the party seeking to establish a date of sale other than the invoice date produces sufficient evidence to overcome this presumption, Commerce will use invoice date as the date of sale."  *Sahaviriya Steel*, 714 F. Supp. 2d at 1279-80.  In other words, the plaintiff bears the burden of producing sufficient evidence demonstrating that another date "better reflects the date on which the exporter or producer establishes the material terms of sale."  *Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1377, n.1 (Fed. Cir. 2003) (citing 19 C.F.R. § 351.401(i) (2003)).   Moreover, even after a plaintiff produces evidence to overcome the presumption, if "the record indicates that Commerce's decision to use the invoice date as the date of sale was reasonable and was supported by substantial evidence, Plaintiff's arguments must fail." *Allied Tube*, 127 F. Supp. 2d at 220.

Notwithstanding the regulatory presumption to use invoice date as the date of sale, Commerce's date of sale methodology is "flexible," *Allied Tube & Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 219 (Ct. Int'l Trade 2000).   If Commerce "is presented with satisfactory evidence that the material terms of sale are finally established on a date other than date of invoice, {it} will use the alternative date as the date of sale." *Preamble*, 62 Fed. Reg. at 27349.   In these situations, however, "the terms of sale must be firmly established and not merely proposed."   *Id.*   Therefore, "{a} preliminary agreement on terms, even if reduced to

writing, in an industry where renegotiation is common does not provide any reliable indication that the terms are truly 'established' in the minds of the buyer and seller."  *Id.*

Here, Commerce's determination to use the shipment date as the date of sale for Kazchrome's U.S. sales is supported by substantial evidence and is otherwise in accordance with law.  As an initial matter, Commerce's regulations recognize that Commerce may use a different date where record evidence demonstrates that the material terms of sale were established earlier.  PDM at 15; IDM at 5–7.  Consistent with this framework, Commerce explained that where shipment precedes invoicing and the record does not show that price or other material terms remained subject to change after shipment, Commerce's practice is to use shipment date as the date of sale.  PDM at 15.

Applying that practice here, Commerce examined Kazchrome's U.S. sales data and found that shipment date consistently preceded invoice date for the transactions at issue.  *Id*. Commerce further determined that the record did not demonstrate that the material terms of sale, such as price or quantity, were established only at invoicing, or that they remained open or subject to renegotiation after shipment.  IDM at 5–6.  Although Kazchrome asserted that final invoices reflected the ultimate price, Commerce reasonably explained that the existence of a later-issued final invoice, standing alone, does not establish that the material terms of sale were not set prior to shipment.  *Id*.

Commerce concluded that the shipment date provided a consistent and reliable date of sale for Kazchrome's U.S. transactions and appropriately reflected the timing of those sales for antidumping purposes.  *Id*.  Further, Commerce examined the information on the record, addressed Kazchrome's contentions, and explained why those arguments did not warrant departure from Commerce's established practice.  IDM at 5–7.  Because Kazchrome does not

demonstrate that the material terms of sale were established at a date after the shipment date,

Commerce's determination to use the shipment date should be presumed correct. *See Viraj*

*Group*, 343 F. 3d at 1377, n.1.

## CONCLUSION

For these reasons, we respectfully request that the Court deny YDD and Kazchrome's

motions for judgment upon the administrative record, sustain Commerce's final determination in

full, and enter judgment for the United States.


                                                Respectfully submitted,

                                                BRETT A. SHUMATE
                                                Acting Assistant Attorney General

                                                PATRICIA M. McCARTHY
                                                Director


                                                /s/ Claudia Burke
OF COUNSEL:                                     CLAUDIA BURKE
BRIEN STONEBREAKER                              Deputy Director
Attorney                                        Commercial Litigation Branch
Office of the Chief Counsel                     Civil Division
   for Trade Enforcement & Compliance           Department of Justice
U.S. Department of Commerce                     P.O. Box 480
                                                Ben Franklin Station
                                                Washington, DC 20044
                                                Telephone: (202) 305-7568
                                                Fax: (202) 307-0972
                                                Email: claudia.burke@usdoj.gov


Dated: February 9, 2026                         Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 9647 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Claudia Burke

35