## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

YDD CORPORATION LLP and
TNC KAZCHROME JSC,

      **Consolidated Plaintiffs,**

v.

**UNITED STATES,**

      **Defendant,**

and

**CC METALS AND ALLOYS, LLC AND
FERROGLOBE USA, INC.,**

      **Defendant-Intervenors.**

**Consol. Court No. 25-00100**

**PUBLIC VERSION**
Business Proprietary Information
removed on pages ii, 2-3, 6-11, 13-19, 21-23, 25-30, 32, 34-35, 40-43

## DEFENDANT-INTERVENORS' OPPOSITION TO THE RULE 56.2 MOTIONS

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel: (202) 991-2701

Date: February 23, 2026

*Counsel to Defendant-Intervenors*
*CC Metals and Alloys, LLC, and*
*Ferroglobe USA, Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES .......................................................................................... iv

RULE 56.2 STATEMENT ............................................................................................... 1

      1.  The Administrative Determination Under Review ...................................................... 1

      2.  The Issues Presented and Reasons Supporting Commerce's Determination ............... 1

  A. Whether Commerce's Determination that YDD's Transactions with a Specific Customer
     Were U.S. Sales Was Supported by Substantial Evidence on the Record and Lawful. ..... 1

  B. Whether Commerce's Determination to Apply Adverse Facts Available Due to YDD's
     Failure to Provide Information About Certain Affiliated Companies was Supported by
     Substantial Evidence on the Record and Otherwise Lawful............................................. 2

  C. Whether the Methodology Used by Commerce to Calculate YDD's Dumping Margin was
     Supported by Substantial Evidence on the Record and Otherwise Lawful. ...................... 3

  D. Whether Commerce's Use of Shipment Date in Determining Kazchrome's Date of Sale
     was Supported by Substantial Evidence on the Record and Otherwise Lawful. ................ 3

JURISDICTION ............................................................................................................... 4

STANDARD OF REVIEW .............................................................................................. 4

STATEMENT OF FACTS ............................................................................................... 5

  I.   COMMERCE'S INVESTIGATION OF YDD ........................................................ 6

  II.  COMMERCE'S INVESTIGATION OF KAZCHROME .............................................. 13

  III.  THE FINAL DETERMINATION .......................................................................... 15

SUMMARY OF THE ARGUMENTS ........................................................................... 15

ARGUMENT.................................................................................................................... 16

  I.   COMMERCE'S DETERMINATION THAT CERTAIN OF YDD'S TRANSACTIONS
     WERE U.S. SALES WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS
     OTHERWISE IN ACCORDANCE WITH LAW ......................................................... 16

   A. Legal Framework.................................................................................................. 16

   B. Commerce's Determination that YDD's Sales to [         ] During the POI Should Be
     Treated as U.S. Sales was Lawful........................................................................... 18

PUBLIC VERSION

II.    COMMERCE'S DETERMINATION THAT YDD DID NOT ACT TO THE BEST OF
       ITS ABILITY IN PROVIDING INFORMATION ABOUT THE RELATIONSHIP
       BETWEEN A U.S. CUSTOMER AND YDD'S AFFILIATES, AND ITS
       APPLICATION OF AFA, WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND
       OTHERWISE LAWFUL ............................................................................................. 24

       A. Legal Framework ................................................................................................. 24

       B. Commerce's Application of Partial AFA to YDD was Warranted and Lawful ............... 26

III.   COMMERCE LAWFULLY APPLIED AN A-TO-A COMPARISON METHODOLOGY
       TO ALL OF YDD'S TRANSACTIONS ......................................................................... 34

IV.    COMMERCE'S DETERMINATION TO USE SHIPMENT DATE AS THE DATE OF
       SALE FOR KAZCRHOME'S U.S. TRANSACTIONS WAS SUPPORTED BY
       SUBSTANTIAL EVIDENCE ON THE RECORD AND OTHERWISE IN
       ACCORDANCE WITH LAW ...................................................................................... 37

       A. Legal Framework ................................................................................................. 37

       B. Commerce Correctly Selected Shipment Date as the Date of Sale for Kazchrome's U.S.
          Sales ............................................................................................................... 39

CONCLUSION ................................................................................................................. 46

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F. 3d 1,339 (Fed. Cir. 2015). .... 25

*Ad Hoc Shrimp Trade Action Committee v. United States*, Slip Op. 25-85, 2025 WL 1938361
 (Ct. Int'l Trade July 8, 2025) ("*Ad Hoc*") ........................................................................ 17, 23

*ArcelorMittal USA LLC v. United States,* 302 F. Supp. 3d 1,366 (Ct. Int'l Trade 2018)............. 38

*Atl. Sugar Ltd. v. United States*, 744 F.2d 1,556 (Fed. Cir. 1984).................................................. 5

*Cleo In. v. United States*, 501 F.3d 1,291 (Fed. Cir. 2007) ........................................................... 4

*Consolidated Edison v. NLRB*, 305 U.S. 197 (1938)..................................................................... 4

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966).................................................................... 5

*Durum Gida Sanyi Ve Ticaret A.S. v. United States*, 311 F. Supp. 3d 1,367
 (Ct. Int'l Trade 2018)................................................................................................................ 17

*Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*, 308 F. Supp. 3d 1,297
 (Ct. Int'l Trade 2018)......................................................................................................... 40, 41

*Essar Steel Ltd. v. United States*, 678 F.3d 1,268 (Fed. Cir. 2012) ............................................ 25

*Fujitsu Gen'l Ltd. v. United States*, 88 F.3d 1,034 (Fed. Cir. 1996) ............................................ 4

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1,323 (Ct. Int'l Trade 2006).................... 5

*Goodluck India Limited v. United States*, 11 F.4th 1,335 (Fed. Cir. 2021) .................................. 33

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 625 F. Supp 2d 1,339
 (Ct. Int'l Trade 2009)............................................................................... 40, 41, 42, 44

*JA Solar International Limited v. United States*, 606 F. Supp. 3d 1,370 (Ct. Int'l Trade 2022).. 17

*Marmen Inc., v. United States,* 134 F. 4th 1,334 (Fed. Cir. 2025).................................................. 35

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)............................... 4

*Mukand, Ltd. v. United States*, 767 F. 3d 1,300 (Fed. Cir. 2014)........................................... 31, 32

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1,333 (Fed. Cir. 2016). ................................. 23

*Nippon Steel Corp. v. United States*, 337 F.3d 1,373 (Fed. Cir. 2003) ....................................... 24

*Nippon Steel Corp. v. United States*, 458 F.3d 1,345 (Fed. Cir. 2006) ......................................... 5

*Nucor Corp. v. United States*, 612 F. Supp. 2d 1,264 (Ct. Int'l Trade 2009) ........................ 38, 44

*PAM, S.p.A v. United States*, 582 F.3d 1,336 (Fed. Cir. 2009) ...................................................... 4

*QVD Food Co. v. United States*, 658 F. 3d 1,318 (Fed. Cir. 2011) ............................................. 23

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 398 F. 3d 1,330 ( Fed. Cir. 2002) .......... 25-26

*Timken Co. v. United States*, 699 F. Supp. 300 (Ct. Int'l Trade 1988) .......................................... 5

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ........................................................................ 4

## STATUTES

19 U.S.C. §§ 1677(33)(B), (C), and (F) ....................................................................... 25, 28, 29 34

19 U.S.C. § 1677b(a) ................................................................................................................... 37

19 U.S.C. § 1677b(a)(1)(A) ......................................................................................................... 38

19 U.S.C. §§ 1677e(a), (a)(1) and (a)(2), (a)(2)(A), (B) & (C) ................................. 10, 24, 27, 28

19 U.S.C. §§ 1677e(b), (b)(1) ................................................................................................ 24, 28

19 U.S.C. § 1677m(d) ............................................................................................................ 31, 32

19 U.S.C. §§ 1516a(a)(2)(A) and (a)(2)(B)(i) ............................................................................... 4

28 U.S.C. § 1581(c) ....................................................................................................................... 4

## REGULATIONS

19 C.F.R. § 351.102(b)(37) ......................................................................................................... 25

19 C.F.R. § 351.401(i) ............................................................................................................ 38, 41

PUBLIC VERSION

## AGENCY DETERMINATIONS & PUBLICATIONS

*Ferrosilicon from Brazil*, 89 Fed. Reg. 31,137 (Dep't of Commerce Apr. 24, 2024) (initiation).. 5

*Ferrosilicon from Brazil, Kazakhstan, and Malaysia:  Antidumping Duty Orders*, 90 Fed. Reg. 21,456 (Dep't of Commerce May 20, 2025). ........................................................................... 1

*Ferrosilicon from Kazakhstan*, 89 Fed. Reg. 88,007 (Nov. 6, 2024) (prelim. determ.) ................ 7

*Ferrosilicon from the Republic of Kazakhstan*, 90 Fed. Reg. 14,077 (Dep't of Commerce Mar. 28, 2025) (fin. determ.) ..................................................................................................................... 1

*See Antidumping Duties; Countervailing Duties: Final Rule,* 62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) (*Preamble*) ..................................................................... 41

*Tin Mill Products from the Netherlands*, 89 Fed. Reg. 1,524 (Dep't of Commerce Jan 10, 2024)(fin. determ.) ....................................................................................................................... 20

## RULE 56.2 STATEMENT

Defendant-Intervenors CC Metals and Alloys, LLC, and Ferroglobe USA, Inc.,

("Petitioners"), petitioners in the underlying investigation, respectfully submit this response to

the Rule 56.2 motions for judgment on the agency record filed in this case by plaintiffs YDD

Corporation LLP ("YDD") and TNC Kazchrome JSC ("Kazchrome"), ECF Nos 30, 31, 32, 33

("YDD Br." and "Kazchrome Br.").

### 1. The Administrative Determination Under Review

The administrative determination under review is the final determination of the U.S.

Department of Commerce ("Commerce") in the antidumping ("AD") investigation of

ferrosilicon from the Republic of Kazakhstan ("Kazakhstan"), covering the period of

investigation ("POI") of January 1, 2023, through December 31, 2023. *Ferrosilicon from the*

*Republic of Kazakhstan*, 90 Fed. Reg. 14,077 (Dep't of Commerce Mar. 28, 2025) (fin. determ.)

("*Final Determination*"), P.R. 280, and accompanying Issues and Decision Memorandum

("*IDM*"), P.R. 272.[1]

The *Final Determination* became effective upon the publication of *Ferrosilicon from*

*Brazil, Kazakhstan, and Malaysia: Antidumping Duty Orders*, 90 Fed. Reg. 21,456 (Dep't of

Commerce May 20, 2025) ("Order"), P.R. 289.

