**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES**

|  |  |
|---|---|
| YDD CORPORATION LLP<br>AND TNC KAZCHROME JSC,<br><br>        *Consolidated Plaintiffs,*<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>        *Defendant*<br><br>    and<br><br>CC METALS AND ALLOYS, LLC AND<br>FERROGLOBE USA, INC.<br><br>        *Defendant-Intervenor.* | Consol. Court No. 25-00100<br><br>**NON-CONFIDENTIAL**<br><br>Business Proprietary<br>Information Removed<br>Between [ ] on Pages 4, 6, 11-<br>12, 15-17, and 20. |

<u>**PLAINTIFF'S REPLY BRIEF**</u>
<u>**IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Matthew McConkey
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3235
mmcconkey@mayerbrown.com
*Counsel to YDD Corporation LLP*

Dated: April 10, 2026

**TABLE OF CONTENTS**

I.    ARGUMENT................................................................................................2

    A.    Commerce's Inclusion of Sales Destined for Canada in Its Calculation of YDD's Dumping Margin Was Not Supported by Substantial Evidence and Was Otherwise Not in Accordance with Law ...............................2

    B.    YDD Provided All Necessary Information on the Record, and Commerce's Finding of Affiliation Based on Petitioner's Additional Factual Information Was Not Supported By Substantial Evidence and Was Otherwise Not in Accordance with Law...............................................7

        1.    Legal Framework ........................................................................7

        2.    Commerce's Insufficient Affiliation Analysis and Failure to Accept YDD's Information Submitted to Cure a Deficiency.................9

    C.    Commerce's Calculation of the Partial AFA Portion of YDD's Dumping Margin Was Incorrect, Not Supported By Substantial Evidence, and Otherwise Not in Accordance with Law.....................................17

    D.    Commerce's Use of Zeroing in Calculating YDD's Dumping Margin Was Contrary to Its Consistent Practice in Investigations and Not in Accordance With Law ...............................................................................20

II.    CONCLUSION.............................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bio-Lab, Inc. v. United States*, 435 F. Supp. 3d 1361 (Ct. Int'l Trade 2020) ................................ 9

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003) .................................... 7, 19

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ........................................................................ 6

*Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022), *opinion modified on denial of reh'g*, No. 2020-2114, 2022 WL 17175134 (Fed. Cir. Nov. 23, 2022) ........... 9, 12, 13

*Jindal Poly Films v. United States*, 794 F. Supp. 3d 1384 (Ct. Int'l Trade 2025) ......................... 9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..... ............................................................................................................................................... 7, 19

*National Nail Corp. v. United States*, 390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019) .................... 13

*Saha Thai Steel Pipe Pub. Co. v. United States*, 663 F. Supp. 3d 1356 (Ct. Int'l Trade 2023)........ ........................................................................................................................................... 11, 14, 17

*TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286 (Ct. Int'l Trade 2005)............................... 8, 12

*U.S. Steel Corp. v. United States*, 621 F.3d 1351 (Fed. Cir. 2010) ............................................ 20

*Universal Camera Corp. v. NLRB.*, 340 U.S. 474 (1951) ........................................................... 11

*Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298 (Ct. Int'l Trade 2015) ...................................................................................................................................... 8, 13, 19

**Statutes**

19 U.S.C. § 1677(33) ............................................................................................................ 8, 9, 14

19 U.S.C. § 1677(35)(B).......................................................................................................... 17, 22

19 U.S.C. § 1677e(a)................................................................................................................... 8, 9

19 U.S.C. § 1677e(b)(1).................................................................................................................. 9

19 U.S.C. § 1677f–1(d)(1)(A)...................................................................................................... 20

19 U.S.C. § 1677m(d)..................................................................................................................... 9

## TABLE OF AUTHORITIES

**Page(s)**

19 U.S.C. § 1673 ........................................................................................................................ 2

19 U.S.C. § 1677a(a) ............................................................................................................. 2, 14

19 U.S.C. § 1677a(b) ................................................................................................................. 14

**Administrative Materials**

*Antidumping Proceedings: Calculation of the Weighted–Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77722 (Dep't Commerce Dec. 27, 2006) ................................................................................................................................ 22

*Certain Large Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Over 4 1/2 Inches) From Japan: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 41366 (Dep't Commerce July 10, 2013) ......................................... 5

*Certain Plastic Decorative Ribbon From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 1055 (Dep't Commerce Feb. 1, 2019) .............. 19

*Extruded Rubber Thread From Malaysia, Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 33588, 33599 (Dep't Commerce June 20, 1997) .................................... 5

*Ferrosilicon From Kazakhstan: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances,* 90 Fed. Reg. 14077 (Dep't Commerce Mar. 28, 2025) ............................................................................................. 2

*Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the People's Republic of China*, 72 Fed. Reg. 60632 (Dep't Commerce Oct. 25, 2007) ............... 18

*Tin Mill Products from the Netherlands: Final Negative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 1524 (Dep't Commerce Jan. 10, 2024) ............................................. 5

**Regulations**

19 C.F.R. § 351.102(b)(3) ...................................................................................................... 8, 12

19 C.F.R. § 351.301(c)(1)(v) ................................................................................................... 10

