**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES**

YDD CORPORATION LLP
AND TNC KAZCHROME JSC,

*Consolidated Plaintiffs,*

v.

UNITED STATES OF AMERICA,

*Defendant,*

and

CC METALS AND ALLOYS, LLC, AND
FERROGLOBE USA, INC.

*Defendant-Intervenors.*

Consol. Court No. 25-00100

**PUBLIC VERSION**

Business Proprietary
Information Removed
Between [ ] on Pages 28-29

**PLAINTIFF YDD CORPORATION LLP'S COMMENTS IN OPPOSITION TO COMMERCE'S FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

Matthew McConkey
Ryan R. Migeed
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3235
mmcconkey@mayerbrown.com
*Counsel to YDD Corporation LLP*

Dated: October 6, 2026

## TABLE OF CONTENTS


I. ARGUMENT .......... 2

A. Commerce's Determination On Remand That YDD's Sales Destined For Canada Were U.S. Sales, Despite YDD's Actual Knowledge That They Were Destined For Canada, Misapplies Its Knowledge Test, Is Not Based On Substantial Evidence, And Is Otherwise Not In Accordance With Law .......... 2

1. The Record Evidence Demonstrates YDD's Knowledge That The Sales Were Destined For Canada. .......... 2

2. The Purchase Order, Customer Letter, Movement Schedule, and Other Evidence Must Be Read In Conjunction With The Distributor Agreement And Specification No. 17. .......... 8

3. Commerce Attempts To Bootstrap Its AFA Finding With Respect To YDD's Affiliation With The Customer Into A Determination That These Sales Were Not Destined For Canada. .......... 15

4. Conclusion .......... 18

B. Commerce's Continued Application Of Partial AFA To YDD On Remand, And Its Calculation Of That Partial AFA Rate, Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law .......... 19

C. Commerce's Continued Use Of Zeroing And Calculation Of The Partial AFA Rate On Remand Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law .......... 26

II. CONCLUSION .......... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) ................................ 12, 18, 23

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States,* 236 F. Supp. 3d 1352 (Ct. Int'l Trade 2017) .................................................................................................................... 30

*Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337 (Fed. Cir. 2017)............... 27, 29

*Artisan Mfg. Corp. v. United States*, 978 F. Supp. 2d 1334 (Ct. Int'l Trade 2014)........................ 5

*Bio-Lab, Inc. v. United States*, 435 F. Supp. 3d 1361, 1374 (Ct. Int'l Trade 2020) ..................... 30

*Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021)........ 16, 17, 18

*China Kingdom Import & Export Co., Ltd. v. United States*, 507 F. Supp. 2d 1337 (Ct. Int'l Trade 2007) .................................................................................................................... 12

*Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*, 308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018)........................................................................................................................... 12

*Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022) .......................... 18, 22

*Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021) ....................... 23

*Jiangsu Senmao Bamboo and Wood Industry Co. v. United States*, 762 F. Supp. 3d 1275 (Ct. Int'l Trade 2025) ........................................................................................................... 26

*Jinfu Trading Co. v. United States*, 31 C.I.T. 996, 2007 WL 1974324 (Ct. Int'l Trade June 13, 2007)............................................................................................................... 8, 13, 14

*Since Hardware (Guangzhou) Co. v. United States*, 35 C.I.T. 1670, 2011 WL 5926137 (Ct. Int'l Trade 2011) ............................................................................................................. 13, 15

*TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286 (Ct. Int'l Trade 2005)...................... 19, 24, 25

*TNC Kazchrome JSC v. United States,* No. 25-00128, 2026 WL 2668862 (Ct. Int'l Trade Sept. 10, 2026).......................................................................................................... 20, 22, 23

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951). ................................................. 19, 22

*Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298 (Ct. Int'l Trade 2015)................................................................................................................... 24, 25

**Statutes**

19 U.S.C. § 1677e(a)........................................................................................................ 15

19 U.S.C. § 1677m(d) ........................................................................................... 16, 18, 20

**Administrative Decisions**

*Antidumping Proceedings: Calculation of the Weighted–Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77722 (Dep't Commerce Dec. 27, 2006)........................................................................................................ 27, 30

*Extruded Rubber Thread From Malaysia, Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 33588, 33599 (Dep't Commerce June 20, 1997) .................................... 2

*Ferrosilicon from Kazakhstan: Amended Final Countervailing Duty Determination; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Countervailing Duty Orde*rs, 90 Fed. Reg. 21,446 (Dep't of Commerce, May 20, 2025) ......................................................................... 20

*Ferrosilicon From Kazakhstan: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 14077 (Dep't Commerce Mar. 28, 2025) ........................................................................... 1

*Ferrosilicon From Kazakhstan: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 88007 (Dep't Commerce Nov. 6, 2024) .......................................................................... 17, 23

*Ferrosilicon from the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination, 90 Fed. Reg. 14,108 (Dep't of Commerce, Mar. 28, 2025)* ............................. 20

*Tin Mill Products from the Netherlands: Final Negative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 1524 (Dep't Commerce Jan. 10, 2024) .......................................... 2, 7

**Regulations**

19 C.F.R. § 351.102(b)(3)................................................................................................. 24

19 C.F.R. § 351.301(c)(1)(v) ............................................................................................. 22

19 C.F.R. § 351.303(g) ...................................................................................................... 14

# INTRODUCTION

Plaintiff YDD Corporation LLP ("Plaintiff" or "YDD") respectfully submits these comments in opposition to the Final Results of Redetermination Pursuant to Court Remand filed by the U.S. Department of Commerce ("Commerce") on September 4, 2026. *See* Final Results of Redetermination Pursuant to Court Remand, ECF No. 71-1 ("Remand Redetermination"). These comments are timely filed pursuant to Rule 56.2(h)(2) of the Rules of this Court. Commerce prepared the Remand Redetermination pursuant to this Court's opinion and remand order, which remanded Commerce's *Final Determination* in the less-than-fair-value investigation of ferrosilicon from Kazakhstan. *See* Slip Op. 26-68, ECF No. 68 (June 23, 2026); *see also Ferrosilicon From Kazakhstan: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 14077 (Dep't Commerce Mar. 28, 2025), P.R. 280 ("*Final Determination*").

As discussed in detail below, the Remand Redetermination is unsupported by substantial evidence and is otherwise not in accordance with law, and should again be remanded to Commerce. Specifically, Commerce's determinations in its Remand Redetermination that: (1) YDD's sales of subject merchandise ultimately destined for Canada are U.S. sales; (2) adverse facts available ("AFA") were properly applied to YDD to find an affiliation between YDD and a U.S. customer; and (3) YDD's weighted-average dumping margin was properly calculated without offsetting positive-margin sales with negative-margin sales, are not supported by substantial evidence and otherwise not in accordance with law.

# I. ARGUMENT

## A. Commerce's Determination On Remand That YDD's Sales Destined For Canada Were U.S. Sales, Despite YDD's Actual Knowledge That They Were Destined For Canada, Misapplies Its Knowledge Test, Is Not Based On Substantial Evidence, And Is Otherwise Not In Accordance With Law

In its Remand Redetermination, Commerce continues to misapply its knowledge test and disregard substantial record evidence demonstrating that, *at the time of sale*, YDD had *actual knowledge* that its sales to a particular customer were ultimately destined for Canada. YDD was not negotiating a price for a product destined for the *United States*; it was negotiating a price for product destined for *Canada*. Commerce's knowledge test does not require evidence that the sales "actually went to Canada," as Commerce continues to insist. Remand Redetermination at 8. Indeed, Commerce even concedes that "completed re-exportation is not a bright-line legal requirement or prerequisite under the knowledge test." *Id.* at 26. Rather, the knowledge test asks whether the respondent knew or reasonably believed, *at the time of sale*, that the sales were destined for a market other than the United States. *See, e.g.*, *Extruded Rubber Thread From Malaysia: Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 33588, 33599 (Dep't Commerce June 20, 1997); *Tin Mill Products from the Netherlands: Final Negative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 1524 (Dep't Commerce Jan. 10, 2024), and accompanying Issues & Decision Memo at Cmt. 2. The record contains clear and substantial evidence that YDD had knowledge that the sales at issue were destined for Canada.