### 2. The Issues Presented and Reasons Supporting Commerce's Determination

#### A. Whether Commerce's Determination that YDD's Transactions with a Specific Customer Were U.S. Sales Was Supported by Substantial Evidence on the Record and Lawful.

---

[1] Public documents in the administrative record are designated as "P.R." and confidential documents are designated as "C.R." Business proprietary information from confidential documents is designated using square brackets and is redacted from the public version of this brief, in accordance with Rule 5(g) of the Court's Rules.

**Yes.**  YDD sold and exported subject merchandise (ferrosilicon sold in the United States) to an affiliated company, [         ].  At the time of importation, that ferrosilicon was identified to U.S. Customs and Border Protection ("CBP") as intended for U.S. consumption.  YDD reported those sales to Commerce as U.S. sales, and Commerce confirmed that those sales were U.S. sales during on-site verification.  As this shows, substantial evidence establishes that the ferrosilicon exported by YDD to the United States during the POI should be treated as U.S. sales in Commerce's dumping analysis.

Although certain record documents suggested that the ferrosilicon exported by YDD to [        ] might be eventually sold to a company in Canada, the record contains no commercial documents that substantiate any claim that the exported ferrosilicon was in fact sold and shipped to Canada.  Commerce reasonably determined that YDD did not know with certainty that the merchandise it was exporting to [        ] during the POI would end up in Canada.

**B.  Whether Commerce's Determination to Apply Adverse Facts Available Due to YDD's Failure to Provide Information About Certain Affiliated Companies was Supported by Substantial Evidence on the Record and Otherwise Lawful.**

**Yes.**  The [            ] and [    ] of YDD's U.S. customer, [        ], also served on the Board of Directors of [         ], a YDD affiliate and parent company of affiliated entities (ASIA FerroAlloys LLP and KazSilicon) that Commerce collapsed with YDD during the investigation.  YDD never reported this information in its questionnaire responses, and never reached out to Commerce, as directed by the questionnaire, to inform Commerce of a potential affiliation in this investigation.  Instead, Petitioners were left to discover this information for themselves and place it on the record after all the questionnaire responses, which were silent regarding this affiliation, had been submitted.

PUBLIC VERSION

Commerce's determination that YDD impeded the investigation proceeding and failed to act to the best of its ability by failing to provide necessary information, and therefore the application of adverse facts available ("AFA") was warranted, was supported by substantial evidence and otherwise in accordance with law.

### C. Whether the Methodology Used by Commerce to Calculate YDD's Dumping Margin was Supported by Substantial Evidence on the Record and Otherwise Lawful.

**Yes.** In applying partial AFA to YDD, Commerce calculated a weighted average antidumping ("AD") margin for the U.S. sales to [          ] using an adverse AD rate, calculated a second, non-AFA margin for YDD's sales to other U.S. customers, and then combined those two calculations to establish a final AD margin. In calculating both sets of U.S. sales-specific margins, Commerce used its weighted-average to weighted-average ("A-to-A") comparison methodology.

YDD claims that Commerce improperly used "zeroing" in its calculations – but it did not. Commerce applied its standard A-to-A methodology, which offset its calculations with non-dumped sales. Its calculations were supported by substantial evidence and otherwise in accordance with law.

### D. Whether Commerce's Use of Shipment Date in Determining Kazchrome's Date of Sale was Supported by Substantial Evidence on the Record and Otherwise Lawful.

**Yes.** On the date of shipment, Kazchrome had already finalized the material terms of its sales agreement with its distributor, TELF AG ("TELF"). At this point, there existed both a long-term contract between Kazchrome and its supplier, as well as shipment-specific implementing agreements. Commerce correctly observed that the price memorialized in the final invoice was normally determined based on pre-determined factors established between the parties prior to shipment. Thus, Commerce's decision to use the date of shipment as

3

Kazchrome's date of sale is supported by substantial evidence and otherwise in accordance with law.

## JURISDICTION

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), as this action was commenced under 19 U.S.C. §§ 1516a(a)(2)(A) and (a)(2)(B)(i).

## STANDARD OF REVIEW

In reviewing Commerce's AD determinations, the Court of International Trade ("CIT") must sustain "any determination, finding or conclusion found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen'l Ltd. v. United States*, 88 F.3d 1,034, 1,038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *PAM, S.p.A v. United States*, 582 F.3d 1,336, 1,339 (Fed. Cir. 2009). The specific factual findings on which Commerce relies "in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

Under the substantial evidence standard, a Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo In. v. United States*, 501 F.3d 1,291, 1,296 (Fed. Cir. 2007). As the Supreme Court has held, substantial evidence is "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent" an

agency determination from being "supported by substantial evidence." *Consolo v. Fed. Mar.*

*Comm'n*, 383 U.S. 607, 620 (1966).

Accordingly, the CIT has explained that it will not substitute its judgment for that of

Commerce in choosing between two fairly conflicting interpretations of the facts on the record.

*See Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988); *Goldlink Indus.*

*Co. v. United States*, 431 F. Supp. 2d 1,323, 1,326 (Ct. Int'l Trade 2006).  Further, the Federal

Circuit has held that "substantial evidence on the record means 'more than a mere scintilla' and

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,"

even if some evidence on the record detracts from the agency's ultimate determination.  *Atl.*

*Sugar Ltd. v. United States*, 744 F.2d 1,556, 1,562-63 (Fed. Cir. 1984) (citing *Universal Camera*

*Corp. v. N.L.R.B*, 340 U.S. 474, 477 (1951)); *PAM S.p.A. v. United States*, 582 F.3d 1,336, 1,339

(Fed. Cir. 2009).  As the Federal Circuit has held, the substantial evidence standard is a "high

barrier" for a challenging party to overcome.  *Nippon Steel Corp. v. United States*, 458 F.3d

1,345, 1,352 (Fed. Cir. 2006) (citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d

1,056, 1,060 (Fed. Cir. 2001)).

## STATEMENT OF FACTS

On March 28, 2024, Petitioners filed a petition with Commerce alleging that imports of

ferrosilicon from Brazil, Malaysia, the Republic of Kazakhstan, and the Russian Federation were

being, or likely to be, sold in the United States for LTFV.  In response, on April 17, 2024,

Commerce initiated, *inter alia*, an AD investigation of ferrosilicon from Kazakhstan.

*Ferrosilicon from Brazil*, 89 Fed. Reg. 31,137 (Dep't of Commerce Apr. 24, 2024) (initiation),

P.R. 24.

On April 12, 2024, Commerce released data from CBP to the interested parties which listed all entries of ferrosilicon from Kazakhstan during the POI that importers had identified upon importation as entering the United States for consumption. Memorandum from Samantha Kinney, Senior International Trade Compliance Analyst, to All Interested Parties, *CBP Kazakhstan Import Data* (Apr. 12, 2024) ("*CBP Kazakhstan Import Data*"), P.R. 20; C.R. 11 & 12.

Commerce selected YDD and Kazchrome as mandatory respondents for individual examination. Memorandum from Mira Warrier, International Trade Compliance Analyst, to File, *Less-Than-Fair Value Investigation of Ferrosilicon from Kazakhstan: Respondent Identification* (May 8, 2024), P.R. 32; C.R. 16; *see also* Memorandum from Minoo Hatten, Director, to James Maeder, Deputy Assistant Secretary, *Ferrosilicon from Kazakhstan; Respondent Identification Memorandum – Clarification* (June 10, 2024), P.R. 55; C.R. 37.

## I.    COMMERCE'S INVESTIGATION OF YDD

On July 31, 2024, YDD submitted its Section A questionnaire response, in which it described its corporate structure and affiliations. Letter from Mayer Brown to Sec'y of Commerce, re: *Ferrosilicon from Kazakhstan; YDD Corporation LLP – Section A Questionnaire Response* (Jul. 10, 2024) (*"YDD AQR"*), P.R. 78; C.R. 52-77. YDD reported that during the POI, "YDD produced merchandise under investigation at the plants of YDD, ASIA and KazSilcon in Kazakhstan." *Id.* at 8. In Exhibit A-3 it provided what it claimed was a "full list of all companies with which YDD is affiliated" and then in Exhibit A-4, provided a chart with the ownership structures of "YDD, ASIA and KazSilicon." *Id.*, C.R. 55-56 at 10 and Exhibits A-3 & A-4.

YDD is a Kazakh firm with international affiliates and entities, as shown by the chart in Exhibit A-4. That chart showed that [

] own [

]. [                ], in turn, has a [              ] ownership and [

] voting stake in YDD.  *Id.*, C.R. 56 .at Exhibit A-4.

The chart also showed that [              ] has a [              ] ownership stake in

[                              ] and [              ], in turn, has a [              ]

ownership stake in ASIA FerroAlloys LLP, referred to as ASIA by YDD, and a [              ]

ownership stake in KazSilicon Metallurgical Combine LLP, referred to as KazSilicon by YDD.

*Id.*

Accordingly, YDD reported that YDD, ASIA and KazSilcon were all affiliated during the

POI and in the *Preliminary Determination* Commerce determined that the three companies

should be "collapsed and treated as a single entity." *Ferrosilicon from Kazakhstan*, 89 Fed. Reg.

88,007, 88,008, n. 9 (Nov. 6, 2024) (prelim. determ.) ("*Preliminary Determination*"), P.R. 199.

In addition, YDD reported that it had two channels of sales to the United States.  *YDD*

*AQR*, P.R. 78; C.R. 52, at 15.  The first channel was directly to unaffiliated U.S. customers.  The

second, it claimed, was "intended to be transshipped to the Canadian market," with one of

YDD's customers, [                              ], purchasing ferrosilicon from YDD to

be delivered to [                ].  *Id.*  YDD alleged that [

].  *Id.*

For the [        ] sales, YDD stated that it provided a contract which showed these

details in Exhibit A-8.  *Id.* at 21.  Exhibit A-8 includes a [

PUBLIC VERSION

] *YDD AQR*, P.R. 78; C.R. 54

& 55 at Exhibit A-8.

In its section C questionnaire response, YDD reiterated that its sales to [          ] were

exported to the United States, but that at some point the merchandise would end up in Canada.

*See* Letter from Mayer Brown to Sec'y of Commerce, *Ferrosilicon from Kazakhstan: YDD*

*Corporation LLP – Section C Questionnaire Response* (Jul. 31, 2024) ("*YDD Sec. C Response*"),

P.R. 87, C.R. 78 – 91 at C-19.

Commerce subsequently requested that YDD provide documentation for all of its sales

with its "unaffiliated U.S. trader [          ]." YDD explained that the ferrosilicon "sold to the

U.S. and shipped to Canada" through [          ] was identified in *YDD AQR* Exhibit A-8, while

the remaining invoices for those sales were attached to its supplemental questionnaire response

at Exhibit S1-4.3. *See* Letter from Mayer Brown to Sec'y of Commerce, *Ferrosilicon from*

*Kazakhstan: YDD Corporation LLP – Response to Supplemental Questionnaire* (Sept. 16, 2024)

("*YDD Supp. Response*"), P.R. 122, C.R. 189-192 at 12. Each invoice showed that [          ]

was headquartered in [          ] and that the merchandise was to be exported to [

]. *Id.* at Exhibit S1-4.3.