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES**

| | |
|---|---|
| YDD CORPORATION LLP<br>AND TNC KAZCHROME JSC,<br><br>     *Consolidated Plaintiffs,*<br><br>  v.<br><br>UNITED STATES OF AMERICA,<br><br>      *Defendant*<br><br>  and<br><br>CC METALS AND ALLOYS, LLC AND<br>FERROGLOBE USA, INC.<br><br>     *Defendant-Intervenor.* | Consol. Court No. 25-00100<br><br>**NON-CONFIDENTIAL**<br><br>Business Proprietary<br>Information Removed<br>Between [ ] on Pages 4, 6, 11-<br>12, 15-17, and 20. |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON**
**THE AGENCY RECORD**

Plaintiff, YDD Corporation LLP ("Plaintiff" or "YDD"), respectfully submits this reply

to the briefs filed by Defendant United States ("the Government"), and Defendant-Intervenors

CC Metals and Alloys, LLC, and Ferroglobe USA, Inc. ("Defendant-Intervenors") in response to

YDD's Brief in Support of its Rule 56.2 Motion for Judgment on the Agency Record, ECF No.

32 ("YDD Br."). *See* Defendant's Response to Plaintiffs' Rule 56.2 Motions for Judgment on

the Agency Record, ECF No. 40 ("Government Br."); Defendant-Intervenors' Opposition to

Rule 56.2 Motions, ECF No. 45 ("Defendant-Intervenors Br."). For the reasons set forth herein

and in Plaintiff's original motion, this Court should reject the arguments presented by the

Government and Defendant-Intervenors and remand Commerce's *Final Determination* in the

1

underlying administrative review for reconsideration consistent with the arguments made herein.

*Ferrosilicon From Kazakhstan: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances,* 90 Fed. Reg. 14077 (Dep't Commerce Mar. 28, 2025), P.R. 280 ("*Final Determination*").

## I.    ARGUMENT

### A.    Commerce's Inclusion of Sales Destined for Canada in Its Calculation of YDD's Dumping Margin Was Not Supported by Substantial Evidence and Was Otherwise Not in Accordance with Law

The Government and Defendant-Intervenors make several misleading and unsubstantiated claims about the extensive record evidence demonstrating that YDD's sales to a specific U.S. customer were indeed destined for Canada.  Under the statute, the dumping margin is the amount by which the price of the product in the home market exceeds the price of the product sold in the U.S. market.  19 U.S.C. §§ 1673, 1677a(a).  Accordingly, sales that merely enter the United States but are reexported and not sold in the United States are not considered in the dumping calculation—nor should they be.  Thus, based on the extensive evidence on the record of these sales' export destination, and Commerce's well-established practice, these sales cannot be considered U.S. sales and should not be treated as U.S. sales for the purpose of calculating YDD's dumping margin.

The Government contends that "the documentation {for these sales} at entry bore *no indication* that the merchandise would be sold outside the United States."  Government Br. at 12 (emphasis added).  As a factual matter, this is false.  The railway bill for a sample of one of these sales includes, in the sender's comments, a reference that the cargo is under contract for the U.S. customer at issue and references "Specification No. 17" of that contract.  *See* C.R. 54-55 at Ex. A-8.  Specification No. 17 of the distribution agreement between YDD and this U.S. customer, executed during the period of investigation ("POI"), specifies that the consignee of the quantity

sold to this customer was a particular Canadian customer and that the ultimate destination country of these sales was Canada. *Id.*

The Government further contends that "YDD did not offer any signed certificates, shipping documents, contracts, packaging, or labeling stating the destination of the merchandise." Government Br. at 13. But this, too, is incorrect. In addition to the railway bill for a sample of one of these sales, YDD provided the underlying distribution contract between YDD and its U.S. customer and a copy of Specification No. 17, which served as amended sales terms for that contract, including "Terms of Delivery." *See* C.R. 54-55 at Ex. A-8. The Government adds that, because the merchandise at issue was shipped to the U.S. customer's warehouse in the United States, this "sales term" indicates that "the sale was completed to a U.S. customer in the United States." Government Br. at 13-14. But, as noted above, Specification No. 17, which applied to the sales at issue, included "Terms of Delivery" that listed the "destination country" as "Canada." C.R. 54-55 at Ex. A-8. The Government provides no explanation why the terms of a legally binding distribution contract between the parties is, as a matter of law and fact, less significant than the fact that the merchandise sat in a U.S. warehouse before being reexported.