### 1. The Record Evidence Demonstrates YDD's Knowledge That The Sales Were Destined For Canada.

Commerce itself explained that its knowledge test considers factors such as: (1) whether there are any papers of legal significance stating the destination of the merchandise; (2) whether there is any packaging or labeling stating that destination; (3) whether there are any unique

features of the merchandise that otherwise indicate the destination; and (4) whether the party made any admissions to Commerce that it knew the relevant shipments were destined for a particular market. *See* Remand Redetermination at 4. In this case, factors (2) and (3) do not apply. YDD does not contend that the packaging stated the ultimate destination of Canada,[1] and there were no features of the merchandise "unique" to the fact that it was destined for Canada. YDD has conclusively demonstrated, however, that factors (1) and (4) are met in this case.

First, regarding whether there are any papers of legal significance stating the destination of the merchandise, YDD made clear to Commerce from *its very first response* to Commerce's antidumping questionnaire that these sales were not sold in the U.S. market, and supported these statements with:

(1) the Distributor Agreement, which is the overarching contract between the parties, *see* Letter from Sydney Mintzer, Mayer Brown LLP, to U.S. Dep't Commerce, re: *YDD Corporation LLP – Section A Questionnaire Response* at 15-16, 20-21, Ex. A-1, and Ex. A-8 (Distributor Ag., art. 1.2) (Jul. 10, 2024), P.R. 78, C.R. 52-55 ("YDD Section A QR"); and

(2) Specification No. 17, an addendum to the Distributor Agreement which governs the sales at issue and includes key sales terms identifying Canada as the destination and the Canadian subsidiary of a global steel producer as the consignee.

In addition, for sample sales documents for shipments from YDD to the U.S. customer at issue ("Company A"),[2] YDD provided:

(3) The Purchase Order, which identifies Canada as the destination and names the same Canadian company as the consignee;

(4) The Packing List; and

(5) The Railway Bill

Both the Packing List and Railway Bill reference the Distributor Agreement and Specification

[1] *See* YDD Section A QR at 21, P.R. 78, C.R. 52 ("There is no difference in packing between products sold for export or domestic consumption.").

[2] Commerce refers to this U.S. customer as "Company A" in the Remand Redetermination. For the sake of consistency and clarity in the briefing, YDD follows this naming convention here.

No. 17, which contains the relevant sales terms (Canadian destination and consignee). *See* YDD Section A QR at Ex. A-8, P.R. 78, C.R. 54-55.

In its Remand Redetermination, Commerce first attempts to address: (1) the Distributor Agreement between YDD and the U.S. customer; (2) the packing list; (3) logistics/international freight documentation; (4) the commercial invoice; and (5) the goods declaration. *See* Remand Redetermination at 5-6, 26-28. These documents, Commerce states, "indicate a destination of the United States." *Id.* at 6. However, the fact that these documents reference the United States as a destination for YDD's shipments to Company A is not proof that YDD *did not know* that the merchandise was ultimately going to Canada. It is undisputed that the sales at issue *first* entered the United States before being reexported to Canada. Commerce again places undue (and unnecessary) emphasis on the fact that transaction documentation shows the sales were to a U.S. customer and delivered to a U.S. location. *See, e.g.*, Remand Redetermination at 3-4. Commerce's focus on that fact misses the point. YDD has not disputed that the merchandise *entered* the United States. *See, e.g.*, Pl. YDD's Br. in Supp. of its Mot. for J. on the Agency R., ECF No. 32 at 16 ("YDD Rule 56.2 Br."). Rather, YDD has repeatedly explained that the merchandise was *not sold in* the United States. YDD repeatedly used the word "transship" to describe these sales in its questionnaire responses. As such, it strains credulity to argue that documents identifying the United States as a destination are "materially contrary evidence." *See* Remand Redetermination at 27. Indeed, Commerce is basically taking the position that unless each and every transaction document on the record references Canada, it is not possible for the knowledge test to apply. That is not the law.

Commerce's brief review of these documents also misses the key fact that several *do* refer to Canada as the ultimate destination. As noted above, both the Packing List and

"logistics/international freight documentation" (*i.e.*, the Railway Bill) reference the Distributor Agreement and Specification No. 17, which contains the relevant sales terms (Canadian destination and consignee). *See* YDD Section A QR at Ex. A-8, P.R. 78, C.R. 54-55. The Packing List states, under the Buyer's reference, the contract number for the Distributor Agreement, together with its date of execution in 2021, and refers to "Appendix No. 17," together with its date of execution in 2023. *See id.* at Ex. A-8, P.R. 78, C.R. 54-55. These are clear references to the Distributor Agreement and Specification No. 17, which provided the sales terms for the sale related to the Packing List—including ultimate delivery to Canada. The Railway Bill also references the Distributor Agreement and Specification No. 17.[3] Therefore, Commerce's cursory conclusion that these documents indicate delivery only to the United States is patently unreasonable and not based on substantial evidence. *See* Remand Redetermination at 6.

When it takes up the Distributor Agreement—a 2021 contract between the parties—and Specification No. 17—an addendum to that contract agreed in 2023—Commerce also unreasonably and arbitrarily minimizes the legal and factual importance of that agreement, which is the overarching contract between the parties from which "Specifications" are made for specific transactions. *See* YDD Section A QR at Ex. A-8 (Distributor Ag., art. 1.2), P.R. 78, C.R. 54-55. Notably, Commerce concedes that Specification No. 17, which governs the sales at issue, is

---

[3] Commerce suggests that the contract number and date listed in the sender's statements section differ between the original Russian railway bill and the English translation. *See* Remand Redetermination at 31. YDD respectfully points the Court to Box 25 of the railway bill in both versions, which correctly states the contract number, referring to the original Distributor Agreement number and date, in 2021. *See* YDD Section A QR at Ex. A-8, P.R. 78, C.R. 54-55. Specification No. 17 was a 2023 addendum to the 2021 contract, and therefore references to Specification No. 17 also reference the 2021 contract. The date "19.01.2023" in Box 3 of the English translation appears to be nothing more than a typographical error, and Commerce, by resorting to its regulations on providing English translations, is attempting to attach a consequence that is "grossly disproportionate" to the "relatively minor" mistake that was made. *Cf. Artisan Mfg. Corp. v. United States*, 978 F. Supp. 2d 1334, 1347-49 (Ct. Int'l Trade 2014). This clerical error should not detract from the fact that Box 25 of the same document state the correct dates of the original 2021 contract and the 2023 addendum, Specification No. 17, and that the correct dates are clearly discernible from the original Russian language document.