Furthermore, YDD claimed that it was "unaffiliated" with its "U.S. customer" [          ],

had no "details on storage and withdrawal of subject merchandise," provided a "confirmation

letter" about the "storage and resale of this U.S. customer," and that it combined its own data

with that provided by the U.S. customer in Exhibit S1-6.2. *Id.* at 12.

Exhibit S1-6.1 is a letter from [                          ], prepared for the investigation, indicating that [          ] sold certain amounts of merchandise to Canada [

], and that additional amounts would be "[

]." *Id.*, P.R. 122; C.R 192 at Exhibit S1-6.1.  Exhibit S1-6.2 listed an amount for the [                          ] derived from Exhibit S1.6.1.  *Id.* at Exhibit S1-6.2.

Up until this point, Commerce had no reason to believe that [          ] was anything more than an unaffiliated U.S. customer of YDD.  All that changed when, on October 24, 2024, Petitioners placed a significant amount of information on the record that showed that the Chairman of the Board of [          ], a YDD affiliate and [                ], was also the [          ] and [        ] of [                    ].  Letter from Bristol Group PLLC to Sec'y of Commerce, *Antidumping Duty Investigation of Ferrosilicon from Kazakhstan:  Pre-Preliminary Comments on YDD's 3rd Supplemental Questionnaire Response* (Oct. 24, 2024) ("*Petitioners Pre-Prelim Comments*"), P.R. 176; C.R. 325.

The information submitted by Petitioners included [                        ] on a [                ] between [                  ] included in *YDD AQR* Exhibit A-8, and [                  ] that [    ] was the [      ] of [        ] and discussing [

].  *Id.* at 4 & Exhibits 1-6.

The record evidence it provided overwhelmingly showed that because YDD's relationship with [          ] met the statutory definition of "affiliated persons" and [          ] could "exercise restraint or direction" over both [        ] and [    ] during the POI, the U.S. customer had a "clear affiliation" with YDD.  *Id.* at 5.  Petitioners advocated that because YDD had "failed to disclose the true nature of the parties' relationship in its questionnaire responses to

Commerce," Commerce should apply AFA to YDD, in accordance with 19 U.S.C. §§ 1677e(a) and (b). *Id.* at 6-9.

Petitioners also pointed out that suspiciously, [         ] seemed to have been removed from [                           ] within two weeks after the Petition was filed, which suggested that YDD might be trying to [                                    ]. *Id.* at 7-8 & Exhibit 5.

YDD responded to Petitioners' submission, stating, for the first time on the record, that [        ] is a Swiss investment company, that under Swiss law, "a Swiss resident must have the authority to sign documents on behalf of a limited liability partnership," and that because of this, the YDD affiliate appointed [        ], a Swiss resident, "with signatory rights." Letter from Mayer Brown to Sec'y of Commerce, *Ferrosilicon from Kazakhstan: YDD Corporation LLP – Response to Petitioners' October 24, 2024, Pre-Preliminary Comments* (Oct. 30, 2024) ("*YDD Pre-Prelim Response*"), P.R. 181; C.R. 328-329 at 3-4.

YDD downplayed the relationship between [        ] and [        ], claiming that [        ]'s appointment agreement stated that he had no management role in [        ] and that his powers were "solely to administrative functions, such as signing company's documents, filing them with the Swiss authorities and paying the bills." *Id.* at 4.

YDD also claimed that [        ] left the [        ] Board of Directors on April 3, 2024, not because of Commerce's investigation, but because the company decided to "hand over the management of its investment as well as the company's representation to professional asset managers." *Id.* at 5. Furthermore, YDD stated that [        ] never employed [        ], and that he did not control or own either YDD or [        ] "at any time or in any fashion." *Id.* at 9. YDD argued that the application of AFA was therefore unwarranted. *Id* at 11-12.

On October 31, 2024, Commerce issued the *Preliminary Determination*, and accompanying Preliminary Decision Memorandum ("*PDM*") (Oct. 31, 2024), P.R. 184. *See also* Memorandum to the File from Mira Warrer, International Trade Compliance Analyst, *Antidumping Duty Investigation of Ferrosilicon from Kazakhstan: Preliminary Analysis Memorandum for YDD* (Oct. 31, 2024) ("*Preliminary Analysis Memo*"), P.R. 190; C.R 338.

Commerce preliminarily determined that YDD's sales to [        ] were U.S. sales for purposes of its AD calculations. *Preliminary Analysis Memo* at 3.

In addition, in light of the extensive amount of information Petitioners had placed on the record showing [        ]'s affiliation with YDD, Commerce also preliminarily determined that YDD had failed to disclose its potential affiliation or relationship with its U.S. customer during the POI, although it "had knowledge of its executive director's identity." *PDM* at 7.

Furthermore, Commerce preliminarily noted that YDD had "not submitted the 2023 consolidated financial statements of ASIA and KazSilicon's parent company" even though YDD's fiscal year ended "nearly a year ago." *Id.*

Commerce therefore preliminarily concluded that YDD had "withheld information regarding its potential affiliation with its U.S. customer," despite being given the opportunity to do so in response to various questions about its affiliations. *Id.* at 7-8.

Accordingly, as AFA Commerce determined to apply "the highest transaction-specific margin (*i.e.*, 35.61 percent) preliminarily calculated for any respondent to YDD's "sales to this U.S. customer." *Id.* at 9 & 11.

Commerce stated that it was applying "the A-A method for all" of the remainder of YDD's "U.S. sales to calculate the weighted-average dumping margin" for YDD. *Id.* at 13-14.

*See also Preliminary Analysis Memo* at 3-5 (explaining how Commerce applied AFA to the [

] sales, but not to YDD's remaining U.S. sales).

YDD subsequently claimed that Commerce had made "a significant ministerial error," by

applying "zeroing" in its AD margin calculations for the non-AFA sales. Letter from Mayer

Brown to Sec'y of Commerce, *Ferrosilicon from Kazakhstan: YDD Corporation LLP –*

*Ministerial Error Allegation* (Nov. 8, 2024), P.R. 200; C.R. 358 at 2.

On December 9, 2024, Commerce responded to YDD's Ministerial Error Allegation.

Memorandum from Samantha Kinney, Senior International Trade Compliance Analyst, to Minoo

Hatten, Director: *Antidumping Duty Investigation of Ferrosilicon from Kazakhstan: Analysis of*

*Ministerial Error Allegation in the Preliminary Determination* (Dec. 9, 2024) ("*Ministerial*

*Memo*"), P.R. 220. Commerce explained that it had calculated a zero margin for YDD's non-

AFA sales, but that it had not applied "zeroing" in any capacity, as alleged by YDD. *Id.* at 3.

From November 12 through November 15, 2024, Commerce verified YDD's

information. Memorandum to File from Mira Warrier, International Trade Compliance Analyst,

and Brittany Bauer, Senior International Trade Analyst, *Verification of the Sales Responses of*

*YDD in the Less-Than-Fair-Value Investigation of Ferrosilicon from Kazakhstan* (Dec. 23,

2024) ("*YDD Verification Report*"), P.R. 226; C.R. 481. YDD attempted to add new factual

information concerning its sales to [        ] to the record, which Commerce correctly declined

to accept. *Id.* at 2.

On January 14, 2025, YDD and Petitioners filed their administrative case briefs. Letter

from Mayer Brown to Sec'y of Commerce, *Ferrosilicon from the Republic of Kazakhstan: Sales*

*and General Issues Case Brief* (Jan. 14, 2025) ("*YDD Admin. Brief*"), P.R. 238; C.R. 490; Letter

from The Bristol Group PLLC to Sec'y of Commerce, *Ferrosilicon from Kazakhstan: Case*

*Brief* (Jan. 14, 2025), P.R. 239; C.R. 489.  Subsequently, on January 21, 2025, Petitioners filed

their rebuttal brief.  Letter from Bristol Group PLLC to Sec'y of Commerce, *Ferrosilicon from*

*Kazakhstan: Rebuttal Brief* (Jan. 21, 2025), P.R. 240; C.R. 491.

## II.    COMMERCE'S INVESTIGATION OF KAZCHROME

On July 8, 2024, Kazchrome submitted its Section A questionnaire response, in which it

described its sales process.  Letter from Baker McKenzie LLP to Sec'y of Commerce,

*Kazchrome's Section A Questionnaire Response* (Jul. 8, 2024) ("Kazchrome AQR"), P.R. 70-76;

C.R. at 40-51.  Kazchrome reported that all of its U.S. sales made through TELF, a Switzerland-

based commodities trading firm, were made pursuant to a long-term contract – the "Long-Term

Agreement." *Id.* at 20 & Exhibit A-14.

Pursuant to the Long-Term Agreement, Kazchrome provided a provisional invoice to

TELF upon each shipment that required that TELF pay [          ] of the provisional price that

the companies had agreed to prior to shipment. *Id.* at 22.  Kachrome stated that the difference

between the provisional and final price was then calculated "based on the sales price established

between TELF and the final customer in the United States." *Id.* at 21.

On August 5, 2024, Kazchrome submitted its home market and U.S. sales questionnaire

responses and databases.  Letter from Baker McKenzie LLP to Sec'y of Commerce,

*Kazchrome's Sections B-C Questionnaire Response* (Aug. 5, 2024) ("Kazchrome BCQR"), P.R.

89-90; C.R. 103-111.  Kazchrome based the date of sale for each U.S. sale on the date of

shipment, following Commerce's practice of selecting the first of either the date of shipment or

date of invoice. *Id.* at C-17.

Two months later, on October 9, 2024, in response to a second supplemental sales

questionnaire, Kazchrome decided to revise its reported universe of sales, and stated that it was

now basing the date of sale for its reported U.S. sales on the date of final invoice instead of the

date of shipment. Letter from Baker McKenzie LLP to Sec'y of Commerce, *Kazchrome's Second Sections A-C Supplemental Questionnaire Response* (Oct. 9, 2024) ("Kazchrome's A-C SQR2"), P.R. 150; C.R. 250-253 at 1.

Commerce became aware that Kazchrome had failed to submit excerpts of the Long-Term Agreement as an exhibit to one of its submissions and contacted Kazchrome to allow it to belatedly submit the exhibit. On October 16, 2024, Kazchrome submitted only a handful of pages from the Long-Term Agreement. Letter from Baker McKenzie LLP to Sec'y of Commerce, *Kazchrome's Response to the Department's October 16, 2024 Memorandum* (Oct. 16, 2024) ("*Kazchrome's October 16 Submission*"), P.R. 158; C.R. 259.