The Government says "at most," YDD provided a letter confirming that the U.S. sales at issue were destined for Canada. Government Br. at 13. Defendant-Intervenors echo this argument, dismissing the "letter prepared by {YDD's U.S. customer} for purposes of the investigation" and other documents designed to provide an inventory accounting of YDD's sales to this U.S. customer as "self-serving documents prepared for this investigation." Defendant-Intervenors Br. at 19, 22. Defendant-Intervenors go one step further, complaining that "there were <u>no</u> commercial documents on the record that showed that the merchandise YDD sold {to

3

NON-CONFIDENTIAL VERSION

this customer} during the POI was, in fact, sold or shipped to Canada during the POI or afterward." *Id.* at 17 (emphasis in original). Not only do these claims ignore the extensive evidence of export destination proffered by YDD, but they also ignore the fact that the letter prepared by YDD's U.S. customer and the inventory accounting YDD submitted were in *direct response* to Commerce's requests for precisely this type of documentation. In its first supplemental questionnaire, Commerce asked, "During the POI, what was the total quantity and value of subject merchandise stored in the warehouse { }? Additionally, include the total withdrawal from the warehouse to its Canadian customer location in {}, Canada." P.R. 123, C.R. 189 at 12. The letter from YDD's U.S. customer, at Exhibit S1-6.1 of that submission, and YDD's prepared inventory accounting, at Exhibit S1-6.2 of that submission, were designed to directly respond to Commerce's requests for information showing that these sales were indeed destined for export to Canada. C.R. 192 at Exs. S1-6.1, S1-6.2. As Exhibit S1-6.2 shows, of YDD's sales to its U.S. customer in 2022 and 2023, [        ] MT out of a total of [        ] MT, or [   ] percent, were shipped out of warehouse to the Canadian customer. *Id.* at Ex. S1-6.2. YDD's U.S. customer averred, in its letter submitted to Commerce, that the remainder in inventory was committed to the Canadian customer under contract and would also be shipped to the Canadian customer. *Id.* at Ex. S1-6.1.

Even if the Government and Defendant-Intervenors are correct that particular documents related to the sales at issue did not make clear their export destination, this is not dispositive in the analysis of whether the sales were *in fact* destined for export. The long-established test Commerce applies for determining whether a sale was destined for an export market turns on the respondent's <u>knowledge</u> of whether the merchandise was destined for an export market. *See, e.g.*, *Extruded Rubber Thread From Malaysia, Final Results of Antidumping Duty Administrative*

4

*Review*, 62 Fed. Reg. 33588, 33599 (Dep't Commerce June 20, 1997); *Certain Large Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Over 4 1/2 Inches) From Japan: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 41366 (Dep't Commerce July 10, 2013) and accompanying Issues & Dec. Memo, ACCESS Doc. 3143611-01 at Cmt. 2 (July 2, 2013); *Tin Mill Products from the Netherlands: Final Negative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 1524 (Dep't Commerce Jan. 10, 2024), and accompanying Issues & Dec. Memo, ACCESS Doc. 4486070-02 at Cmt. 2 (Jan. 4, 2024).  The test is *not* whether a particular entry summary or purchase order noted that the sale was being sold to an ultimate customer outside the United States.  Commerce has never required, as part of this analysis, that a *specific* commercial document state the export destination.

Here, YDD clearly had knowledge, based on its distribution agreement with the customer, that the sales to this particular U.S. customer were destined for Canada and would not be sold in the United States.  Moreover, YDD made clear to Commerce from its very first response to Commerce's antidumping questionnaire that these sales were not sold in the U.S. market and, therefore, should not be considered in Commerce's dumping analysis.  C.R. 53 at Ex. A-1; C.R. 54-55 at Ex. A-8; *see also* P.R. 87, C.R. 78 at C-16–C-17 (clarifying in its Section C response that it reported these sales as EP sales, but that they should not be included in the dumping margin calculation because "YDD had knowledge that the material was intended for the Canadian market.").  YDD even defined these sales destined for Canada as a separate channel of distribution in its response to Section A of Commerce's questionnaire.  P.R. 78, C.R. 52, at 15-16.

NON-CONFIDENTIAL VERSION

To the extent that Defendant-Intervenors argue that YDD cannot prove what happened to *all* of the merchandise after YDD sold it to its U.S. customer,[1] this line of argument is contradicted by the record evidence and is, in any event, irrelevant. *See* Defendant-Intervenors Br. at 17. First, as noted above, YDD prepared—at Commerce's request—an inventory-in, inventory-out accounting of the merchandise sold to its U.S. customer and kept in its U.S. warehouse during the POI. C.R. 192 at Ex. S1-6.2. This accounting was current as of Commerce's regulatory deadline for accepting new factual information. At verification, YDD's counsel attempted to provide documentation showing that additional quantities in inventory at the U.S. customer's warehouse had been exported to Canada, but Commerce declined to accept this information corroborating its supplemental response. C.R. 368 at Minor Corrections; *see also* P.R. 238, C.R. 490 at 4. Second, as noted above, Commerce's test for determining whether merchandise was destined for export hinges on the respondent's <u>knowledge</u> of export destination. The documentation YDD provided—including a legally binding distribution contract—evinces YDD's good-faith knowledge that these sales were destined for Canada.

Finally, the Government concludes that "YDD's arguments amount to mere disagreement with Commerce's weighing of the evidence," Government Br. at 14, but no reasonable mind could review a distribution contract that clearly states "Canada" as the destination country of the merchandise subject to that contract and conclude that the merchandise was sold in the United States. *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (defining the substantial evidence standard as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

---

[1] The record supports that [        ] MT out of a total of [        ] MT in sales to YDD's U.S. customer, or [    ] percent, were in fact shipped out of warehouse to the Canadian customer. C.R. 192 at Ex. S1-6.2.