"transaction-specific." Remand Redetermination at 28. Commerce nevertheless states that "{t}he distributor agreement identifies the destination as the 'United States,'" implying that the agreement was limited to U.S. sales. *See* Remand Redetermination at 6. That position is categorically false. Appendix No. 2 of the agreement specifies the sales territory subject to the agreement, which includes the United States and Canada, among other shipping destinations. *See* YDD Section A QR at Ex. A-8, P.R. 78, C.R. 54-55. Commerce acknowledges as much, but dismisses Appendix No. 2 as "not transaction-specific." Remand Redetermination at 28. Commerce's analysis of this contract and Specification No. 17 misses the forest for the trees. The reality is that all of the sales at issue were subject to the Distributor Agreement, and to Specification No. 17, which specified that the entire quantity shipped to fulfill the Purchase Order was committed to an ultimate customer in Canada, the named consignee. *See* YDD Section A QR at Ex. A-8, P.R. 78, C.R. 54-55. Importantly, the contract number (which identifies the Distributor Agreement) and Specification No. 17 were explicitly referenced in key transaction documents, including the Purchase Order, Packing List, and Railway Bill. *See id.*, P.R. 78, C.R. 54-55. Commerce provides no explanation why the terms of a legally binding distribution contract between the parties are, as a matter of law and fact, less significant than the fact that *some* (though not all) documents identify the United States as an interim delivery point.

Second, regarding whether the party made any admissions to Commerce that it knew the relevant shipments were destined for a market other than the United States, YDD made *explicit* and *repeated admissions* throughout its responses alerting Commerce to the fact that some sales in its U.S. sales database should be excluded from the dumping calculation because they were destined for another market. In its very first response to Commerce's antidumping questionnaire, YDD told Commerce that it knew at the time of sale that its shipments to

Company A were not U.S. sales, as the product was ultimately destined for Canada. *See* YDD Section A QR at 15-16, 20-21, Ex. A-1, and Ex. A-8, P.R. 78, C.R. 52-55. YDD even defined these sales destined for Canada as a separate channel of distribution. *Id.* at 15-16, P.R. 78, C.R. 52. YDD reaffirmed this fact repeatedly throughout the investigation, including in its response to Section C of Commerce's antidumping questionnaire and in its submissions of monthly Quantity and Value data. *See* Letter from Sydney Mintzer, Mayer Brown LLP, to U.S. Dep't Commerce, re: *YDD Corporation LLP – Section C Questionnaire Response* at C-16–C-17 (Jul. 31, 2024), P.R. 87, C.R. 85, 97 (clarifying that, although it reported these sales, they should not be included in the dumping margin calculation because "YDD had knowledge that the material was intended for the Canadian market"); Letter from Nikolay Mizulin, Mayer Brown LLP, to U.S. Dep't Commerce, re: *Monthly Quantity and Value Data* (Oct. 2, 2024), P.R. 141, C.R. 229 (noting that the reported quantity and value of shipments to the United States explicitly excluded "Redirected Sales to Canada").

YDD thus did everything it was required, and able, to do in the underlying investigation to explain and document its actual knowledge that the product sold to Company A was not destined for consumption in the United States. Commerce nonetheless disregarded those statements and the supporting documentation in the Remand Redetermination and again treated the sales to Company A as U.S. sales. It was that same failure to engage with this evidence that led the Court to remand the issue to the agency in the first place.

Commerce claims that it applied the knowledge test framework from *Tin Mill Products from the Netherlands* to assess whether YDD had knowledge that its sales to Company A were destined for Canada. Remand Redetermination at 5-6, 26-27. It further states that it weighed the contrary evidence the Court identified for Commerce to address—the purchase order, the

customer letter, and the movement schedule—together with the other transaction documents and YDD's questionnaire responses. *Id.* at 5. But, even based on the evidence not counting the identified "contrary evidence," the record contains sufficient information to reasonably conclude that YDD knew, or had reason to know, that its sales were destined for Canada. The fact that not every sale and shipment document referenced Canada is not "evidence" supporting Commerce's conclusion that the sales were therefore U.S. sales. Nor is the fact that certain shipping documents identify the United States as a destination, because no party disputes that the product was *first shipped* to the United States. Based on the record evidence, Commerce should have concluded that the sales at issue were not U.S. sales.

### 2. The Purchase Order, Customer Letter, Movement Schedule, and Other Evidence Must Be Read In Conjunction With The Distributor Agreement And Specification No. 17.

The purchase order, customer letter, and movement schedule—which Commerce characterizes as the "contrary evidence cited by YDD" that the Court instructed Commerce to consider on remand, *see* Remand Redetermination at 6—further demonstrate that YDD actually knew that the merchandise was destined for Canada, and that the merchandise in fact was reexported to Canada. In reviewing the purchase order, customer letter, and movement schedule, Commerce points to immaterial elements of each that it claims are inconsistencies. However, Commerce may not substitute mere "skepticism" for consideration of the evidence. *Jinfu Trading Co. v. United States*, 31 C.I.T. 996, 2007 WL 1974324 at **3 (Ct. Int'l Trade June 13, 2007) (remanding to Commerce, with instructions to reopen the record, where the court found that Commerce had not explained why certain documents, even if considered credible, nevertheless would not have supported the respondent's claims). The purchase order, customer letter, movement schedule, and other evidence must be read *in conjunction with* the Distributor Agreement and Specification No. 17.

As an initial matter, Commerce concedes that Specification No. 17 "supports YDD's position that it understood the merchandise would first be delivered to the United States and would ultimately be destined for Canada." Remand Redetermination at 28. Under Commerce's traditional knowledge test, nothing more is needed; the inquiry should end there. The knowledge test hinges on the respondent's *knowledge* of export destination. The documentation YDD provided—including a legally binding distribution contract signed during the POI—evinces YDD's good-faith knowledge that these sales were destined for Canada.

However, Commerce went on to misunderstand the record evidence and thereby misapply the knowledge test. Bizarrely, Commerce claims that the purchase order "only supports YDD's position to the extent that it identifies an anticipated Canadian consignee or final destination." Remand Redetermination at 6-7. The Canadian consignee is not a hypothetical. It is one of the sales terms specified in *both* the purchase order and Specification No. 17, which is a binding legal contract between YDD and its U.S. customer. *See* YDD Section A QR at Ex. A-8, P.R. 78, C.R. 54-55.

Commerce further assigned the purchase order "limited weight because it refers to facilitating shipment in 2024 and because its specific quantity does not correspond exactly to the disputed POI sales of Company A." Remand Redetermination at 29. Commerce goes on to state that "the terms for the shipment in Specification 17 are for the year 2024, after the POI." *Id*. at 30. But these are precisely the points that YDD's evidence was designed to clarify. First, Specification No. 17, a contractual obligation agreed and signed in 2023, sets out a mandatory *total* quantity to be delivered to the Canadian customer in calendar year 2024. *See* YDD Section A QR at Ex. A-8, P.R. 78, C.R. 54-55. As YDD accurately explained, the purchase order dated in 2023 sets out sales terms identical to the terms in Specification No. 17. Remand

Redetermination at 30. Second, as a consequence of Specification No. 17's commitment to the Canadian customer, YDD's shipments during the 2023 POI to the U.S. customer, which were stored in the U.S. customer's warehouse, were already committed to the Canadian customer to fulfill the 2024 quantity commitment.