The limited excerpts from the Long-Term Agreement submitted by Kazchrome showed that both the provisional and final prices paid by TELF to Kazchrome for the U.S. sales of Ferrosilicon depended on certain factors, including the use of a [

]. *Id.* at Attachment I; *see also* Kazchrome AQR, C.R. 43 at Exhibit A-14   In addition, Kazchrome stated that under the Long Term Agreement, the final price paid by TELF for ferrosilicon could also differ from the provisional price to account for [

]. *See Kazchrome's October 16 Submission* at Attachment I.

On October 31, 2024, Commerce preliminarily determined that the material terms of sale for Kazchrome's U.S. sales were established upon the [                    ], but because it believed those dates had not been placed on the record by Kazchrome, it would use shipment date as the date of sale. *See PDM*, P.R. 184 at 15; *see also Memorandum – Preliminary*

*Determination Margin Calculation for TNC Kazchrome J.S.C.* (Oct. 31, 2024) ("*Kazchrome*

*Prelim Calculation Memo*"), P.R. 186; C.R. 331 at 3.

## III.    THE FINAL DETERMINATION

On March 21, 2025, Commerce issued the *Final Determination*, in which it determined to

treat YDD's sales to [          ] as U.S. sales, it continued to apply AFA to YDD's sales to

[          ], and it "declined to make any changes" to its calculation of YDD's weighted-average

AD margin calculation.  *IDM* at 28-33.  *See also* Memorandum to the File from Mira Warrier,

International Trade Compliance Analyst, *Less-Than-Fair-Value Investigation of Ferrosilicon*

*from Kazakhstan; Final Analysis Memorandum for YDD Corporation LLP; Asia FerroAlloys*

*LLP; and KazSilicon Metallurgical Combine LLP* (March 21, 2025) ("*Final Calculation*

*Memorandum*"), P.R. 273; C.R. 502.

Commerce also determined that the shipment date was the appropriate date of sale for

Kazchrome's U.S. sales.  *IDM* at 7.

### SUMMARY OF THE ARGUMENTS

Substantial evidence supports Commerce's determination that YDD's sales to [          ]

were U.S. sales, and Commerce's treatment of those sales as U.S. sales was reasonable and

lawful.

Commerce reasonably determined that YDD failed to act to the best of its ability in

providing information that it was affiliated with its U.S. customer, [          ], during the POI.

Accordingly, Commerce's application of partial AFA to YDD's transactions with [          ]

was supported by substantial evidence on the record and was otherwise in accordance with law.

Commerce appropriately calculated YDD's AD margin using its standard methodology,

without zeroing.  YDD mistakenly claims that Commerce applied zeroing, but the calculation

adjustment advocated by YDD to offset the alleged non-existent "zeroing" has no basis in law or on the record.

Finally, Commerce's determination to use the date of shipment as the date of sale for Kazchrome's U.S. sales was consistent with the material terms of sale established in the Long-Term Agreement, was supported by substantial evidence on the record, and was otherwise in accordance with law.

## ARGUMENT

I.    **COMMERCE'S DETERMINATION THAT CERTAIN OF YDD'S TRANSACTIONS WERE U.S. SALES WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS OTHERWISE IN ACCORDANCE WITH LAW**

Commerce's determination that YDD's sales to [          ] were U.S. sales for purposes of its AD margin calculations was supported by substantial evidence on the record and should be affirmed by this Court. During the POI, those sales were purchased by [          ], shipped to a location in the United States, and declared to CBP as intended for consumption in the United States. There are no commercial documents on the record that show that this merchandise was, in fact, subsequently sold and shipped to Canada, either during the POI or afterwards. Because Commerce determined that the record was insufficient to support a finding that the exporter knew with certainty that the ferrosilicon sold by YDD to [          ] during the POI was destined for Canada, Commerce's determination to treat those transactions as U.S. sales in its AD calculations was lawful.

### A. Legal Framework

It is uncontested that the subject merchandise sold to [          ] by YDD entered the United States and was reported to CBP upon importation as [          ]. *CBP Kazakhstan Import Data*, P.R. 20; C.R. 11, 12. Thus, the issue before the Court is merely

whether Commerce's determination that those U.S. transactions should also be treated as U.S. sales for purposes of its dumping calculations was supported by substantial evidence and lawful.

At issue is Commerce's application of its "knowledge" test. Commerce made its determination based on its long-standing practice that if "documentary or physical evidence" on the record reflects that the exporter "knew or had reason to know" that the merchandise would definitively be exported from the United States to a third country, then the "physical evidence and documentation prepared at the time of the transaction," will be given "greater consideration" than "unsubstantiated statements or declarations that may be in the best interest of the investigated company sourcing those statements." *Durum Gida Sanyi Ve Ticaret A.S. v. United States*, 311 F. Supp. 3d 1,367, 1,375-76 (Ct. Int'l Trade 2018) ("*Durum Gida*"); *JA Solar International Limited v. United States*, 606 F. Supp. 3d 1,370, 1,374-75 (Ct. Int'l Trade 2022); *Ad Hoc Shrimp Trade Action Committee v. United States*, Slip Op. 25-85, 2025 WL 1938361 (Ct. Int'l Trade July 8, 2025) ("*Ad Hoc*") at *2 & *6.

The CIT has explained that that the standard is not "whether the sales were destined for" a third country, but rather whether, based on "probative, reliable and verifiable" evidence, the exporter "knew or should have known that the sales" would not be consumed in the United States. *Ad Hoc.* at *2 & *3.

For purposes of this investigation, while there were documents on the record that indicated that [        ] intended to sell and export ferrosilicon to Canada at some point, there were <u>no</u> commercial documents on the record that showed that the merchandise YDD sold [        ] during the POI was, in fact, sold or shipped to Canada during the POI or afterward. Accordingly, for purposes of the investigation, Commerce determined that YDD did not know, or have reason to know with certainty, that the merchandise it was selling to [        ] during

the POI would be sold to Canada instead of being consumed in the United States. Thus,

Commerce lawfully determined to treat the sales as they were reported by YDD to Commerce, as

U.S. sales.

   **B. Commerce's Determination that YDD's Sales to [          ] During the POI**
   **Should Be Treated as U.S. Sales was Lawful.**

   Most of the relevant facts on the record concerning the destination of YDD's sales to

[          ] are uncontested:

   1)    [          ] purchased the subject merchandise from YDD during the POI;

   2)    The subject merchandise was exported to the United States and declared to CBP

         as [



         ] during the POI;

   3)    YDD included those sales in its reported U.S. sales database;

   4)    Commerce included YDD's sales to [          ] when it conducted a quantity and

         value reconciliation of YDD's sales at verification; and

   5)    After importation, [          ]'s subject merchandise was delivered to a

         [                              ].

*See YDD Verification Report*, P.R. 226, C.R. 481 at 10-11; *YDD Supp. Response,* P.R. 122, C.R.

203 at Exhibit S1-14.3.

   YDD argued during the investigation that despite all of these facts, Commerce should

treat these sales as sales to Canada. In support of this claim, it pointed to *YDD AQR* Exhibit A-8,

which included a commercial invoice, a [          ], and a [          ] document,

indicating that the merchandise purchased by [          ] was intended to be shipped to [

          ] and then later sold to customers in [          ]. *YDD AQR*, P.R. 78; C.R. 54

& 55 at Exhibit A-8.  Further, it referenced a letter prepared by [          ] for purposes of the investigation in which the company stated that it sold certain amounts of ferrosilicon to Canada as of [                ], and a document prepared by the attorneys for YDD that claimed to tie the information from Exhibit S1-6.1 to the reported YDD sales to [          ] during the POI. *YDD Supp. Response*, P.R. 122, 192.

YDD argued that under Commerce's knowledge test, Commerce will not treat sales of merchandise to the United States and entered for consumption as U.S. sales if YDD knew, or should have known, that the destination of the merchandise was ultimately another country and that this information showed that it knew the ferrosilicon was destined for Canada.  *YDD Case Br.*, P.R. 238, C.R. 490 at 1-6.

Commerce disagreed with YDD's arguments and concluded that these sales should be treated as U.S. sales.  *IDM* at 28-30.  Commerce emphasized that the sales at issue "were shipped, and entered for consumption, into the United States without any qualification or limitation, such as through a bonded U.S. warehouse, during the POI."  *Id.* at 30.  It then stated that it disagreed that Commerce's knowledge test supported a determination that the sales at issue should be removed from the U.S. sales database and pointed to signed invoices on the record that only indicated "the United States as the destination of the subject merchandise sold to a specific U.S. customer."  *Id.* at 30.

In an original investigation, Commerce is analyzing and examining sales of the merchandise at issue for the first time to determine if that merchandise is being dumped.  In other words, Commerce cannot look to past administrative reviews to retroactively observe if certain sales declared upon importation for U.S. consumption were resold to a third country, kept in a

warehouse for an extensive amount of time, or actually consumed in the United States during the

POI, with future imports of subject merchandise used to fulfill contractual obligations.

Accordingly, before it determines to treat sales as non-U.S. sales in its dumping

calculations, Commerce must be extremely confident that an exporter knew that merchandise

sold to the United States and declared upon importation as entered for U.S. consumption would,

in fact, *not* be consumed in the United States.

YDD cites to the *Tin Mill Products from the Netherlands* LTFV investigation as support

for its argument, but a comparison of the amount of evidence available to Commerce in *Tin Mill*

*Products* to the information in this investigation reveals a stark contrast that supports

Commerce's conclusions in the *Final Determination*.  YDD Br. at 15-16 (citing *Tin Mill*

*Products from the Netherlands*, 89 Fed. Reg. 1,524 (Dep't of Commerce Jan. 10, 2024) (fin.

determ.) ("*Tin Mill Products*"), and accompanying IDM (Jan. 10, 2024) at Comment 2).

In *Tin Mill Products*, the issue before Commerce was whether certain sales reported as

home market sales were, in fact, home market sales and not third country sales.  The respondent

supplied "declarations from customers stating that the merchandise in question was not

exported," while at verification Commerce "reviewed various reconciling items, including third

country sales" and "checked the destination (of the sales) using (the respondent's) data system,

and confirmed the customer and destination for all pre-selected and 'surprise' sales." *Tin Mill*

*Products* IDM at 12-13.

Commerce requested supporting documentation for numerous sales that the respondent

designated as home market transactions, including delivery schedules from the respondent's

sales system and transportation documents which included the destination of export.  *Id.* at 15.