NON-CONFIDENTIAL VERSION

Nor is Commerce's conclusion in this case consistent with the test it applies for determining whether sales were destined for an export market. Where, as here, Commerce acts differently in one case than it has consistently acted in similar circumstances without providing a reasonable explanation, its actions are arbitrary. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46 (1983) ("an agency changing its course must supply a reasoned analysis") (citation omitted); *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). For these reasons, Commerce's determination that the sales at issue were U.S. sales must be remanded to the agency for reconsideration.

**B.      YDD Provided All Necessary Information on the Record, and Commerce's Finding of Affiliation Based on Petitioner's Additional Factual Information Was Not Supported By Substantial Evidence and Was Otherwise Not in Accordance with Law**

Commerce's finding of an affiliation between YDD and one of its U.S. customers was not supported by substantial evidence and was otherwise not in accordance with law. Commerce's affiliation determination must be remanded to the agency so that it may conduct a proper affiliation analysis under the statute that takes into consideration the rebuttal factual information timely submitted by YDD.

**1.      Legal Framework**

The test for whether two companies are considered "affiliated" is defined by the statute and Commerce's regulations. The Act defines "affiliated persons" to include, as relevant here,

> Any officer or director of an organization and such organization . . .{,} {e}mployer and employee{,} {a}ny person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization{,} {t}wo or more persons directly or indirectly controlling, controlled by, or under common control with, any person{, and} {a}ny person who controls any other person and such other person.

7

NON-CONFIDENTIAL VERSION

19 U.S.C. § 1677(33).  Importantly, the Act explains: "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."  *Id.*

> Commerce's regulations further provide:
>
> In determining whether control over another person exists, . . . {Commerce} will consider the following factors, among others: Corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships.  {Commerce} will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product. {Commerce} will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control.

19 C.F.R. § 351.102(b)(3) (emphasis added).  Commerce is "precluded from finding control" "unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." *Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298, 1304 (Ct. Int'l Trade 2015) (quoting 19 C.F.R. § 351.102(b)(3)); *see also TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286, 1296–97 (Ct. Int'l Trade 2005).

Commerce's discretion in applying adverse facts available ("AFA") is bound by a two-step analysis stipulated by the Act.  First, Commerce may resort to "facts otherwise available" only if (1) necessary information is not available on the record *or* (2) an interested party withholds information requested by the agency, fails to provide such information by the requested deadline, significantly impedes the proceeding, or provides information that cannot be verified.  19 U.S.C. § 1677e(a).  Only when this threshold requirement is met *and* a second, separate finding is made that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce "*may* use an inference that is

8

adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1) (emphasis added).

Commerce's use of adverse inferences under 19 U.S.C. § 1677e(a) is "subject to section 1677m(d)," which requires that, if Commerce determines a response to a request for information is deficient, Commerce "*shall* promptly inform the person submitting the response of the nature of the deficiency *and shall*, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations." 19 U.S.C. § 1677m(d) (emphasis added). The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has instructed that the "statutory entitlement to notice and opportunity to remedy any deficiency is unqualified." *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022), *opinion modified on denial of reh'g*, No. 2020-2114, 2022 WL 17175134 (Fed. Cir. Nov. 23, 2022).

In this analysis, the Court is guided by the remedial purpose of the trade law. *See Bio-Lab, Inc. v. United States*, 435 F. Supp. 3d 1361, 1374 (Ct. Int'l Trade 2020) ("the primary purpose of the AFA statute is not to punish companies, but rather to calculate accurate rates.") (citation omitted). In making this determination, the Court has previously considered the particular circumstances of the respondent, *see, e.g.*, *Jindal Poly Films v. United States*, 794 F. Supp. 3d 1384, 1387 (Ct. Int'l Trade 2025). Such considerations may include whether the company is a first-time respondent in a Commerce investigation, as YDD is in this case.

### 2. Commerce's Insufficient Affiliation Analysis and Failure to Accept YDD's Information Submitted to Cure a Deficiency

Regardless of whether Commerce properly applied AFA in its affiliation analysis, and properly notified YDD of any deficiency in its responses, Commerce is separately required to conduct a proper affiliation analysis, *see* 19 U.S.C. § 1677(33), which it did not do in this case.

9

In its *Preliminary Determination*, Commerce took Petitioners' factual information alleging an affiliation at face value and concluded, as a *preliminary* finding, that YDD was affiliated with a U.S. customer through the corporate responsibilities of an individual who served in corporate roles in both the U.S. customer and a company affiliated with YDD.  *See* P.R. 184 at 7. Commerce specifically noted that, although YDD had submitted additional information to "rebut, clarify, and correct" the information submitted by Petitioners, Commerce was unable to consider it before the statutory deadline for issuing the *Preliminary Determination*.  *Id.* at 6.  Yet, even though YDD's rebuttal information regarding the affiliation allegation was timely submitted,[2] there is nothing in Commerce's *Final Determination* to suggest that Commerce revisited its preliminary affiliation finding and considered YDD's timely submitted rebuttal information for the *Final Determination*.  Commerce's final affiliation determination amounts to a single paragraph that shows no sign Commerce even considered YDD's timely submitted information rebutting Petitioners' affiliation claim:

> We agree with the petitioners and continue to find, consistent with our *Preliminary Determination*, that it is appropriate to apply partial facts available, with adverse inferences, to the YDD Single Entity's sales to a specific U.S. customer. As discussed in the *Preliminary Determination*, we find that necessary information is not on the record with respect to the YDD Single Entity and the specific U.S. customer, and that the YDD Single Entity withheld information requested by Commerce and failed to provide the information within the established deadlines in the form and manner requested, thereby significantly impeding the proceeding.  Further, the record shows that the YDD Single Entity failed to act to the best of its ability to comply with Commerce's request for information because it had access to this information, Commerce had requested this information, and yet it did not provide it until one day prior to the *Preliminary Determination*. Thus, pursuant to sections 776(a)(1) and 776(a)(2)(A)-(C), and 776(b) of the Act, we relied on AFA to determine the dumping margin for the YDD Single Entity in relation to sales to a specific U.S. customer.

---

[2]    It is not in dispute that YDD's October 30, 2024 response to Petitioners' submission of factual information on October 24, 2024 was timely submitted pursuant to Commerce's regulations at 19 C.F.R. § 351.301(c)(1)(v).

10

P.R. 272 at 31-32 (footnotes omitted).  Indeed, Commerce's explanation admits that its affiliation determination relied exclusively on what it considered in its *Preliminary Determination*.  *Id.*  The substantial evidence standard requires more.  *Universal Camera Corp. v. NLRB.*, 340 U.S. 474, 488 (1951) (noting that the substantial evidence standard requires the agency to "take into account whatever in the record fairly detracts" from the weight of the evidence that supports the agency's conclusion).

None of the cases cited by the Government support its position that Commerce's affiliation finding in this case was in accordance with law.  In fact, they generally support YDD's argument.  The Government relies on *Saha Thai Steel Pipe Public Co. v. United States* for the proposition that Commerce may, as partial facts available, find affiliation based on factual information submitted by the petitioner.  *See* Government Br. at 17 (citing *Saha Thai Steel Pipe Pub. Co. v. United States*, 663 F. Supp. 3d 1356, 1375 (Ct. Int'l Trade 2023)).  But that case supports YDD's position with respect to the specific affiliation found here.  While the Court agreed with Commerce in *Saha Thai* that substantial evidence supported affiliation findings with respect to six of seven parties, the Court rejected Commerce's affiliation finding with respect to the seventh.  The Court concluded that Commerce failed to explain how "a single shared human resources manager {between two companies} meets the statutory definition of affiliation," and remanded for Commerce to "perform a proper affiliation analysis."  *Id.* at 1376–77.  That situation is directly analogous to Commerce's affiliation determination here.  The individual at issue was selected for an administrative role at [          ], a company affiliated with (but having no direct or indirect control over) YDD, because he is a Swiss resident, and a formality of Swiss corporate law requires that a Swiss resident have authority to sign documents on behalf of a limited liability partnership established in Switzerland.  C.R. 328-329 at 3.  [          ] is a Swiss

11

entity domiciled in Switzerland. *See id.* at Ex. 1. Accordingly, the individual was not an employee of [       ], and was a director in name only, appointed to sign paperwork on behalf of [       ] as a Swiss resident and to file it with Swiss authorities. He was not in a position with "actual capacity or ability to exercise control" under either § 1677(33)(B) or § 1677(33)(F). *See TIJID, Inc.*, 366 F.Supp.2d at 1296–97.

*TIJID, Inc.* is instructive on this point: Although, in that case, there was evidence that one company's CEO was on the boards of two allegedly affiliated companies, *and was authorized to sign financial statements and certifications for and on behalf of those companies*, the Court found it reasonable to determine that there was no control over those companies because the individual's "involvement in the direction of the {companies} was minor." *TIJID, Inc.*, 366 F. Supp. 2d at 1294 (emphasis added). Board membership alone does not demonstrate a "relationship that ha{s} the potential to impact decisions relating to the subject merchandise." *Id.* Indeed, in this case, the individual served as CEO of a company whose sales were reexported to Canada, as discussed above, and therefore the alleged affiliation does not even relate to, or have the ability to affect, "production, pricing, or cost of the subject merchandise." 19 C.F.R. § 351.102(b)(3).

The Government also cites *Hitachi*, but in that case, the Federal Circuit faulted Commerce for failing to accept information the respondent tried to place on the record to cure a deficiency. 34 F.4th at 1375. As in that case, Commerce's later claim that YDD did not provide necessary information is at odds with its initial information request, which asked for information on affiliated parties, *i.e.* relationships which "ha{ve} the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." 19 C.F.R. § 351.102(b)(3). As explained in YDD's opening brief, the individual's ministerial role at a

company—whose affiliation with YDD *was* disclosed—granted him no power to "impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." *See, e.g.*, YDD Br. at 23-24.  Moreover, Commerce's failure to consider the rebuttal information YDD timely placed on the record shortly before the *Preliminary Determination* "cannot be reconciled with Commerce's later ruling that {YDD} had 'not cooperate{d} to the best of its ability.'" *Hitachi*, 34 F.4th at 1383.  As the Federal Circuit instructed in *Hitachi*, "{b}efore making {an} adverse inference, Commerce must examine a respondent's actions and assess the extent of the respondent's abilities, efforts, and cooperation in responding to Commerce requests for information." *Id.* at 1386 (citation omitted).  Commerce made no such examination of the extent of YDD's efforts because it did not even consider YDD's timely submitted rebuttal information regarding the alleged affiliation.