The fact that the purchase order's "specific quantity does not correspond exactly to the disputed POI sales of Company A, which total to a smaller quantity of metric tons," as Commerce points out, supports *YDD's claim*, not Commerce's. *See* Remand Redetermination at 29. YDD has explained, from the beginning, that all sales to the U.S. customer at issue were reexported to Canada. The fact that those shipments to the customer's U.S. warehouse during the 2023 POI were *fewer* than the total quantity promised to the Canadian customer under Specification No. 17 supports YDD's contention that *all* of these shipments were reexported to fulfill the Canadian customer's order for a specified 2024 quantity. Indeed, as the movement schedule submitted by YDD shows, as of September 1, 2024, 89 percent of the U.S. customer's sales to its Canadian customer, including quantities shipped in 2023, had been shipped out of the warehouse to the Canadian customer. *See* Letter from Nikolay Mizulin, Mayer Brown LLP, to U.S. Dep't Commerce, re: *YDD Corporation LLP – Response to Supplemental Questionnaire* at Ex. S1-6.2 (Sep. 16, 2024), P.R. 123, C.R. 192 ("YDD First Supp. QR"). As described further below, YDD attempted to document during verification that additional reexports had been made, bringing the total quantity sold to the U.S. customer and reexported to Canada closer to 100 percent.

The movement schedule supplies the remaining "reconciliation" that Commerce alleges is missing from the record. *See* Remand Redetermination at 30. Commerce wraps up its "reconsideration" of this record evidence with the complaint that "the record does not provide a

complete transaction reconciliation between the contractual quantity of metric tons reported in Specification 17 and entire sales universe provided in YDD's U.S. sales database." *Id.* However, the movement schedule demonstrates that the U.S. customer had existing inventory in the U.S. warehouse, and was therefore able to make up the difference between the 2024 total quantity commitment and the smaller quantity of POI sales. *See* YDD First Supp. QR at Ex. S1-6.2, P.R. 123, C.R. 192. This also explains why the quantity in Specification No. 17 does not reconcile to the "entire sales universe provided in YDD's U.S. sales database." *See* Remand Redetermination at 30.

Moreover, YDD attempted to provide Commerce an updated movement schedule at verification, which would have shown that additional reexports had been made, providing the reconciliation that Commerce claims to have wanted—but which Commerce declined to accept. As YDD explained, although it (understandably) was not able to obtain precise shipment data from its customer, it instead provided—at Commerce's request—an inventory-in, inventory-out accounting of the merchandise sold to its U.S. customer and reexported from the customer's U.S. warehouse to Canada. YDD First Supp. QR at Ex. S1-6.2, P.R. 123, C.R. 192. The customer's signed letter attests to the quantities in the movement schedule. *Id.* at Ex. S1-6.1, P.R. 123, C.R. 192. This accounting was current as of Commerce's regulatory deadline for accepting new factual information. At verification, YDD's counsel attempted to provide an updated movement schedule showing that additional quantities in inventory at the U.S. customer's warehouse had been exported to Canada to fulfill the 2024 quantity commitment under Specification No. 17, but Commerce declined to accept this information corroborating its supplemental response. Letter from Nikolay Mizulin, Mayer Brown LLP, to U.S. Dep't of Commerce re: *YDD Corporation LLP – Minor Corrections* at Attachment (Nov. 14, 2024), P.R. 203, C.R. 360 ("Minor

Corrections"); *see also* Letter from Nikolay Mizulin, Mayer Brown LLP, to U.S. Dep't Commerce, re: *Sales and General Issues Case Brief* at 4 (Jan. 14, 2025), P.R. 238, C.R. 490. In other words, YDD reasonably attempted to document as best it could during the course of Commerce's investigation (which occurred in 2024), that 2023 sales stored in a U.S. warehouse were being reexported to the ultimate customer in Canada in accordance with Specification No. 17.

Thus, Commerce's eleventh-hour claim on remand that the evidentiary record supporting the reexport of these sales was insufficient is clearly disingenuous. Given Commerce's "broad authority to gather information," it "may not justify the absence of evidence by invoking procedural difficulties that were at least in part a creature of its own making." *Albemarle Corp. v. United States*, 821 F.3d 1345, 1358-59 (Fed. Cir. 2016). Indeed, this Court has previously found Commerce's determination to be "lacking substantial evidence" where a respondent attempted to provide clarifying information at verification and Commerce declined to accept it but later determined that the respondent's submissions on the issue were deficient. *See, e.g.*, *Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*, 308 F. Supp. 3d 1297, 1320 (Ct. Int'l Trade 2018). In *Eregli*, Commerce preliminarily determined not to grant a respondent a duty drawback adjustment on the basis that certain documents were illegible or insufficiently translated and "failed to establish a link between the imported inputs and the duties exempted upon export." *Id.* at 1315. The respondent "offer{ed} to provide better quality copies of certain documents" on the first day of verification, but Commerce declined the documents. *Id*. The court found Commerce's determination to be "based on its procedural missteps," and opined that "{r}emedying any deficiency in a questionnaire response typically will require submission of new information." *Id.* at 1320 (citing *China Kingdom Import & Export Co., Ltd. v. United*

*States*, 507 F. Supp. 2d 1337, 1356 (Ct. Int'l Trade 2007)). So too here: If there was, in fact, a deficiency in YDD's responses regarding its sales destined for Canada, Commerce should have made that deficiency clear. At the very least, it should have accepted YDD's clarifying information at verification that showed that additional quantities in the U.S. customer's warehouse were reexported to Canada—which appears to have been the key fact at issue with respect to these sales, in Commerce's view.

Rather than concluding that the record lacks evidence of YDD's knowledge of the destination of these sales, Commerce's Remand Redetermination makes clear that its reconsideration of these facts was not a reconsideration at all, but rather, a conclusory determination based on the assumption that YDD lied. Commerce states that one of "the primary reasons why" it finds the "purchase order" produced by YDD to be "unconvincing" is that it is "a self-serving document." Remand Redetermination at 8. Commerce further asserts that "we do not think {YDD's explanation that it could not obtain further evidence from its customer} is true." *Id.* Additionally, while Commerce concedes that "completed re-exportation is not a bright-line legal requirement or prerequisite under the knowledge test," it nevertheless asserts that "whether the sale is actually re-exported is important evidence of the genuineness of a respondent's claims it believed merchandise was ultimately destined for another market." *Id*. at 26.

Such conclusions are not supported by the record, do not rely on substantial evidence, and are entirely unreasonable. Commerce must actually consider the evidence, and may not "simply take the view that, because it was justified in suspecting the reliability of plaintiff's proffered evidence {}, it was entitled to view *all* evidence relating to {plaintiff's claims} with skepticism." *Jinfu*, 2007 WL 1974324 at **3 (emphasis added); *see also Since Hardware*

*(Guangzhou) Co. v. United States*, 35 C.I.T. 1670, 2011 WL 5926137 at **6-8 (Ct. Int'l Trade 2011). In *Jinfu* and *Since Hardware*, the court reprimanded Commerce for taking the same attitude toward the proffered evidence that it took in this case. As in *Jinfu*, Commerce did not explain in its Remand Redetermination why, "if proven to be genuine," the evidence would not demonstrate what YDD claims it demonstrates. *Jinfu*, 2007 WL 1974324 at **8. To the contrary, Commerce admitted that Specification No. 17 "supports YDD's position that it understood the merchandise would first be delivered to the United States and would ultimately be destined for Canada." Remand Redetermination at 28. YDD certified to the accuracy of all exhibits it submitted, in accordance with Commerce's procedures and regulations for the submission of documentation in antidumping investigations. *See* 19 C.F.R. § 351.303(g) (setting out requirement that each submission to Commerce containing factual information include language certifying, under penalty by law for providing false information to the U.S. Government, to the accuracy of the information submitted). Commerce did not offer an adequate explanation for why, if its reservations about the "genuineness" of YDD's evidence were allayed, the evidence would nevertheless demonstrate that the sales at issue were U.S. sales.