At verification, Commerce even "tied the first and fifth selected home market sales (whose

delivery location was confirmed during their individual review)" to the respondent's reconciliation worksheets of sales reported as home market sales and noted no discrepancies. *Id.* at 15-16.  In addition, Commerce collected extensive relevant documentation, including 34 invoices for home market sales, 12 delivery notes, and various screenshots from the respondent's sales system.  *Id.* at 16-17.

Only after gathering and analyzing all of that data on the record did Commerce conclude with confidence that the sales at issue were home market sales pursuant to its knowledge test.  *Id.*

On the other hand, in this investigation, YDD reported these sales as *U.S. sales* to Commerce, and record evidence showed that [          ] purchased the subject merchandise, had YDD deliver it to a specified location in the United States, and took title to the subject merchandise during the POI.  Further, Commerce verified these sales as part of its quantity and value reconciliation of YDD's home market sales.

Thus, the POI-specific information on the record for these sales overwhelmingly supported a determination that the transactions should be treated as U.S. sales for purposes of Commerce's dumping analysis.

Further, although, as YDD argues, the [                    ] on the record references [                                                                                                ], that agreement is specifically, by its terms, for sales of ferrosilicon [                    ].  *YDD AQR,* P.R. 78; C.R. 54 & 55 at Exhibit A-8.  The POI in this investigation, however, covered the calendar year of 2023.

In fact, there are no invoices, bills of lading, or other commercial documentation that traces shipments between [          ] and [                    ] of subject merchandise back to the merchandise sold by YDD to [          ] during the POI.  *See* Petitioners' Rebuttal Br., P.R.

21

240; C.R. 491 at 13 (pointing out that YDD provided no "actual purported downstream sales

documentation from [          ]").  Instead, when asked by Commerce to provide documentation

in support of alleged sales of [          ]'s merchandise at the warehouse in [      ] to "its

Canadian customer location in [               ]," YDD provided only self-serving documents

prepared for this investigation by [          ] and YDD's counsel that indicated amounts of

ferrosilicon that the company sold, or would soon deliver, to [                    ] in

[                                                    ]." *YDD Supp.*

*Response*, P.R. 122, C.R. 192 at Exhibits S1-6.1 & S1-6.2.[2]  None of this information reflected

sales to Canada during the POI, and none of it specifically tied the merchandise shipped and sold

to Canada with the merchandise sold by YDD to the United States.

      Thus, for example, based on the paltry record information pertaining to this issue, it is

just as possible that subject merchandise sold by YDD to [          ] and stored in the [      ]

warehouse in 2022 was sold and delivered to Canada [      ], as it was that subject merchandise

sold and delivered during the POI or afterward was used in those transactions.

      Furthermore, it is also possible that [          ] could have sold some of that ferrosilicon

to consumers in the United States or other countries, depending on [          ]'s existing

inventory.  The record is simply not complete with respect to this issue.

      YDD's Brief points to documents it claims indicate the merchandise that it was selling to

[          ] would eventually end up in Canada.  YDD Br. at 16-18.  However, the test is not one

---

[2] The sales quantities referenced in Exhibits S1-6.1 do not correspond to the [      ] amount
reflected by the purchase orders submitted on the record or the total quantity of sales to
[          ] reported in the U.S. sales database, so Exhibit S1-6.2, prepared by YDD's counsel,
attempts to tie these numbers to the record documents, although there is no documentation
reflecting when or how that ferrosilicon was sold to Canada.  *YDD Supp. Response* at Exhibit S1-
6.2.

of *belief* of ultimate destination, but of *knowledge* of ultimate destination. As the Court

explained in *Ad Hoc*, Commerce must be confident in applying its knowledge test, based on

"probative, reliable and verifiable" evidence, that an exporter "knew or should have known that

the sales were," in no way, intended "for consumption" in the United States during the relevant

period of examination. *Ad Hoc* at *2 & *3. With no commercial documentation on the record

establishing dates and details of sales or shipments of ferrosilicon from [          ] to Canada,

Commerce's analysis in the *IDM* makes it clear that Commerce was not confident that YDD

knew with certainty that the merchandise purchased by [          ] in 2023 would end up in

Canada during the POI or afterward.

Furthermore, YDD claims that all of the information it supplied was "consistent with

Commerce's normal practice," but, as shown by the very example cited by YDD, *Tin Mill

Products*, that claim is unfounded, as it is Commerce's historical practice in LTFV investigations

to require more information than that relied upon by YDD in this investigation to satisfy the

knowledge test. YDD Br. at 15-16.

In the end, the responsibility for the lack of information with respect to these transactions

on the record rested with YDD. As the Federal Circuit has held, "the burden of creating an

adequate record lies with interested parties and not with Commerce." *QVD Food Co. v. United

States*, 658 F. 3d 1,318, 1,324 (Fed. Cir. 2011); *see also Nan Ya Plastics Corp. v. United States*,

810 F.3d 1,333, 1,337-38 (Fed. Cir. 2016).

Commerce determined that under its knowledge test there was insufficient information on

the record to substantiate that YDD knew, or should have known, that [          ] would

definitely sell its merchandise to Canada within the POI or afterwards. *IDM* at 30. Accordingly,

Commerce's determination to treat YDD's [          ] sales as U.S. sales in its AD margin

calculations was supported by substantial evidence on the record and otherwise in accordance with law.

## II. COMMERCE'S DETERMINATION THAT YDD DID NOT ACT TO THE BEST OF ITS ABILITY IN PROVIDING INFORMATION ABOUT THE RELATIONSHIP BETWEEN A U.S. CUSTOMER AND YDD'S AFFILIATES, AND ITS APPLICATION OF AFA, WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE LAWFUL

From the very outset of the investigation, YDD unquestionably withheld critical and necessary information concerning the full scope of its affiliated parties, which impeded the conduct of the investigation. Commerce's resort to partial AFA was therefore fully supported by substantial evidence on the record and otherwise in accordance with law.

### A. Legal Framework

Pursuant to 19 U.S.C. § 1677e(a)(2) Commerce shall apply "facts otherwise available" if an interested party: (1) withholds information that has been requested; (2) fails to provide requested information by the deadlines established, or in the form and manner requested; (3) significantly impedes a proceeding; or (4) provides information that cannot be verified.

Additionally, if Commerce determines "that an interested party has failed to cooperate by not acting to the best of its ability to comply with the request for information," it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." *See* 19 U.S.C. § 1677e(b)(1). The Federal Circuit has held that the "best of its ability" standard requires a respondent to "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *See Nippon Steel Corp. v. United States*, 337 F.3d 1,373, 1,382 (Fed. Cir. 2003) ("*Nippon Steel*"). The Court noted that "intentional conduct, such as deliberate concealment or inaccurate reporting, {unequivocally demonstrates} a {respondent's} failure to cooperate." *Id. See also Essar Steel Ltd. v. United States*, 678 F.3d 1,268, 1,276 (Fed. Cir. 2012) ("Providing false information and failing to

24

produce key documents unequivocally demonstrate that {respondent} did not put forth its

maximum effort.").

At issue in this litigation is YDD's failure to report information pertaining to an

affiliation between [          ] and YDD.  Under 19 U.S.C. § 1677(33), Commerce considers

certain parties to be "affiliated" or "affiliated persons," including "(B) any officer or director of

an organization and such organization; (C) partners; (D) employer and employee; (E) any person

directly or indirectly owning, controlling, or holding with power to vote, five percent or more of

the outstanding voting stock or shares of any organization and such organization; (F) two or

more persons directly or indirectly controlling, controlled by, or under common control with, any

person; and (G) any person who controls any other person and such other person."  The statute

further provides that "a person shall be considered to control another person if the person is

legally or operationally in a position to exercise restraint or direction over the other person."  *Id.*

Furthermore, under 19 C.F.R. § 351.102(b)(37) Commerce defines "person" to include

"any interested party as well as any other individual, enterprise, or entity, as appropriate."

Importantly, 19 U.S.C. § 1677(33)(B) does not specify any role or function that an officer

or director must perform or undertake, an important consideration if one were to take YDD's

characterization of its unreported affiliation at face value.

The Federal Circuit has upheld Commerce's application of AFA when substantial

evidence on the record supported Commerce's determination that an exporter withheld

information with respect to an affiliation and impeded the proceeding until directly confronted

with the affiliation on the record.  *Ad Hoc Shrimp Trade Action Committee v. United States*, 802

F. 3d 1,339, 1,354-1,357 (Fed. Cir. 2015).  *See also Ta Chen Stainless Steel Pipe, Inc. v. United

States*, 398 F. 3d 1,330, 1,335-36 (Fed. Cir. 2002) (affirming Commerce's application of partial

AFA because a respondent was affiliated with another company during the period of review and did not provide necessary sales information.  The Court held the respondent "bore the burden of creating an accurate record").

### B. Commerce's Application of Partial AFA to YDD was Warranted and Lawful

Commerce's AFA determination centered around [              ], the [                    ] and [        ] of [        ] during the POI, who signed, on behalf of [              ], the [              ] and [          ] document with YDD that applied to [          ]'s purchases of YDD's ferrosilicon during the POI – documents attached to YDD's section A questionnaire response.  *YDD AQR*, P.R. 78; C.R. 55 at Exhibit A-8.

Until Petitioners discovered [        ]'s multiple business roles and placed information on the record showing that he was both the [              ] and [      ] of [              ] as well as a member of the Board of [            ], and thus affiliated with YDD during the POI, as well as statements he made publicly discussing [

], no information about this relationship between [          ] and [        ] was on the record.  *Petitioners Pre-Prelim Comments*, P.R. 176; C.R. 325 at 4 & Exhibits 1-6.

It was only in response to Petitioners' submission – long after YDD had answered Commerce's affiliation questions in the section A questionnaire – that YDD belatedly addressed [          ] and his role in both organizations.  *YDD Pre-Prelim Response*, P.R. 181; C.R. 328-329 at 3-4.  YDD claimed that YDD company [          ] is a Swiss company, and Switzerland required a Swiss resident to sign binding documents on its behalf.  *Id.* at 4.  They therefore appointed [          ], a Swiss citizen, to the Board of Directors.  He signed documents on behalf of [            ], filed them with the Swiss government, and paid [            ] bills in that role.  *Id.* at 4.  He did this while also serving as [              ] and [      ] of [            ] during the POI, yet YDD never mentioned it in response to all of Commerce's questionnaires.

In the *PDM*, Commerce pointed to the Section A questionnaire, which clearly states that if the possibility of an affiliation existed, but a respondent was unsure if they should address it, they should contact the Commerce official immediately and discuss it with them. *PDM* at 7, n.38 (referring to question G-10 of the section A questionnaire). It noted that YDD never raised this potential affiliation with Commerce, instead consistently referring to [          ] as an "unaffiliated U.S. customer." *PDM* at 9. Further, in the *PDM* Commerce explained that [          ] "held a position in ASIA and KazSilicon's parent company," ([          ]), yet never reported that fact in its questionnaire responses. *Id.*

Thus, in accordance with 19 U.S.C. §§ 1677e(a) and (b), Commerce preliminarily determined that YDD had not acted to the best of its ability in providing evidence of its affiliation with [          ] during the POI, and it applied partial AFA to YDD's U.S. sales to that U.S. customer. *PDM* at 9-11.