Other cases the Government relies upon are inapposite.  *National Nail Corp. v. United States* involves a respondent's reporting of in-scope and out-of-scope merchandise.  390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019).  Yet, even that is a case where the Court found Commerce's application of adverse inferences improper where the respondent had timely submitted revisions on the record, precluding Commerce's use of facts available.  *Id.* at 1380–84.

*Zhaoqing New Zhongya Aluminum Co.*, meanwhile, involves a challenge to Commerce's decision to collapse three producers into a single entity.  70 F. Supp. 3d at 1308.  YDD has not challenged Commerce's decision to collapse YDD, Asia FerroAlloys LLP ("ASIA"), and KazSilicon Metallurgical Combine LLP ("KazSilicon") into a single entity.  Commerce's decision to collapse affiliated producers/sellers of the subject merchandise is distinct from its general affiliation analysis, and a collapsing decision's impact on Commerce's calculation of a dumping margin is wholly different from the implications of an affiliation between YDD and one

13

of its *customers*.[3]  Indeed, by raising Commerce's collapsing analysis, the Government and Defendant-Intervenors appear, at best, to conflate the collapsing analysis with the affiliation analysis and, at worst, to purposely muddy the issue for the Court's review.  *Cf.* Defendant-Intervenors Br. at 29.

For their part, Defendant-Intervenors do not meaningfully support the substance of Commerce's affiliation determination—despite having been the ones to place information on the record claiming an unreported affiliation exists.  Rather, Defendant-Intervenors repeat the speculations they made in their initial affiliation allegation, insinuating that "it is possible that the parties were also partners" and suggesting that "public statements" by an individual could demonstrate that the individual has direct or indirect control over the company, as required by the statute.  Defendant-Intervenors Br. at 29 (citing 19 U.S.C. § 1677(33)(F)).  But "public statements" by an individual cannot reasonably meet the statutory standard of affiliation— *especially* where, as here, the relevant contractual agreement between the parties is on the record.  C.R. 328-329 at Ex. 3.  And, in any event, there is nothing in Commerce's *Final Determination* that allows a reasonable mind to conclude that Commerce itself made *either* of these conclusions in making a final affiliation determination—even if these conjectures could be the basis of such a finding.  *See Saha Thai*, 663 F. Supp. 3d at 1368 ("Bare speculation is not substantial evidence.").

Defendant-Intervenors never actually answer to the fact that they and Commerce misunderstood the corporate structure and that the company alleged to have control over YDD in fact had no "actual capacity or ability to exercise control" over YDD.  *Compare* Defendant-

---

[3]    While the dumping margin on sales made <u>from</u> companies in a collapsed entity are calculated on the basis of export price ("EP"), sales <u>to</u> an affiliated party in the United States are excluded from the calculation of EP and U.S. price for those sales is instead calculated on the basis of *constructed* export price ("CEP").  *See* 19 U.S.C. §§ 1677a(a), (b).

NON-CONFIDENTIAL VERSION

Intervenors Br. at 27-30, *with* YDD's Br. at 26.  Instead, they (again) misconstrue the corporate relationship between YDD and [          ], referring to it as a "YDD company."  Defendant-Intervenors Br. at 26.  The individual at issue was a nominal director of [          ].  As illustrated in the corporate ownership diagram YDD submitted at Exhibit A-4, [          ] has no "actual capacity or ability to exercise control" over YDD as a legal matter, because it has no ownership stake in YDD whatsoever:

15

**NON-CONFIDENTIAL VERSION**

16

C.R. 54 at Ex. A-4.  Thus, it is incorrect to say, as Defendant-Intervenors assert, that a nominal

director of [          ] could "exercise restraint or direction over both entities," meaning YDD

and its allegedly affiliated U.S. customer.  Defendant-Intervenors Br. at 29.

The disputed nature of the alleged affiliation, and the fact that Commerce did not perform

a proper affiliation analysis on these facts, warrants a remand to Commerce for the agency to

make a proper affiliation determination applying the statutory definition and its regulatory

standard of "actual capacity or ability to exercise control," just as the Court ordered in *Saha Thai*

under analogous circumstances.  *See* 663 F. Supp. 3d at 1377.

C.    **Commerce's Calculation of the Partial AFA Portion of YDD's Dumping Margin Was Incorrect, Not Supported By Substantial Evidence, and Otherwise Not in Accordance with Law**

The Government insists that the calculation error YDD raised as a ministerial error was a

"policy-driven, methodological decision" by Commerce**.**  Government Br. at 22-26.  But, if

Commerce did indeed intend to calculate YDD's partial AFA rate in the way that it did, such a

calculation was a violation of the statute and an abuse of Commerce's discretion.