By the same token, Commerce cannot now claim, on remand, that a "reconciliation" between the Specification No. 17 quantity and YDD's entire sales universe was "pivotal" to the issue after turning away the very evidence that helped prove up that reconciliation. *See Jinfu*, 2007 WL 1974324 at **8 (finding that "Plaintiff rightly complains that it had no way of knowing that the lack of a reference date would be pivotal to its case" and instructing Commerce on remand to reopen the record). Such granular detail has not previously been required to pass the knowledge test, and Commerce does not even claim that such proof of reexport is a "bright-line legal requirement or prerequisite" now. Remand Redetermination at 26. Yet, YDD tried to

provide such proof of additional reexports and was rebuffed by Commerce, which apparently took the view that further verification of supplemental information *Commerce itself had requested* was untimely submitted. *See* Minor Corrections, P.R. 203, C.R. 360.

*Especially* on an issue where Commerce has not applied AFA due to the respondent's refusal to cooperate by withholding information or impeding the proceeding, *see* 19 U.S.C. § 1677e(a), Commerce's conclusion that the respondent has lied is wholly inappropriate. Indeed, as the court instructed in *Since Hardware*, "{a}lthough unverifiable information may be disregarded by Commerce, generally {Commerce} *must make an effort to verify information* before it can reasonably be deemed unverifiable." 2011 WL 5926137 at **7 (emphasis added); *id.* at **11 (permitting Commerce to reopen the record as necessary). Commerce did not make that effort here, and tries to save its determination on remand by assailing Plaintiff's own integrity.

**3. Commerce Attempts To Bootstrap Its AFA Finding With Respect To YDD's Affiliation With The Customer Into A Determination That These Sales Were Not Destined For Canada.**

Although Commerce insists that it "did not determine that YDD's destination response was unusable or deficient within the meaning of section 782(d) of the Act, and Commerce did not use facts available or an adverse inference to determine the destination of the Company A sales," Commerce in fact uses such language. Commerce now asserts that "necessary information" regarding the destination of these sales was "missing from the record." Remand Redetermination at 8. Moreover, Commerce states that YDD "should have provided all the documentation Commerce requested," and that "{i}ts failure to do so to the best of its ability resulted in necessary information missing from the record." *Id.*

In other words, Commerce is attempting to bootstrap its AFA finding with respect to YDD's affiliation with the customer for these sales into its erroneous determination that these

sales were U.S. sales. Commerce is using its AFA affiliation finding in its consideration of the sales destination, but insisting that it did not apply AFA as to the sales destination—and therefore is not bound to its statutory obligations regarding deficiencies in the record. *See* 19 U.S.C. § 1677m(d).[4]

Commerce correctly notes that it issued a supplemental questionnaire on this issue to YDD. Indeed, the letter from YDD's U.S. customer and the inventory movement schedule YDD submitted were in *direct response* to Commerce's requests for this documentation. In its first supplemental questionnaire, Commerce asked, "During the POI, what was the total quantity and value of subject merchandise stored in the warehouse { }? Additionally, include the total withdrawal from the warehouse to its Canadian customer location in {}, Canada." Letter from Genevieve Coen, Program Manager, to YDD Corporation LLP, re: *Supplemental Questionnaire* (Aug. 29, 2024), P.R. 109, C.R. 176 ("First Supp. Questionnaire"); *see* YDD First Supp. QR at 12, P.R. 123, C.R. 189. The letter from YDD's U.S. customer, at Exhibit S1-6.1 of that submission, and YDD's prepared inventory accounting, at Exhibit S1-6.2 of that submission, were designed to directly respond to Commerce's requests for information showing that these sales were indeed reexported to Canada. *Id.* at Exs. S1-6.1, S1-6.2, P.R. 123, C.R. 192. However, if Commerce ever found these documents deficient, it neither alerted YDD to that fact nor gave it an opportunity to cure the deficiency.

If documentation of reexport of specific entries to Canada was the key fact that Commerce now claims, on remand, to have relied upon in its redetermination, and Commerce found the record lacking the necessary information, Commerce should have reopened the record

---

4 If Commerce determines that a response to a request for information is deficient, Commerce "*shall* promptly inform the person submitting the response of the nature of the deficiency *and shall*, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations." 19 U.S.C. § 1677m(d) (emphasis added).

on remand to request this evidence. *See, e.g.*, *Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1398-99 (Ct. Int'l Trade 2021) (where Commerce found that respondent failed to submit sufficient information to prove a key fact for granting an entered value adjustment, as only one sample invoice was provided, court instructed Commerce, on remand, to either find in respondent's favor or give respondent an opportunity to submit the additional requested evidence). Commerce argues that *Canadian Solar* is distinguishable because "Commerce did not reject YDD's destination response as noncompliant or find that additional information was necessary to apply the knowledge test." Remand Redetermination at 35. Yet, Commerce relies on the contradictory argument that YDD did not provide information "to the best of its ability," Remand Redetermination at 8, while simultaneously claiming that "Commerce did not determine that YDD's destination response was unusable or deficient within the meaning of section 782(d)," *id.* at 34. Commerce cannot have it both ways.

Importantly, the court in *Canadian Solar* found that Commerce "creat{ed} an impression that Canadian Solar's submission was accepted as a response" by not providing the respondent with notice of any deficiencies until issuing its decision (in that case, the preliminary determination). 537 F. Supp. 3d at 1398. So too here: Commerce never gave YDD the impression that it disagreed with YDD's assessment that these sales were destined for Canada, and should therefore be excluded from the dumping calculation, until issuing its *Preliminary Determination*. *See Ferrosilicon From Kazakhstan: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 88007 (Dep't Commerce Nov. 6, 2024), P.R. 199 ("*Preliminary Determination*"), and accompanying Preliminary Decision Memorandum (Dep't Commerce Oct. 31, 2024), P.R. 184

("Prelim. Decision Memo"). But Commerce cannot wait to notify a respondent of a deficiency in its responses until "it is too late to correct." *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022). As in *Canadian Solar*, the Court should find here that "Commerce {} should have requested supplemental information pursuant to 19 U.S.C. § 1677m(d) if it found the information that {respondent} submitted deficient to resolve" the issue. 537 F. Supp. 3d at 1398. The proper solution in such circumstances is to reopen the record on remand. *Id.*

Put simply, Commerce's Remand Redetermination attempts to paper over the fact that it misapplied its own knowledge test—and does so again on remand. From its very first submission (the YDD Section A QR), YDD admitted to Commerce that it knew the relevant shipments were destined for Canada. *See* Remand Redetermination at 4; YDD Section A QR at 15-16, P.R. 78, C.R. 52. Then, YDD provided additional documentation in response to Commerce's request for information showing "the total withdrawal from the warehouse to its Canadian customer location in {}, Canada." YDD First Supp. QR at 12, P.R. 123, C.R. 189. Commerce now claims that this was not enough, and that YDD should have submitted "(1) Canadian entry documentation, (2) U.S. export documentation, (3) release records, (4) downstream invoices, (5) a bill of lading, or (6) transportation records from the U.S. to Canada." Remand Redetermination at 9. No such documentation is required under Commerce's knowledge test. If it were, Commerce should have made that clear in its requests for information and cannot now "justify the absence of evidence by invoking procedural difficulties that were at least in part a creature of its own making." *Albemarle Corp.*, 821 F.3d at 1358-59.