In its case brief, YDD argued that [          ] was not employed by YDD and that his position on the Board of Directors was just that of an administrative figurehead with no managerial power. YDD's Case Br. P.R., 238, C.R. 490 at 6-7. YDD argued that because his responsibilities were merely to sign binding paperwork on behalf of the YDD company and pay the company's bills, YDD was justified in not thinking he had a "controlling position" at [          ], [          ] and YDD were not affiliated, and that it did not need to raise [          ]'s position in both companies. *Id.* at 6.

Commerce disagreed. It stated that YDD clearly knew about [          ]'s dual roles in both companies during the POI, that it withheld that information from Commerce, and that it failed to provide the information "within the established deadlines in the form and manner requested, thereby significantly impeding the proceeding." *IDM* at 31-32. Further, it determined

27

that because YDD had that information available to it but failed to provide it, it had failed to act

to the best of its ability. *Id.* at 32. Commerce therefore applied AFA to the YDD/[          ]

transactions, pursuant to 19 U.S.C. §§ 1677e(a)(1) and (a)(2)(A), (B) &(C), as well as 19 U.S.C.

§ 1677e(b). *Id.*

     Commerce's application of partial AFA to YDD in this case was obviously warranted.

Even if [          ]'s role on the Board of Directors at [          ] had not been managerial in

nature, and was "only" to participate in Board of Director meetings, sign binding documents on

behalf of the company to be filed with the government, and pay bills, as claimed by YDD, those

functions made him an "officer or director" of [          ], pursuant to 19 U.S.C. § 1677(33)(B),

while at the same time he was the [          ] and director in charge of [          ]. *See*

*PDM at 7.*

     Further, the information supplied by YDD showed that [          ]'s role was significant in

the conduct of the company.  For example, the [

          -      -     -  -    -  -    ]. *YDD Pre-Prelim*

*Response*, P.R. 181; C.R. 328-329 at Exhibit 3 (emphasis added).  Likewise, the various [

          ].  *Id.* at Exhibit 4.  Additionally, it is extremely

doubtful that someone in just an "administrative" role, as YDD claimed, would have been given

the latitude to make public statements and grant interviews to business media [

          ]. *Petitioners' Pre-Prelim Comments*, P.R.

176; C.R. 325 at Exhibits 6 & 7.

28

In the *Preliminary Determination*, Commerce collapsed YDD, ASIA, and KazSilicon and treated them as a single entity, which it continued to do in the final determination. Furthermore, [        ] is a parent company of ASIA and KazSilicon, and all three companies are owned by [                                                    ]. *YDD AQR,* C.R. 56 at Exhibit A-4. Thus, by serving as an officer or director in [                    ] also served as an officer or director in the collapsed YDD entity, under 19 U.S.C § 1677(33)(B), as well as the collapsed YDD entity's U.S. customer, [        ].

In addition, [        ] was also legally and operationally empowered to exercise restraint or direction over both entities during the POI, under 19 U.S.C. § 1677(33)(F). This was demonstrated by public statements, such as a news article explicitly identifying [        ] as YDD's [

                        ]. *Id.* at Exhibit 6 ([

                ].

Furthermore, it is possible that the parties were also partners under 19 U.S.C. § 1677(33)(C), as that is how they were described in an article in which [        ] stated that [

                        ]. *Id.* at Exhibit 7 ([

                                ]).

In sum, the record demonstrated that YDD and [        ] were affiliated parties within the meaning of sections 19 U.S.C. §§ 1677(33)(B), (C), and (F) during the POI. Despite its clear affiliation with [        ], YDD failed to disclose the true nature of the parties' relationship in its questionnaire responses to Commerce and instead chose to obfuscate and conceal it from Commerce, declaring each of its sales to [        ] as unaffiliated.

29

YDD's reporting prevented Commerce from pursuing full lines of inquiry and obtaining necessary information with respect to [            ]'s financial statements and affiliations, its downstream sales to its unaffiliated U.S. customers, and any other direct or indirect relationships that it may have had with other companies and entities in Kazakhstan, such as YDD's raw material suppliers and service providers that would have been relevant to the antidumping analysis.

Without complete and accurate information about YDD's affiliates and their relationships, Commerce was unable to assess the reliability of reported sales or use those sales to calculate an accurate dumping margin. Additionally, YDD's failure to report its affiliation with a U.S. customer who accounted for [                        ] YDD's reported U.S. sales raised serious questions and concerns about the reliability of YDD's other questionnaire responses.

Accordingly, Commerce's determination that YDD did not act to the best of its ability in reporting its affiliations with [            ] was supported by substantial evidence on the record and Commerce's application of partial AFA to the YDD/[            ] transactions was in accordance with law.

YDD argues that Commerce misinterpreted information on the record and that even if [        ] was affiliated with [            ] during the POI, [            ] had no control over YDD during the POI. YDD Br. at 22-26. YDD alleges that because Commerce and Petitioners misunderstood its corporate structure, Commerce's application of AFA was not warranted because [        ] and the Board of Directors on which [            ] served had no "actual capacity or ability to exercise control" over YDD. YDD Br. at 26.

Furthermore, YDD argues that Commerce was wrong in finding that "necessary information was missing" from the record because it tried to provide Commerce information at verification at this issue, "but Commerce decided not to consider it," a decision YDD claims was "arbitrary." YDD Br. at 28.

Instead, YDD claims that it was the victim of Commerce's failure to abide by the statute, and that Commerce was the party at fault in this case, because it was required to notify YDD of the deficiencies in its submissions before applying AFA, pursuant to 19 U.S.C. § 1677m(d), and it never did so. YDD Br. at 30-31 (citing *Mukand, Ltd. v. United States*, 767 F. 3d 1,300, 1,304 (Fed. Cir. 2014) ("*Mukand*")). To be clear, although YDD never placed information about a potential affiliation on the record in response to Commerce's questionnaires, and that information was supplied for the first time on the record by the Petitioners before the *Preliminary Determination*, YDD incredibly claims that *Commerce*, and not YDD, was in the wrong because Commerce never asked YDD about the potential affiliation in the first instance in its questionnaires to YDD. *See* YDD Br. at 31.

In sum, YDD claims that because Commerce did not initially point to the potential affiliation, of which it had no knowledge, in its questionnaires, and then "chose to accept Petitioner's late-filed factual information alleging the affiliation," while not accepting YDD's untimely submissions at verification, Commerce acted unreasonably and blamed "YDD for its own gatekeeping of the administrative record." *Id.* at 32. YDD claims that Commerce's AFA analysis was a "disingenuous attempt to reverse-engineer a gap in the record where there wasn't one." *Id.*

There is no merit to YDD's arguments. First, 19 U.S.C. § 1677m(d) only requires Commerce to promptly inform a respondent of a deficiency, if Commerce "determines" that the

questionnaire is deficient.  As explained by the CIT, "{i}nherent in the requirement of

§1677m(d) is a finding that Commerce was or should have been aware of the deficiency in the

questionnaire response." *ABB Inc. v. United States*, 355 F. Supp. 3d 1,206, 1,222 (Ct. Int'l Trade

2018) ("*ABB*").  As the Court in *ABB* stated, "§ 1677m(d) does not require Commerce to issue a

supplemental questionnaire seeking assurances" that a respondent's questionnaire responses

were complete and accurate.  *Id.*  If Commerce was not in a position to know that YDD's

responses were incomplete, then the burden to provide the necessary information and create an

adequate record fell solely on YDD.  *Id.* (citing *Nan Ya Plastics*, 810 F.3d at 1,337 and *QVD*

*Food Co.*, 658 F.3d at 1,324).

YDD cites to *Mukand* in support of its "deficiency" argument, but *Mukand* does not

support its claims.  In *Mukand*, the Federal Circuit affirmed Commerce's application of total

AFA, determined that it was "reasonable for Commerce to expect from Mukand more accurate

and responsive answers to the questionnaire," and held that it was Mukand that evaded providing

all the necessary information on the record.  *Mukand*, 767 F.3d at 1,307.

Likewise, as Commerce explained in both the *PDM* and *IDM*, YDD was aware that the

[          ] and [      ] of its U.S. customer also served on [        ]'s Board of

Directors during the POI and elected not to share that information with Commerce in its

questionnaire responses.  Accordingly, Commerce had no obligation under 19 U.S.C.

§ 1677m(d) to make YDD aware of a deficiency in its affiliation questionnaires of which

Commerce, itself, was unaware.

In addition, there is no validity to YDD's argument that Commerce's rejection of new

factual information at verification was "arbitrary."  Commerce's long-standing practice is to

accept corrective information at verification only for minor corrections to information already on

32

the record. The Federal Circuit has held that this practice "strikes an appropriate balance between finality and accuracy." *Goodluck India Limited v. United States*, 11 F.4[th] 1,335, 1,343 (Fed. Cir. 2021). Accordingly, when Commerce has rejected new factual information presented at verification that did not meet the description of minor corrections, the Federal Circuit has upheld Commerce's determinations as within its discretion and supported by substantial evidence on the record. *Id.* (citations omitted). Thus, Commerce's refusal to accept YDD's new factual information at verification was in no way "arbitrary," but was in fact lawful and within its discretion.[3]

Furthermore, YDD's arguments appear to ignore the fact that YDD had an opportunity to respond to Petitioner's submission, and in fact did so. *See YDD Pre-Prelim Response*, P.R. 181; C.R. 328-329. Indeed, many of the arguments raised by YDD in that submission are repeated in YDD's Brief. Accordingly, YDD's claim that Commerce was unfairly "gatekeeping" the record by allowing Petitioner's submission on the record but not allowing the information YDD tried to submit at verification, while quietly ignoring its own *Pre-Prelim Response* and all the claims therein that YDD put on the record in defense of its position is, to use YDD's own word, "disingenuous."

Finally, YDD's arguments about its corporate structure ignore the fact that Commerce's questionnaire directed respondents to contact Commerce "immediately" if they were "uncertain" if a company was affiliated with them or if they did not believe that they were able to prepare a response including that information. Letter from Commerce to YDD Corporation LLP, *Section A Questionnaire* (June 10, 2024), P.R. 56 at General Instructions, G-10. Commerce explicitly

---

[3] YDD calls Petitioner's submission "late-filed," but it was filed within the time period allowed by Commerce's regulations, while it was YDD who chose never to report in any of its timely questionnaire responses its affiliation with a U.S. customer.

cited this language in applying AFA in the *PDM*, and it was a basis on which Commerce

preliminarily applied AFA to YDD.  *PDM* at 3.