The Act defines the term "weighted average dumping margin" as "the percentage

determined by dividing the *aggregate* dumping margins determined for a specific exporter or

producer by the aggregate export prices and constructed export prices of such exporter or

producer." 19 U.S.C. § 1677(35)(B) (emphasis added).  Here, however, Commerce did not

determine a weighted average dumping margin using the *aggregate* dumping margins

determined for YDD's sales transactions.  Instead, as YDD explained in its ministerial error

allegation, Commerce calculated two dumping margins: one for YDD's non-AFA sales and one

for the sales to a particular customer, to which Commerce applied partial AFA.  *See* P.R. 200,

C.R. 358; *see also* P.R. 281, C.R. 521.  The non-AFA margin was a negative number, indicating

17

that those sales were not dumped at all.  *Id.*  To assign YDD a single dumping margin, Commerce then set the first (non-AFA) dumping margin to zero before averaging it with the partial AFA margin.  *Id.*  By first calculating a dumping margin for the non-AFA sales, zeroing the result, and *then* averaging in the partial AFA sales, Commerce did not determine YDD's weighted-average dumping margin on an *aggregate* basis.  Thus, Commerce's calculation of separate margins for the non-AFA and the partial AFA sales was not in accordance with law.

Commerce does not normally calculate a separate margin for partial AFA sales in similar circumstances.  Instead, it applies the partial AFA to the incomplete data point and then calculates a weighted-average dumping margin for all of a respondent's sales, in accordance with the statute.  In *Coated Free Sheet Paper from China*, for instance, Commerce indicated that partial AFA would be applied to individual sales values, which then got averaged in the aggregate dumping margin.  Commerce agreed with the petitioner in that case that it should "follow its normal practice and assign, as partial AFA, the highest overall transaction-specific dumping margin to the unreported sales quantity, *which it should then include in the weighted-average dumping margin calculation*."  *Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the People's Republic of China*, 72 Fed. Reg. 60632 (Dep't Commerce Oct. 25, 2007), and accompanying Issues & Dec. Memo, ACCESS Doc. 3785467-02 at Cmt. 23 (Oct. 17, 2007) (emphasis added). Clearly, the implication was that the partial AFA applied by Commerce would be baked into the transaction values that are then averaged into the dumping margin.

Similarly, in *Certain Plastic Decorative Ribbon from China*, Commerce applied partial AFA for several data reporting issues.  In accordance with its practice, it applied the appropriate partial AFA to each and then used the companies' sales and FOP databases to calculate the

18

weighted-average dumping margin.  For example, with respect to misreported product characteristics, as partial AFA, Commerce assigned "to the CONNUM, for which certain FOPs were not reported, the highest amount reported for these missing FOPs for any other CONNUM in the FOP database."  *Certain Plastic Decorative Ribbon From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 1055 (Dep't Commerce Feb. 1, 2019) and accompanying Issues & Dec. Memo at Cmt. 12.  The application of partial AFA to these issues did not result in the separate calculation of a margin based on data with partial AFA and a margin based on data to which partial AFA was not applied.  Instead, Commerce calculated an overall, *aggregated* weighted-average dumping margin based on all the transactions in the submitted databases, with individual transactions adjusted to reflect the partial AFA applied to those sales.  As Commerce explained in that case, the individual reporting issues to which partial AFA had been applied "do not impact the overall reliability of the entire U.S. and/or FOP databases upon which our dumping calculation and analysis are based."  *Id.*

Commerce's consistent practice in calculating a dumping margin that incorporates partial AFA belies its change of practice in this case.  Where Commerce changes its normal practice in a particular case, however, Commerce must sufficiently explain the departure from its consistent past practice.  *See, e.g.*, *Zhaoqing New Zhongya Aluminum Co.*, 70 F. Supp. 3d at 1306 ("When an agency treats two similar transactions differently, an explanation for the agency's actions must be forthcoming.") (citation omitted); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 46 ("an agency changing its course must supply a reasoned analysis") (citation omitted); *Consol. Bearings*, 348 F.3d at 100.  Commerce offered no such explanation here.  Accordingly, the Court should remand Commerce's calculation of the partial AFA rate for further explanation.

19

**D.      Commerce's Use of Zeroing in Calculating YDD's Dumping Margin Was Contrary to Its Consistent Practice in Investigations and Not in Accordance With Law**

The Government and Defendant-Intervenors insist that Commerce did not apply zeroing in calculating YDD's dumping margin, but the facts—and their own descriptions of Commerce's calculation—demonstrate that this is exactly what Commerce did.  *See* Government Br. at 26-30; Defendant-Intervenors' Br. at 34-37.

Commerce applied zeroing as part of how it calculated YDD's final dumping margin.  In a break from its normal practice, as described above, Commerce created two sets of margins: a margin that applied to YDD's non-AFA sales and a margin that applied to the partial AFA sales.  *See* C.R. 338 at 3; *see also* C.R. 502, 504, 505.  When the dumping margin for the non-AFA sales was calculated using Commerce's normal average-to-average ("A-to-A") method,[4] Commerce found a negative number, *i.e.* no dumping.  *If Commerce calculated the margin by averaging both the non-AFA sales and the partial AFA sales as one group of sales, Commerce also would have found no dumping.  See* P.R. 200, C.R. 358.

As explained in YDD's Ministerial Error Allegation, the total number of results with a negative value (*i.e.* with no dumping) was [          ] and the total number of results with a positive value was [          ].  *See* P.R. 200, C.R. 358 at Attachment 2 (citing C.R. 344 at 56).  The sum that represents the "total amount of dumping," according to Commerce's A-to-A method, is a negative number, [          ].  *See id.* at Attachment 1 (summing numbers in C.R. 344 at 56).