**4. Conclusion**

Accordingly, the Court should remand this issue to Commerce a second time, with instructions to apply its knowledge test consistent with the language of that test and its consistent

prior applications of that test, *i.e.,* to consider Article 1.2 of the Distributor Agreement, *see* YDD Section A QR at Ex. A-8, P.R. 78, C.R. 54-55, explain its consideration of that document in conjunction with the purchase order on the record at YDD Section A QR at Ex. A-8, P.R. 78, C.R. 54-55, and, if necessary, reopen the record to allow YDD to place information on the record pertaining to whether the entries at issue were in fact shipped to Canada.

### B. Commerce's Continued Application Of Partial AFA To YDD On Remand, And Its Calculation Of That Partial AFA Rate, Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law

In its Remand Redetermination, Commerce claims to have "reconsider{ed} the AFA issue" but its findings on remand are essentially a carbon copy of the *Final Determination*. *See* Remand Redetermination at 10-12. Commerce's finding of affiliation continues to be based on information filed shortly before the *Preliminary Determination* by CC Metals and Alloys, LLC ("CCMA") and Ferroglobe USA, Inc. ("Ferroglobe") (collectively, "Petitioners"), and it is abundantly clear that Commerce has continued to avoid taking into account the information YDD placed on the record to rebut Petitioners' information and has not actually weighed that evidence in reaching its "redetermination" on this issue. Moreover, Commerce has once again incorrectly applied the legal test for a finding of affiliation, which requires one party to have "actual capacity or ability to exercise control" over the other. *TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286, 1296-97 (Ct. Int'l Trade 2005) (internal quotation marks and citation omitted). Because Commerce has misapplied the law in making its affiliation determination, and has failed to "take into account whatever in the record fairly detracts" from the weight of the evidence that supports its conclusion, Commerce's Remand Redetermination is not supported by substantial evidence and is otherwise unlawful. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951).

In reiterating its affiliation determination, Commerce first takes issue with the fact that YDD did not report as an affiliate the U.S. customer to which it sold merchandise that it knew was going to be reexported to Canada. Remand Redetermination at 11. YDD consistently maintained, from its very first submission to Commerce, that the sales at issue were reexported to Canada. *See* YDD Section A QR at 15-16, P.R. 78, C.R. 52. Therefore, from YDD's perspective, these sales were outside the universe of U.S. sales and were merely reported out of an abundance of caution. The idea that YDD was on notice of an obligation to report further information regarding the customer for these sales reads the facts of this case backwards, starting from the assumed conclusion that these sales were U.S. sales to begin with.

Commerce further claims that it "tried to solicit and request information regarding the deficiencies in YDD's responses through the issuance of supplemental questionnaires." Remand Redetermination at 38-39 (citing First Supp. Questionnaire at 9-11, P.R. 109, C.R. 176). However, the questions on the pages of the supplemental questionnaire cited by Commerce requested information on YDD's home market database, including inland freight expenses and undefined variables, and general questions about YDD's U.S. sales database, including product codes, discrepancies in field names, pay terms, insurance expenses, indirect selling expenses, and inventory carrying costs—but nothing that could fairly be characterized as requesting further information about YDD's reported affiliated companies. *See* First Supp. Questionnaire at 9-11, P.R. 109, C.R. 176.

In similar circumstances in Commerce's companion countervailing duty investigation,[5] which another respondent appealed, the court recently remanded Commerce's finding of

---

[5] *See Ferrosilicon from the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 14108 (Dep't Commerce Mar. *28, 2025); see also Ferrosilicon from Kazakhstan: Amended Final Countervailing Duty Determination; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Countervailing* Duty Orders, 90 Fed. Reg. 21,446 (Dep't of Commerce, May 20, 2025).

affiliation due to its failure to satisfy its obligation to notify the respondent of a deficiency and provide an opportunity to cure under 19 U.S.C. § 1677m(d). *TNC Kazchrome JSC v. United States*, No. 25-00128, 2026 WL 2668862, at *1-3 (Ct. Int'l Trade Sept. 10, 2026). There, Commerce discovered an affiliation at verification after the respondent had stated in its questionnaire response that it believed it was not required to report its parent companies' financial information because they were not domiciled or otherwise located in the subject country, Kazakhstan. *Id.* at *2. The court determined that Commerce should have corrected the respondent's "misunderstanding." *Id.*

Similarly, here, YDD had no apparent obligation to disclose an affiliation with a customer where sales to that customer were destined for a third country market. Yet, when Petitioners placed on the record information alleging an affiliation a mere seven days before the *Preliminary Determination*, YDD timely filed additional factual information to rebut that allegation. *See* Letter from Adam H. Gordon, The Bristol Group PLLC, to U.S. Dep't Commerce, re: *Pre-Preliminary Comments on YDD's 3rd Supplemental Questionnaire Response* (Oct. 24, 2024), P.R. 176, C.R. 325; Letter from Nikolay Mizulin, Mayer Brown LLP, to U.S. Dep't Commerce, re: *YDD Corporation LLP – Response to Petitioners' October 24, 2024 Pre-Preliminary Comments* (Oct. 30, 2024), P.R. 181, C.R. 328-329 ("YDD Pre-Preliminary Rebuttal"). Nevertheless, given the timing so close to the *Preliminary Determination*, Commerce asserted that it was "unable to consider this information for the preliminary determination." Prelim. Decision Memo at 6, P.R. 184. However, Commerce also appears not to have considered that information in the *Final Determination*, either. Commerce's final affiliation determination amounted to a single paragraph that shows no sign Commerce even considered YDD's timely submitted information rebutting Petitioners' affiliation claim. *See*

Issues and Decision Memorandum accompanying the *Final Determination* at 31-32 (Dep't Commerce Mar. 21, 2025) (footnotes omitted). Indeed, Commerce's explanation admitted that its affiliation determination relied exclusively on what it considered in its *Preliminary Determination*—in other words, the information YDD submitted on this issue has not previously been considered by Commerce at all. *Id.* at 31-32, P.R. 272.

Based on the Remand Redetermination's glancing reference to YDD's submission, it is clear that Commerce *still has not considered* the information YDD placed on the record in response to Petitioners' pre-preliminary comments. Indeed, Commerce admits as much, stating that "the timing of the disclosure deprived Commerce of the opportunity to examine the relationship, issue timely supplemental questions, and obtain information necessary." Remand Redetermination at 12. For that reason alone, Commerce's affiliation determination on remand is unsupported by substantial evidence. *See Universal Camera Corp.*, 340 U.S. at 488 (holding that an agency must "take into account whatever in the record fairly detracts" from the weight of the evidence that supports its conclusion).