YDD's arguments about the nature of [          ]'s relationship with producer/exporter

YDD and its U.S. customer, [          ], were exactly the types of information which YDD

should have included in a questionnaire response about potential affiliates or at least shared with

Commerce if it was "uncertain" about the relevance of that information.  Instead, YDD made no

reference in any of its questionnaire responses to the role [          ]'s [     ] and [

] held in [          ].

YDD's arguments dismissing the affiliation between the two companies during the POI

as irrelevant are, if anything, an attempt to divert attention from its own inadequate responses.

The record reflects that YDD failed to act to the best of its ability in reporting [          ]'s and

[          ]'s affiliation under 19 U.S.C. § 1677(33), and YDDs allegations about power

dynamics between the companies in no way justifies or excuses that failure.

Accordingly, Commerce correctly determined to apply partial AFA to YDD's sales to

[          ].  We therefore respectfully request that the Court affirm that determination as

supported by substantial evidence on the record and otherwise in accordance with law.

## III.     COMMERCE LAWFULLY APPLIED AN A-TO-A COMPARISON METHODOLOGY TO ALL OF YDD'S TRANSACTIONS

In calculating an AD margin, as recognized by the Federal Circuit, "Commerce first

decides whether 'a pattern of export prices (or constructed export prices) for comparable

merchandise … differ significantly among purchasers, regions, or period of time,'" in comparing

home market sales to U.S. sales, and if it finds a pattern to exist, Commerce then must determine

if those differences can be addressed through the use of Commerce's standard A-to-A

comparison methodology. *Marmen Inc., v. United States,* 134 F. 4th 1,334, 1,337 (Fed. Cir.

2025) (citing 19 U.S.C. §§ 1677f-1(d)(1)(B)(i) & (ii)).

If Commerce only uses the A-to-A comparison methodology in calculating an AD

margin, it will not treat negative dumping margins as "zero," (*i.e.*, "zeroing"), in its comparisons.

Instead, it will offset all "dumped" transactions by "non-dumped" transactions in its calculations.

In this investigation of YDD, that was the situation – Commerce only applied the A-to-A

comparison methodology in its AD margin calculations and never used "zeroing" in its

comparisons.

YDD alleges that Commerce applied zeroing in its calculations, but Commerce's

description of its AD margin calculations and the actual calculations contradict that claim. YDD

Br. at 33-38. Specifically, in the *Preliminary YDD Calculation Mem*o, Commerce explained that

it "created two margin calculation programs," the first for those transactions involving [          ]

and the second for the remainder of U.S. sales. *Preliminary YDD Analysis Memo*, P.R. 190; C.R.

338 at 3. Commerce then "combined the data from both margin programs and applied the AFA

rate to the [          ] sales. *Id.* Across the board, Commerce only used A-to-A comparisons,

and in all of those calculations dumped sales were offset by non-dumped sales. *Id.*

Subsequently, in the *Final Calculation Memorandum*, Commerce explained that the

results of its analysis did "not support consideration of an alternative to the average-to-average

method." *Final Calculation Memorandum*, P.R. 273; C.R. 502 at 2. Further, Attachment 2 to

the *Final Calculation Memorandum* (pages 37 and 45 of the SAS Output) showed that all of the

comparisons using the [          ] sales reflected a pattern of prices that differed significantly

among purchasers, regions, or period of time, but that there was no meaningful difference in

margins between the use of the A-to-A methodology and the "average-to-transaction"

methodology, resulting in Commerce using the A-to-A methodology (with no zeroing) for those transactions. *Id.* at Attachment 2.

In addition, Attachment 3 to the *Final Calculation Memorandum* (page 47 of the SAS Output) showed that no pattern existed for comparisons using YDD's remaining U.S. sales, which meant that Commerce used its A-to-A methodology with no zeroing for those comparisons as well. *Id.* at Attachment 3.

YDD alleges that Commerce "set the negative … sales to zero in the margin calculation." YDD Br. at 37. That is an incorrect description of Commerce's calculations, as it did not "set" any sales to "zero." Instead, it calculated a zero margin for the non-AFA sales. As Commerce explained in the *Ministerial Memo*, "in the A-A methodology, the total amount of dumping is the sum of the total positive comparison results and the total negative comparison results *only* if the result is greater than zero. In this case, the sum of the positive and negative comparison results was not greater than zero, therefore the program correctly listed zero as the correct amount of total dumping for the sales for which we did not apply AFA and this is the value Commerce used in its spreadsheet." *Ministerial Memo*, P.R. 220 at 3 (emphasis included).

Rather than acknowledge that Commerce calculated a zero AD margin for the non-AFA sales, YDD instead claims that the result of that margin calculation "was in fact a negative number." YDD Br. at 35. However, there is no requirement in law that Commerce calculate a "negative" AD margin.

In applying partial AFA, Commerce lawfully combined two margins, one of them being zero and the other being larger than zero, into YDD's ultimate AD margin. That combination of margins was not "zeroing," as YDD claims. Indeed, Commerce is under no obligation to first offset all dumped sales in its AD margin calculations with all non-dumped sales (as it did here)

and then, as YDD alleges, revisit those calculations a second time with an adjustment based on

alleged "positive and negative" AD margins. Notably, YDD cites to no legal authority for what

is tantamount to a "double-offsetting" adjustment, because no statute, regulation, or Court

holding has ever required Commerce to apply such an unreasonable analysis.

In sum, YDD is incorrect in its claim that Commerce applied "zeroing" in its

calculations. Furthermore, this Court should reject YDD's argument that Commerce was

required in the *Final Determination* to calculate a negative AD margin, much less offset its

calculations by a negative AD margin, as meritless.

### IV.    COMMERCE'S DETERMINATION TO USE SHIPMENT DATE AS THE DATE OF SALE FOR KAZCRHOME'S U.S. TRANSACTIONS WAS SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD AND OTHERWISE IN ACCORDANCE WITH LAW

The material terms of sale for Kazchrome's U.S. sales were agreed upon between

Kazchrome and TELF on or before the date of shipment. While the final price paid by TELF for

the ferrosilicon may have differed for some transactions from the earlier prices established at the

date of shipment, those differences were a natural consequence of the pricing mechanisms set

forth in the Long-Term Agreement. In other words, the subsequent changes in prices were not,

as Kazchrome suggests, the result of further renegotiations of the material terms of sale between

Kazchrome and TELF. Thus, Commerce's selection of the date of shipment as the date of sale

was supported by substantial evidence on the record and otherwise lawful.

### A.    Legal Framework

The sole issue presented by Kazchrome in its Brief is whether Commerce erred in

selecting the date of shipment as the date of sale. Commerce determines its dumping margins by

comparing the normal value of the foreign like product and the export price (or constructed

export price) of that foreign like product. *See* 19 U.S.C. § 1677b(a). The normal value is the

price "at a time reasonably corresponding to the time of the sale used to determine the export

price." *Id.* § 1677b(a)(1)(A). Thus, Commerce's selection of the date of sale for a respondent's

U.S. sales is critical in establishing the appropriate universe of U.S. sales to compare in the

dumping analysis. *See ArcelorMittal USA LLC v. United States,* 302 F. Supp. 3d 1,366, 1,370

(Ct. Int'l Trade 2018) ("The date of sale therefore defines the universe of sales that fall within

Commerce's period of investigation, and that are subject to Commerce's less than fair value

determination").

      The date of sale is often the invoice date, but Commerce may use another date if that date

"better reflects the date on which the exporter or producer establishes the material terms of sale."

19 C.F.R. § 351.401(i). Further, Commerce has a "'well established and longstanding practice'

of looking beyond the invoice date to the parties' actual course of conduct, as well as the parties'

expectations concerning the transaction, to determine whether an earlier date—such as the

contract date—represents the point at which the parties reached a meeting of the minds on the

material terms of sale." *Nucor Corp. v. United States*, 612 F. Supp. 2d 1,264, 1,308 (Ct. Int'l

Trade 2009) (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1,204, 1,208 (Fed. Cir.

1995)("*Nucor Corp.*"); *Koyo Seiko Co. v. United States*, 36 F. 3d. 1,565, 1,573 (Fed. Cir. 1995);

and *Allied Tube and Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 218-219 (Ct. Int'l

Trade 2000)).

      In the *Final Determination*, Commerce determined that the material terms of the sales

between Kazchrome and TELF were set at the date of shipment, and therefore that was the date

the parties reached a meeting of the minds on those terms,

**B. Commerce Correctly Selected Shipment Date as the Date of Sale for Kazchrome's U.S. Sales**

There were three potential dates of sale for Kazchrome's U.S. sales at issue in this investigation: the shipment date, the date of title transfer, and the final invoice date. After consideration of the record as a whole and the arguments of the parties, Commerce determined that the appropriate date of sale for those sales was the shipment date. *IDM* at 7. Commerce reached this conclusion after determining that at the point of shipment Kazchrome's and TELF's transactions had advanced beyond the stage of mere negotiation and that they had reached a meeting of the minds on the material terms of sale. *IDM* at 7.

In its initial questionnaire responses, Kazchrome advocated for the use of the shipment date (as the earlier of either invoice or shipment date). *See IDM* at 6-7 (citing *Kazchrome's BCQR*, P.R. 89; C.R. 103 at 16-18). Consistent with those responses, in its initial section C questionnaire Kazchrome reported all of its U.S. sales during the POI using shipment date as the date of sale. *See Kazchrome's BCQR*, P.R. 90; C.R. 90 at Exhibit C-1.

It was only later, in its supplemental questionnaire responses, that Kazchrome argued that Commerce should instead use the date of final invoice, rather than the date of shipment, as the date of sale. *See IDM* at 7 (citing *Kazchrome's Second A-C SQR*, P.R. 150, C.R. 250 at 1).

Commerce acknowledged Kazchrome's shifting narrative on the date of sale and database revisions in the *IDM*, and noted that the use of date of shipment as the date of sale "aligned" with its "practice of using the earlier of the invoice or shipment date." *Id.* at 6. Further, Commerce determined that the record evidence showed that "the material terms of sale for Kazchrome's U.S. sales were set prior to the final invoice" and that this fact was supported by its verification of Kachrome's data. *Id.* at 7.