---

[4]      *See* YDD Br. at 33-34 ("In 'normal investigations,' Commerce determines the dumping margin by comparing either (a) the weighted average of the normal values to the weighted average of the export prices, or (b) the normal values of individual transactions to the export prices of individual transactions.  *See* 19 U.S.C. § 1677f–1(d)(1)(A); *see also U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1362 (Fed. Cir. 2010).  The first of these comparison methods is referred to as the 'average-to-average' method.").

If Commerce had followed its normal offsetting process in applying the A-to-A method, as the Government and Defendant-Intervenors contend it did, it would have found no dumping because, as the Government points out, Commerce does not calculate "negative" dumping margins. Government Br. at 29. When the total amount of dumping is a negative number, Commerce will find that the dumping margin is zero.

However, Commerce did not follow its normal offsetting process here. Instead, it created a second set of margins—the partial AFA margins for YDD's sales to the allegedly affiliated company. *See* C.R. 338 at 3; *see also* C.R. 502, 504, 505.[5] When Commerce averaged the set of partial AFA margins with the set of positive and negative (non-AFA) margins, Commerce fixed the sum of the non-AFA margins, a negative number, to zero before averaging the two sets of margins. *See* P.R. 200, C.R. 358. This was zeroing.

The Government attempts to distinguish zeroing from what Commerce did in this case. The Government explains that "'{z}eroing' is the practice by which Commerce, in calculating an overall dumping margin, disregards negative dumping margins by setting them to zero, thereby preventing non-dumped sales from offsetting dumped sales," and further explains that "zeroing concerns the exclusion of negative comparison results." Government Br. at 28.

This is precisely what Commerce did in this case.

Rather than average the set of partial AFA sales with the set of YDD's other sales, Commerce averaged the two sets separately. Commerce applied "offsetting" in the non-AFA set of sales, by allowing YDD's negative non-AFA sales to offset its positive non-AFA sales. (The Government and Defendant-Intervenors agree, *see* Government Br. at 28; Defendant-Intervenors

---

[5]     Commerce referred to these two margins by the suffix codes EQ (*i.e.* equal to the sales to the U.S. customer, to which Commerce applied partial AFA) and NE (*i.e.* not equal to the sales to the U.S. customer, to which Commerce did not apply partial AFA).

Br. at 36.)  But Commerce did not permit the negative non-AFA sales to offset the positive AFA sales because Commerce fixed the non-AFA result at zero before averaging those sales with the AFA sales.  By the Government's own explanation of zeroing, Commerce "prevent{ed} non-dumped sales from offsetting dumped sales" by setting the negative dumping margin of non-AFA sales to zero before averaging them with the rest of YDD's sales.

Missing the irony in its argument, the Government incongruously asserts that "{t}he mere fact that the final net result is zero does not indicate zeroing; it indicates that offsets were effective."  Government Br. at 29.  But YDD is not arguing that Commerce should not have applied offsetting.  Rather, Commerce should have applied offsetting to all of YDD's sales, consistent with the statute and Commerce's long-standing practice of not using zeroing in antidumping investigations in which it applies the A-to-A method.  *See Antidumping Proceedings: Calculation of the Weighted–Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77722 (Dep't Commerce Dec. 27, 2006).  The Government's argument misses the point because it addresses only one set of the sales at issue.  Defendant-Intervenors make the same claim, asserting that, "{i}n applying partial AFA, Commerce lawfully combined two margins, one of them being zero and the other being larger than zero."  Defendant-Intervenors Br. at 36.  But the statute requires Commerce to calculate one dumping margin, not two.  19 U.S.C. § 1677(35)(B) ("The term 'weighted average dumping margin' is the percentage determined by dividing the *aggregate* dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer.") (emphasis added).

The Act requires Commerce to calculate a dumping margin on an exporter's or producer's sales on an *aggregate* basis.  By first calculating a dumping margin for the non-AFA

22

NON-CONFIDENTIAL VERSION

sales, zeroing them, and then averaging in the partial AFA sales, Commerce did not determine YDD's weighted-average dumping margin on an aggregate basis. Thus, Commerce's calculation of YDD's weighted-average dumping margin is not in accordance with law and must be remanded to the agency for reconsideration.

## II.    CONCLUSION

For the reasons stated above, Plaintiff again respectfully requests that the Court enter judgment in its favor.

Respectfully submitted,

/s/ Matthew McConkey
Matthew McConkey
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3235
mmcconkey@mayerbrown.com
*Counsel to YDD Corporation LLP*

Dated: April 10, 2026

**CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURES 2(B)(1)**

The undersigned hereby certifies that this brief contains 6,351 words, exclusive of the corporate disclosure statement, table of contents, table of authorities, glossary of case-specific acronyms and abbreviations, and certificates of counsel, and therefore complies with the maximum 7,000 word count limitation as set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

/s/ Matthew McConkey
Matthew McConkey
Mayer Brown LLP
(202) 263-3235
mmcconkey@mayerbrown.com
*Counsel to YDD Corporation LLP*