But Commerce is wrong, on multiple counts, that "the timing of the disclosure deprived Commerce of the opportunity to examine the relationship" at issue. First, YDD's submission containing new factual information was timely submitted. It is uncontested that YDD's October 30, 2024 response to Petitioners' October 24, 2024 pre-preliminary comments was timely submitted pursuant to Commerce's regulations governing the submission of factual information. *See* YDD Pre-Preliminary Rebuttal, P.R. 181, C.R. 328-329; 19 C.F.R. § 351.301(c)(1)(v). Second, this Court has repeatedly made clear that a respondent's filings with Commerce are what "trigger Commerce's obligation to notify" the respondent of deficiencies in its filings and provide an opportunity to cure. *TNC Kazchrome*, 2026 WL 2668862, at *2. Thus, if a

supplemental questionnaire was warranted in response to YDD's October 30, 2024 submission, Commerce was required to issue one. *See, e.g.*, *id.* at *1 n.2 ("{T}he statutory entitlement to notice and opportunity to remedy any deficiency is unqualified.") (quoting *Hitachi Energy*, 34 F.4th at 1384). Third, Commerce may not "justify the absence of evidence by invoking procedural difficulties that were at least in part a creature of its own making." *Albemarle Corp.*, 821 F.3d at 1358-59. Commerce's own regulations permitted YDD's submission of factual information at the time YDD submitted it. It is prejudicial—and nonsensical—to allow the submission with one hand and deny it consideration with the other. Moreover, using its regulatory authority, Commerce fully extended the deadline by which to issue the *Final Determination*, giving itself *additional time* in which to consider YDD's October 30, 2024 submission. *Preliminary Determination* at 88009, P.R. 199 ("Commerce is postponing the final determination…"). On remand, Commerce certainly had the ability and opportunity to examine the information YDD placed on the record and to request supplemental information if it was necessary to do so. Commerce cannot reasonably continue to hang its hat on the inapposite claim that "the timing of the disclosure" was too close to the *Preliminary Determination*—which, for all intents and purposes, was *two determinations ago*. Commerce has had two additional chances to get this right but has, instead, passed the buck a third time.

Commerce's claim that "YDD had many opportunities to place the requisite affiliation information on the record"—citing the same pages from the same supplemental questionnaire discussed above—does not absolve Commerce of its statutory obligation when the supplemental questionnaires it issued "mention{ed} nothing about any error and fail{ed} to use language that would alert the respondent to a deficiency in a prior response." *TNC Kazchrome*, 2026 WL

2668862, at *2 (quoting *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1326 (Ct. Int'l Trade 2021)) (citation modified).

Indeed, YDD identified sales to this customer as a separate channel of distribution that were not, in fact, U.S. sales but "were intended to be transshipped to the Canadian market." YDD Section A QR at 15-16, P.R. 78, C.R. 52. Therefore, the issue of affiliation with respect to these sales was irrelevant because they should not have been considered in the dumping calculation at all. YDD reported these sales out of an abundance of caution, to avoid any perception that these sales might be "discovered" later in Commerce's investigation and misconstrued as unreported U.S. sales. *See, e.g.*, *id.* at 15-16, P.R. 78, C.R. 52; YDD First Supp. QR at 12, P.R. 123, C.R. 189. It was reasonable for YDD to have concluded, based on Commerce's supplemental questionnaires, that Commerce had accepted its reporting of these sales as non-U.S. sales.

Even setting aside these procedural concerns with Commerce's finding of affiliation on remand, Commerce's conclusion is not supported by substantial evidence and not in accordance with law because it does not follow the legal test for affiliation. A finding of affiliation requires finding that one party has "actual capacity or ability to exercise control" over the other. *TIJID, Inc.*, 366 F. Supp. 2d at 1296-97. Commerce is "precluded from finding control" where the relationship does not have "the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." *Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298, 1304 (Ct. Int'l Trade 2015) (quoting 19 C.F.R. § 351.102(b)(3)); *see also TIJID, Inc.*, 366 F. Supp. 2d at 1296–97.

Had Commerce reasonably considered YDD's October 30, 2024 submission, it should have come to the conclusion that the legal test for affiliation is not met here. The individual at

issue, the CEO of YDD's U.S. customer, was selected for an administrative role at a company ("Company B") affiliated with (but having no direct or indirect control over) YDD, because he is a Swiss resident, and a formality of Swiss corporate law requires that a Swiss resident have authority to sign documents on behalf of a limited liability partnership established in Switzerland. YDD Pre-Preliminary Rebuttal at 3, P.R. 181, C.R. 328. Company B is a Swiss entity domiciled in Switzerland. *See id.* at Ex. 1, P.R. 181, C.R. 328. The individual was a director in name only, appointed to sign paperwork on behalf of the entity as a Swiss resident and to file it with Swiss authorities.

Mere formalities do not pass the legal test for affiliation. As the court instructed in *TIJID, Inc.*, where there was evidence that one company's CEO was on the boards of two allegedly affiliated companies, *and was authorized to sign financial statements and certifications for and on behalf of those companies*, there is no control where the individual's "involvement in the direction of the {companies} {is} minor." 366 F. Supp. 2d at 1294. Board membership alone does not demonstrate a "relationship that ha{s} the potential to impact decisions relating to the subject merchandise." *Id.* Here, too, the individual's nominal role at a company affiliated with (but having no direct or indirect control over) YDD cannot be considered to render the U.S. customer thereby affiliated with YDD. There is no evidence on the record—even taking into account Petitioners' October 24, 2024 submission—that supports a finding that the individual's role at Company B granted that individual "the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." *Zhaoqing*, 70 F. Supp. 3d at 1304.

Accordingly, because Commerce (1) declined to consider factual information timely submitted by YDD regarding the alleged affiliation; (2) neither adequately notified YDD of any

deficiencies in its responses regarding the alleged affiliation nor provided YDD an opportunity to cure those deficiencies; and (3) still has not found, under the established legal test for affiliation, that a "relationship that has the potential to impact decisions relating to the subject merchandise" existed, Commerce's affiliation finding continues to be unsupported by substantial evidence and an abuse of discretion. Should the Court disagree with YDD that the sales at issue were not U.S. sales, the Court should nevertheless remand Commerce's affiliation determination and calculation of the dumping margin applied to these sales in accordance with the arguments made herein.

### C. Commerce's Continued Use Of Zeroing And Calculation Of The Partial AFA Rate On Remand Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law

As explained above, Commerce should have concluded, under a proper application of its knowledge test, that YDD's sales to Company A were not sales to the United States, and therefore the issue of Commerce's effective zeroing on these sales is moot. Nevertheless, because Commerce addressed the issue in its Remand Redetermination, YDD responds to that redetermination below.

In its Remand Redetermination, Commerce made no change to the calculation of YDD's dumping margin and continues to insist that it did not use zeroing. Specifically, Commerce claims that it weighted the partial AFA sales differently from YDD's other sales in the dumping calculation "because the absolute amount of negative comparison results exceeds the total amount of positive comparison results for the non-AFA U.S. sales." Remand Redetermination at 40. Therefore, Commerce asserts, its "weighting of the AFA sales prevents the excess negative comparison results from being used as offsets for dumping found for other partial AFA U.S. sales." *Id.*

Commerce's methodology of weighting the partial AFA sales differently from the rest of

YDD's sales is clearly an impermissible "results-driven" approach designed to produce a particular outcome. *Cf. Jiangsu Senmao Bamboo and Wood Industry Co. v. United States*, 762 F. Supp. 3d 1275, 1278 (Ct. Int'l Trade 2025). Commerce's Remand Redetermination cites no prior proceeding, and no case law before this Court, to support its use of this methodology in this case. The one case Commerce cites for the proposition that "zeroing the negative A-A margin was a reasonable exercise of its delegated authority," *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1350-51 (Fed. Cir. 2017), was an appeal of Commerce's final results in an *eighth administrative review*. However, as YDD explained in its initial Rule 56.2 brief before this Court, Commerce has a long-standing policy of not zeroing in *investigations* in which it applies the A-to-A method even though it contends that it may, in certain circumstances, use zeroing in administrative reviews. *See* YDD Rule 56.2 Br. at 33-35 (citing *Antidumping Proceedings: Calculation of the Weighted–Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77722 (Dep't Commerce Dec. 27, 2006) ("*Final Modification*")). As YDD explained, Commerce's policy is the result of a notice-and-comment rulemaking. YDD Rule 56.2 Br. at 35 (citing *Final Modification*, 71 Fed. Reg. 77722). This agency rule has been upheld by the Federal Circuit and remains undisturbed in Commerce's normal practice. *Id.*

Instead, here, Commerce created two margins: one for non-AFA sales and one for the partial AFA sales. For the sales to which partial AFA was not applied, Commerce used the A-to-A method and fully applied offsets for non-dumped sales. Remand Redetermination at 15. Separately, Commerce applied partial AFA to other U.S. sales and calculated an amount of dumping for this defined group of U.S. sales. *Id*. Then, "{t}o calculate YDD's overall estimated weighted-average dumping margin, Commerce combined the amount of dumping found for each

comparison method, *i.e.*: (1) the A-A method and (2) the application of partial AFA, and divided that total by the total net value of YDD's U.S. sales." *Id*.