In the end, Commerce determined that at the time of shipment, Kazchrome and TELF had

agreed upon the essential commercial terms governing Kachrome's U.S. sales, including

[                                                    ], through both the Long-Term

Agreement, as well as the shorter, implementing agreements between the two companies. *See*

*IDM* at 7 (citing to *Verification of the Sales Response of TNC Kazchrome JSC in the Less-Than-*

*Fair-Value Investigation of Ferrosilicon from Kazakhstan*, (Dec. 23, 2024), P.R. 227; C.R. 482

at 10). It therefore concluded that the date of shipment was the appropriate date of sale for

purposes of analyzing Kazchrome's U.S. sales. *Id.*

Commerce's determination was lawful, supported by substantial evidence on the record,

and consistent with Commerce's regulations and practice. When Commerce determines the

appropriate date of sale to use for its calculations, it generally considers the material commercial

terms of sale to include the quantity, payment terms, delivery terms, and price of the

merchandise. *See Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*, 308 F. Supp. 3d

1,297, 1,306-07 (Ct. Int'l Trade 2018) ("*Eregli*") (citing *Sahaviriya Steel Indus. Pub. Co. v.*

*United States*, 714 F. Supp. 2d 1,263, 1,280 (Ct. Int'l Trade 2010), *aff'd,* 649 F.3d 1,371 (Fed.

Cir. 2011)).

However, even when a material term of sale, such as the final price paid in the sale, is

subject to change after shipment, that does not automatically mean that the appropriate date of

sale is the final invoice price, as the determination of the appropriate date of sale is made on a

case-by-case basis. *See Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,

625 F. Supp 2d 1,339, 1,373 (Ct. Int'l Trade 2009) ("*Habas Sinai*") (holding that the contractual

nature of a late delivery fee altering the final price did not constitute a material change in the

term of sale). As Commerce has explained, "price and quantity are often subject to continued

negotiation between the buyer and the seller until a sale is invoiced," and the date of an

enforceable sale "is not necessarily the date on which the terms of sale actually are established."

*See Antidumping Duties; Countervailing Duties: Final Rule,* 62 Fed. Reg. 27,296, 27,348-49

(Dep't of Commerce May 19, 1997) (*Preamble*).

      In accordance with 19 C.F.R. § 351.401(i), Commerce's practice is normally to use

invoice date as the date of sale unless another date better reflects when the material terms of sale

were fixed. *See Eregli,* 308 F. Supp. 3d at 1,306-07. Commerce has recognized that a sale may

occur even where the final amount payable is not definitively known, where a methodology for

price adjustment is established at the time of sale and the buyer is obligated to pay. *See Habas*

*Sinai,* 625 F. Supp 2d at 1,376 (upholding Commerce's use of a date of contract rather than date

of invoice wherein the material terms of the agreement were set on the date of contract despite a

subsequent billing adjustment).

      The record shows that Kazchrome's sales to TELF were governed both by the Long-

Term Agreement, as well as smaller "Additional Agreements" that would dictate and implement

the details on individual shipments. *Id. See Kazchrome's October 16 Submission*, P.R. 158;

C.R. 259 at Attachment I. One problem, however, is that Kazchrome placed only [          ]

pages of the Long-Term Agreement on the record. *Id.* This included some [

                                        ] *Id.* Thus,

Commerce's understanding of the details set forth in the Long-Term Agreement was derived

from a review of only a very limited number of pages selectively placed on the record by

Kazchrome.

      Nonetheless, even from those select pages, Commerce could conclude that the Long-

Term Agreement set forth material terms governing Kazchrome's U.S. transactions, including

[

] in determining the

final price paid by TELF for the merchandise.  *Id.*

     With respect to the transaction-specific implementation agreements, those agreements

identified specific details for each sale, such as, in one example, the fact that the [          ]

would be the [              ] identified in the Long-Term Agreement to set the price for a

particular transaction.  *See Kazchrome AQR*, C.R. 43 at Exhibit A-14.

     As Kazchrome states, there were post-shipment price settlements between the two

companies, but those settlements did not reopen negotiations or alter the fundamental bargains

between the parties.  Kazchrome Br. at 18.  Instead, those post-shipment settlements functioned

as a routine commercial practice, occurring only after the goods had shipped and title had passed.

*See Kazchrome's October 16 Submission* P.R. 158; C.R. 259  at Attachment I.  Preliminary

prices were fixed prior to or at shipment, and any subsequent price settlements were determined

in accordance with the parties' previously agreed-upon pricing mechanism.  *Id.*

     In sum, the Long-Term Agreement had mechanisms built into the contract that would

predictably impact price changes from the provisional price to the final price, as implemented

through the subsequent transaction-specific agreements.  *See id.*; *Kazchrome AQR*, C.R. 43 at

Exhibit A-14.  Accordingly, given the nature of those agreements, both the Long-Term

Agreement and implementation agreements predated the issuance of the date of final invoice.

     The mechanism used by Kazchrome and TELF to set and implement the material terms

of the U.S. sales in this investigation was similar to the facts in *Habas Sinai*.  In *Habas Sinai*, the

final price of the sales were subject to conditional fees that could only be determined after

delivery and final invoicing.  *See Habas Sinai*, 625 F. Supp 2d at 1,373.  The CIT upheld

Commerce's determination that, even though the final prices of the sales were subject to change, those changes to the final prices were fixed to predetermined conditions and thus did not reflect a change in the material terms of the agreement. *See id.* Similarly, in this investigation, provisions to account for variables that modified the final U.S. prices from the provisional prices, such as [                                                    ], were already predetermined and established in the Long-Term Agreement. *See Kazchrome's October 16 Submission*, P.R. 158; C.R. 259 at Attachment I.

In the *IDM*, Commerce reasonably concluded that such downstream adjustments did not delay the formation of a sale, with the material elements of that sale settled prior to or on the date of shipment. *See IDM* at 7. In other words, the later price modifications did not alter the buyer's obligation to accept the goods or the seller's entitlement to payment. Instead, it merely finalized the precise amount owed under a pricing framework that was already in place based on the Long-Term Agreement. *See Kazchrome's October 16 Submission* at Attachment I.

Accordingly, Commerce's determination that the date of shipment was the appropriate date of sale was therefore supported by substantial evidence and in accordance with law.

Kazchrome now argues that the date of final invoice, rather than the date of shipment, is the actual date of sale. Kazchrome Br. at 2. Kazchrome insists that, because the final price was "not established until Kazchrome accepted TELF's pricing schedule and issued the final invoice," the material terms of the agreement were not established until the date of final invoice. Kazchrome Br. at 18. Lacking a finalized price at the point of shipment, Kazchrome claims, renders the date of shipment unusable as the date of sale.

However, as the CIT held in both *Habas Sinai* and *Nucor Corp.*, a change in price does not always mean a change in the date of sale. In fact, in both cases, the CIT upheld Commerce's

practice of considering dates other than the invoice date as the dates of sale, even when a material term, such as price, was subject to change.

In *Habas Sinai*, the Court held that subsequent changes to prices that were already considered at the point of contracting did not reflect changes to the materials terms of the sales agreement between the two parties.  *See Habas Sinai*, 625 F. Supp 2d at 1,376.  Likewise, in *Nucor Corp.*, the CIT held that it is Commerce's obligation to review the actual terms of the agreements between the contracting parties and determine at what point the material terms of sale were set, even if there were later changes in the ultimate price of the merchandise.  *See Nucor Corp.*, 612 F. Supp. 2d at 1,313 (stating that "{e}ven when there is evidence of change in a material term, Commerce still must consider whether … the parties had the expectation that the material terms of sale were fixed on the date of contract").

Accordingly, contrary to Kazchrome's claims, a change in price, alone, does not mean that material terms of sale were not established earlier in a transaction.  Instead, Commerce, and the Court, must consider the record as a whole in determining the appropriate date of sale.  In this case, Commerce was correct in determining that at the date of shipment the material terms of sale were set, and therefore, the date of shipment was the appropriate date of sale to apply to Kazchrome's U.S. sales.

Additionally, Kazchrome asserts that Commerce erred in not considering the date of title transfer as an alternative date of sale.  Kazchrome Br. at 20-22.  Specifically, Kazchrome argues that Commerce wrongly determined that the title transfer date was insufficiently supported with documentation on the record to be considered the date of sale.

In the investigation, Commerce stated in both the *PDM* and *IDM* that its decision to use the date of shipment instead of the date of title transfer reflected that the title transfer date was

not on the record and not included in the U.S. database of sales. *PDM*, P.R. 184 at 15; *IDM*, P.R. 272 at 7. Kazchrome argues that this determination was in error, and that the date of title transfer was on the record, just not in the U.S. database of sales. Kazchrome Br. at 20-22.

Furthermore, Kazchrome claims that the date of title transfer was superior to the date of shipment because for each U.S. transaction, the final price could not be set until the date of title transfer. Kazchrome argues this is the case because the final pricing schedule was not provided to Kazchrome by TELF until title had passed. Kazchrome Br. at 8 (citing *Kazchrome's October 16 Submission*, P.R. 158; C.R. 259 at Attachment I).

As explained above, the Long-Term Agreement explicitly provided for variables pursuant to which final prices could differ from the provisional price. *Kazchrome's October 16 Submission*, P.R. 158; C.R. 259 at Attachment I. Accordingly, there is no question that after the date of shipment, final prices could, and often did, change from the prices at the date of shipment in the transactions between Kazchrome and TELF. *Id.* However, it was in that Long-Term Agreement that the material terms of the U.S. sales, such as quantity or price, were either established or proceedings were set forth under which material terms could be later established between the parties. *Id.*; *Kazchrome AQR*, C.R. 43 at Exhibit A-14.

On the other hand, title transfer was just a pricing mechanism that set the date for which the final price would be calculated, and nothing more. *See Kazchrome's October 16 Submission*, P.R. 158; C.R. 259 at Attachment I. Furthermore, unlike the date of shipment, title-transfer did not implement or modify material terms of sale established in the Long-Term Agreement or later implemented in the subsequent transaction-specific agreements.

For the reasons detailed above, Petitioners respectfully request that this Court affirm Commerce's determination that the date of shipment was the appropriate date of sale for calculating Kazchrome's AD margin in the underlying investigation.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court deny YDD's and Kazchrome's motions for judgment on the agency record and sustain Commerce's *Final Determination* with respect to the designation of certain YDD sales as U.S. sales and application of AFA to those transactions, Commerce's comparison methodology in calculating of YDD's AD margin, and the date of sale applied to Kazchrome's transactions as supported by substantial evidence and otherwise in accordance with law.


Respectfully submitted,


Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

Dated: February 23, 2026          *Counsel to Defendant-Intervenors CC Metals and Alloys, LLC, and Ferroglobe USA, Inc.*

46

PUBLIC VERSION

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION**

I hereby certify that according to the word count function of Microsoft Word, which was used to prepare the brief, the foregoing brief contains 13,350 words and therefore complies with word count limitation in the Standard Chambers Procedures.

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel: (202) 991-2701

Dated: February 23, 2026

*Counsel to Defendant-Intervenors*
*CC Metals and Alloys, LLC, and*
*Ferroglobe USA, Inc.*