Commerce claims that it "utilized the A-A method for both the partial AFA sales and the non-AFA sales, independently, and weight averaged the subsequent estimated dumping margin." *Id*. at 42. However, that is not what was done in this case. If Commerce had applied the A-to-A method to all sales, including offsetting positive-margin sales with negative-margin sales for <u>*all*</u> of YDD's sales, the calculation should have been as follows:

| METHOD | SALE TYPE | TOTVAL* (A) | TOTAL AMOUNT OF DUMPING** (B) | CASH DEPOSIT RATES*** C = (B /A) | CASH DEPOSIT RATES (Partial AFA)**** D = SUM(B) / SUM(A) |
|---|---|---|---|---|---|
| Average-to-Average | [ ] | $ [ ] | $ [ ] | [ ] | -10.90% |
| | [ ] | $ [ ] | $ [ ] | [ ] | |
| Total | | $ [ ] | $ [ ] | | |

Commerce itself explains that it <u>did not use</u> "the negative comparison results for non-dumped sales under the A-A method to offset the dumping calculated for U.S. sales where partial AFA has been applied." Remand Redetermination at 16; *see also id.* at 40-43 ("Commerce aggregated the two margins, but used the zero cash-deposit, rather than allowing the negative cash-deposit rate to offset the positive partial-AFA margin."). Thus, Commerce improperly applied zeroing in an investigation when using the A-to-A method, as follows:

| METHOD | SALE TYPE | TOTVAL* (A) | TOTAL AMOUNT OF DUMPING** (B) | CASH DEPOSIT RATES*** C = (B /A) | CASH DEPOSIT RATES (Partial AFA)**** D = SUM(B) / SUM(A) |
|---|---|---|---|---|---|
| Average-to-Average | [ ] | $ [ ] | $ - | 0.00% | 6.01% |
| | [ ] | $ [ ] | $ [ ] | [ ] | |
| **Total** | | **$ [ ]** | **$ [ ]** | | |

*See* Memorandum from Mira Warrier, Int'l Trade Compliance Analyst, AD/CVD Operations, Office II, to The File, re: *Final Analysis Memorandum for YDD Corporation LLP; Asia FerroAlloys LLP; and KazSilicon Metallurgical Combine LLP* at Attachment IV (Mar. 21, 2025), C.R. 506. *See also* Memorandum from Mira Warrier, Int'l Trade Compliance Analyst, AD/CVD Operations, Office II, to The File, re: *Business Proprietary Information Accompanying the Final Results of Redetermination for Ferrosilicon from Kazakhstan* (Sep. 4, 2026), Remand C.R. 5.

According to Commerce, "the program correctly printed a 'zero' as the result for the total amount of dumping for those sales using the A-to-A methodology. . . . The reported zero therefore reflects the result after offsets were applied {to the non-AFA sales}, rather than the exclusion of negative comparison results." Remand Redetermination at 15. In other words, Commerce improperly applied offsets to one set of sales but not the other. By Commerce's own explanation, it followed a different methodology for the two sets of sales.

Commerce itself compares what it did here to what it did in *Apex Frozen Foods*, namely, using the A-to-A method for the non-AFA sales and the A-to-T method for the partial AFA

sales. *Id*. at 16. Commerce attempts to suggest that it did not engage in zeroing even as it cites a case for the proposition that it may be justified in "zeroing the negative A-A margin." *Id.* at 41 (citing *Apex Frozen Foods*, 862 F.3d at 1350-51) (emphasis added).

In "weighting" the partial AFA sales, Commerce zeroed the non-AFA sales. Calling it by a different name[6] does not change the result—and, indeed, this appears to be exactly Commerce's intent. Commerce's approach *resulted* in zeroing the non-AFA sales so that the partial AFA sales would produce a margin, punishing YDD for what Commerce determined was YDD's failure to disclose an affiliation. Even setting aside the fact that "the primary purpose of the AFA statute is not to punish companies, but rather to calculate accurate rates," *Bio-Lab, Inc. v. United St*ates, 435 F. Supp. 3d 1361, 1374 (Ct. Int'l Trade 2020), YDD did not fail to cooperate to the best of its ability in disclosing an affiliated relationship as Commerce maintains, as explained above. In any event, the affiliation affected only those sales that were destined for Canada and should have been removed from the dumping calculation anyway.

Pursuant to Commerce's long-standing policy of not zeroing in investigations in which it applies the A-to-A method, *see Final Modification*, Commerce must properly apply the A-to-A method for *all* U.S. sales, including the partial AFA sales, and offset positive-margin sales with negative-margin sales. Partial AFA is not a separate alternative comparison method such as the A-to-T method, yet Commerce has treated it as such in calculating YDD's final weighted-average dumping margin. *See* Remand Redetermination at 42-43. This is not merely an unusual application of Commerce's calculation methodologies, but a direct contradiction of Commerce's stated policy in antidumping investigations.

---

[6] *Cf. An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States,* 236 F. Supp. 3d 1352, 1360 (Ct. Int'l Trade 2017) ("The court cannot assess the reasonableness of {Commerce's methodology} when Commerce justifies that methodology by claiming it is something other than what it actually is.").

Accordingly, should the Court disagree with YDD that the sales at issue were not U.S. sales, the Court should nevertheless remand Commerce's calculation of the dumping margin on these sales with instructions that it recalculate that margin in accordance with Commerce's A-to-A method and its policy of not zeroing in investigations in which it applies the A-to-A method.

## II. CONCLUSION

For the foregoing reasons, YDD respectfully requests that this Court hold that Commerce's Remand Redetermination is not supported by substantial evidence and otherwise not in accordance with law, remand Commerce's Results of Redetermination to Commerce for reconsideration consistent with the opinion of this Court, and order such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Matthew McConkey
Matthew McConkey
Ryan R. Migeed
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3235
mmcconkey@mayerbrown.com
*Counsel to YDD Corporation LLP*

Dated: October 6, 2026

**CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURES 2(B)(1)**

The undersigned hereby certifies that these comments contain 9,500 words, exclusive of the corporate disclosure statement, table of contents, table of authorities, glossary of case-specific acronyms and abbreviations, and certificates of counsel, and therefore complies with the maximum 10,000 word count limitation applicable to comments filed pursuant to Rule 56.2(h)(2) as set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

/s/ Matthew McConkey
Matthew McConkey
Mayer Brown LLP
(202) 263-3235
mmcconkey@mayerbrown.com
*Counsel to YDD Corporation LLP*